Federal Communications Commission                FCC 02-229

Before the
**Federal Communications Commission**
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Year 2000 Biennial Regulatory Review – | ) |
| Amendment of Part 22 of the Commission's Rules | ) |
| to Modify or Eliminate Outdated Rules Affecting | ) |
| the Cellular Radiotelephone Service and other | ) |
| Commercial Mobile Radio Services | ) |

WT Docket No. 01-108

**REPORT AND ORDER**

**Adopted:** August 8, 2002          **Released:** September 24, 2002

**By the Commission:** Commissioner Copps approving in part, dissenting in part, and issuing a separate statement; Commissioner Martin approving in part, concurring in part, and issuing a separate statement

## TABLE OF CONTENTS

Paragraph

I.    **INTRODUCTION**.........................................................................................1

II.    **BACKGROUND**.........................................................................................2

III.   **DISCUSSION**............................................................................................4
    A.   Section 11 of the Communications Act...............................................4
    B.   Analog Cellular Compatibility Standard...............................................5
        1.   Overview..................................................................5
        2.   Indefinite Retention of the Analog Requirement is Not Warranted. ..........9
        3.   Sunset of the Analog Requirement. ........................................22
            a.   911-only phones and non-subscribed emergency phones. ..........23
            b.   Accessibility issues................................................26
    C.   Electronic Serial Number Rule.........................................34
    D.   Channelization Requirements...........................................40
    E.   Modulation Requirements and In-Band Emissions Limitations. ..............43
    F.   Vertical Wave Polarization Requirement...............................47
    G.   Assignment of System Identification Numbers. ........................52
    H.   Determination of Cellular Geographic Service Area.....................57
    I.   Service Commencement and Construction Periods.......................61
    J.   Incidental Services Rule. .............................................64
    K.   Cellular Anti-Trafficking Rules........................................70
    L.   Other Rule Changes Recommended by Commenters. .....................75
        1.   Overhaul of the Unserved Area Licensing Rules. .......................76
        2.   CGSA Expansion Notifications.........................................83

Federal Communications Commission                    FCC 02-229

3.      Contract Extension Clarification.................................................85
4.      Symmetry for Cellular and PCS Renewal Rules........................87
5.      Maximum Base Station Transmit Power..................................88

IV.     ADMINISTRATIVE MATTERS........................................................90
A.      Final Regulatory Flexibility Act Analysis...............................90
B.      Paperwork Reduction Act Analysis.........................................91

V.      ORDERING CLAUSES ....................................................................92

**Appendix A: Rule Changes**
**Appendix B: Final Regulatory Flexibility Act Analysis**
**Appendix C: List of Commenters**

I.      INTRODUCTION

1.      As part of our year 2000 Biennial Review of regulations, we amend Part 22 of our rules by modifying or eliminating various rules that have become outdated due to technological change, increased competition in the Commercial Mobile Radio Services (CMRS), or supervening rules.  We undertake this review as directed by section 11 of the Communications Act of 1934, as amended (Act).[1] Section 11 of the Act mandates that we review all of our regulations relating to providers of telecommunications service and "determine whether any such regulation is no longer necessary in the public interest as the result of meaningful economic competition between providers of such service."  In the event that we determine that a rule is "no longer necessary in the public interest" as the result of meaningful economic competition, section 11 provides that we "shall repeal or modify" the subject regulation.  Accordingly, in this *Report and Order*, we:

- ■      Modify sections 22.901 and 22.933 of our rules to eliminate, after a five-year transition period, the requirement that carriers provide analog service compatible with Advanced Mobile Phone Service (AMPS) specifications.

- ■      Remove the manufacturing requirements found in section 22.919 governing electronic serial numbers (ESNs) in cellular telephones.

- ■      Eliminate cellular channelization provisions of section 22.905.

- ■      Remove the requirement in section 22.915 that cellular systems have the capability to provide service using the modulation types specified in the Office of Engineering and Technology Bulletin No. 53 (OET 53), and modify language in section 22.917 regarding the out-of-band emission limit.

- ■      Eliminate the requirement in section 22.367 of our rules requiring that electromagnetic waves radiated by transmitters be vertically polarized.

- ■      Eliminate the procedures and rules set forth in section 22.941 by which the Commission administers cellular system identification numbers (SIDs).

---

[1] *See* 47 U.S.C. § 161.

2

Federal Communications Commission                    FCC 02-229

- ■ Clarify the language in section 22.911(b) regarding the term "SAB" (service area boundary) in situations in which a carrier employs alternative methods to determine the cellular geographic service area (CGSA)[2] of its system.

- ■ Resolve issues relating to the incidental services rule, cellular anti-trafficking, as well as other Part 22 issues raised by commenters.

## II.    BACKGROUND

2.      In January 2001, pursuant to the statutory mandate under section 11 of the Act requiring us to review our rules, Commission staff completed an evaluation of regulations affecting telecommunications service providers, and issued a report regarding recommendations made as a result of that review.[3]  In its review, the staff recommended that we reexamine the cellular rules and determine whether any of the rules are no longer necessary as a result of the technological advances and growth in competition that have occurred in mobile telephony since the rules were first promulgated.  In the *Biennial Review Report*, we accepted the staff's recommendation to initiate a rulemaking to review the Part 22 cellular rules[4] to consider which rules are obsolete because of competitive or technological developments.  We also followed the recommendation to review rules regulating other Part 22 services on the same basis.[5]  Accordingly, in May 2001, we issued a *Notice of Proposed Rulemaking* (*NPRM*) seeking to identify and address outdated rule sections of Part 22.[6]

3.      In the *NPRM*, we noted that our rules governing the cellular service have changed little since we first initiated the service in the early 1980s.[7]  Although the Commission re-evaluated certain of its Part 22 rules in 1994 in the *Part 22 Rewrite*,[8] many of the Commission's general technical rules remain unchanged since the cellular service was established.  The wireless environment, however, has changed significantly in the interim.  As we observed in the *NPRM*, technological advances have allowed cellular carriers to increase the capacity of their systems, and to provide advanced services to their customers in the form of enhanced service quality and advanced calling features.  Moreover, the mobile telephony industry has become much more competitive with the entry of CMRS providers using technologies other than analog cellular into the market.  Many of our cellular rules, however, do not reflect these developments, and continue to be more applicable to the earlier forms of cellular than the more advanced digital services available today.  Accordingly, we concluded in the *NPRM* that it is appropriate to re-examine our original cellular rules to determine whether certain rules should be eliminated or modified.

---

[2] A CGSA is the geographic area served by a cellular system.

[3] *See* Biennial Regulatory Review, CC Docket No. 00-175, *Report*, 16 FCC Rcd 1207 (2001) (*Biennial Review Report*); Biennial Regulatory Review 2000 Updated Staff Report (rel. Jan. 17, 2001) (*Biennial Review Staff Report*).

[4] 47 C.F.R. §§ 22.900 *et seq.*

[5] *See Biennial Review Staff Report* at para. 104.

[6] Year 2000 Biennial Regulatory Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting the Cellular Radiotelephone Service and other Commercial Mobile Radio Services, *Notice of Proposed Rulemaking*, 16 FCC Rcd 11169 (2001) (*NPRM*).

[7] *NPRM* at para. 7.

[8] In the Matter of Revision of Part 22 of the Commission's Rules Governing the Public Mobile Services, CC Docket No. 92-115, *Report and Order*, 9 FCC Rcd 6513 (1994) (*Part 22 Rewrite*).

Federal Communications Commission                    FCC 02-229

## III.    DISCUSSION

### A.    Section 11 of the Communications Act.

4.      In 1996, Congress anticipated that the development of competition would lead market forces to reduce the need for regulation and amended the Communications Act of 1934 to permit and encourage competition in various communications markets.[9] Section 11 of the 1996 Act requires us to review biennially all of our regulations "that apply to the operations or activities of any provider of telecommunications service" and to "determine whether any such regulation is no longer necessary in the public interest as a result of meaningful economic competition between providers of such service."[10] In the past, we have looked to the plain meaning of the text for guidance in exercising our obligation pursuant to section 11.[11] We have stated that "the language places an obligation on the Commission to 'determine' if the regulation in question 'is no longer necessary in the public interest as the result of meaningful economic competition.'"[12] Further, section 11 explicitly provides that "the Commission shall repeal or modify" any regulation that it determines is no longer necessary in the public interest as a result of meaningful economic competition.[13] We note that section 11 places the burden on the Commission to make the requisite determinations; no particular burden is placed on the opponents or proponents of a given rule.[14] We have previously interpreted the language of section 11 as directing us to examine why a rule originally was "necessary" and whether it continues to be necessary.[15] We have found that in making the determination whether a rule remains "necessary" in the public interest once meaningful economic competition exists, the Commission must consider whether the concerns that led to the rule or the rule's original purposes may be achieved without the rule or with a modified rule.[16]

---

[9] *See* Telecommunications Act of 1996, Pub. Law No. 104-104, 110 Stat. 56 (1996) ("1996 Act"), introductory statement (the 1996 Act was intended "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."); Joint Managers' Statement, S. Conf. Rep. No. 104-230, 104th Cong., 2d Sess. 113 (1996) at 1 (stating that the 1996 Act would establish a "pro-competitive, deregulatory national policy framework").

[10] *See* 47 U.S.C. § 161. Section 11 states:

BIENNIAL REVIEW OF REGULATIONS. – In every even-numbered year (beginning with 1998), the Commission -- (1) shall review all regulations issued under this Act in effect at the time of the review that apply to the operations or activities of any provider of telecommunications service; and (2) shall determine whether any such regulation is no longer necessary in the public interest as the result of meaningful economic competition between providers of such service.

(b) EFFECT OF DETERMINATION. – The Commission shall repeal or modify any regulation it determines to be no longer necessary in the public interest.

[11] *See* In the Matter Of 2000 Biennial Regulatory Review Spectrum Aggregation Limits for Commercial Mobile Radio Services, WT Docket No. 01-14, *Report and Order*, 16 FCC Rcd 22628, para. 25 (2001) (*Spectrum Cap Order*).

[12] *Id.* (quoting 47 U.S.C. § 161(a)(2)).

[13] 47 U.S.C. § 161(b).

[14] *See Spectrum Cap Order* at 22678-79, para. 25.

[15] *Id.* at 22679, para. 25.

[16] *Id.* We note that, in the context of section 202(h) of the Communications Act, the U.S. Court of Appeals for the D.C. Circuit found that we are not limited to the original purpose of a rule when determining whether or not it remains necessary. *See Fox Television Stations, Inc. v. FCC et al.*, 280 F.3d 1027 (D.C. Cir. 2002) ("Nothing in §

Federal Communications Commission                    FCC 02-229

**B.      Analog Cellular Compatibility Standard.**

**1.      Overview.**

5.          In establishing the Cellular Radiotelephone Service in the early 1980s, the Commission found that a single technology -- analog -- should be mandated to accomplish two goals: 1) to enable subscribers of one cellular system to be able to use their existing terminal equipment (*i.e.* mobile handset) in a cellular market in a different part of the country (roaming); and 2) to facilitate competition by eliminating the need for cellular consumers to acquire different handset equipment in order to switch between the two competing carriers within the consumers' home market (thus ensuring reasonable consumer costs.).  To facilitate these goals, all carriers were required to provide service exclusively in accordance with the then-existing compatibility standard for analog systems, known as Advanced Mobile Phone Service (AMPS). The detailed technical standards for AMPS were set out in the Office of Engineering and Technology Bulletin No. 53 (OET 53) in April 1981.  The OET 53 specifications established technical operational parameters and descriptions of call processing algorithms and protocols to be used by analog cellular systems.[17]  Pursuant to section 22.901, a carrier must provide service to any subscriber within the carrier's CGSA, including both the carrier's subscribers and roaming customers that are using technically compatible equipment.[18]  Section 22.901(d) specifically requires that carriers make mobile services available to subscribers whose mobile equipment conforms to the AMPS compatibility standard.[19]  Our cellular rules, in effect, continue to obligate carriers to provide analog service consistent with the standard identified two decades ago in OET 53.

6.          Given the rapid growth of the mobile telephony industry, we sought comment in the *NPRM* on whether to modify or eliminate the rules governing the provision of analog service by cellular carriers.[20]  We inquired whether the analog service compatibility requirement remains necessary to facilitate competition or to ensure the availability of service to all cellular consumers. We also requested comment on whether market forces now provide a sufficient incentive for cellular providers to utilize compatible and/or interoperable technologies to ensure nationwide operating capability.[21]  We were particularly interested in whether eliminating the rule requiring carriers to operate their analog facilities consistent with the AMPS compatibility standard would have any impact on the continued provision of service to existing analog consumers.[22]  Although there are a variety of mobile telephone technologies and services now available to consumers, we noted that there may be some consumers who lack access to alternatives to analog services.[23]  We indicated that we are particularly concerned with the potential

---

202(h) suggests the grounds upon which the Commission may conclude that a rule is necessary in the public interest are limited to the grounds upon which it adopted the rule in the first place.").

[17] *See* An Inquiry into the Use of the Bands 825-845 MHz  and 870 MHz and 870-890 MHz for Cellular Communications Systems; Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems, CC Docket No. 79-318, *Report and Order*, 86 FCC 2d 469, 1508 at paras. 92-93.

[18] 47 C.F.R. § 22.901; *See* Interconnection and Resale Obligations Pertaining to Commercial Mobile Services, CC Docket No. 94-54, *Second Report and Order and Third Notice of Proposed Rulemaking*, 11 FCC Rcd 9462, 9469-9470, para. 11 (1996); Interconnection and Resale Obligations Pertaining to Commercial Mobile Services, CC Docket No. 94-54, *Third Report And Order and Memorandum Opinion and Order on Reconsideration*, 15 FCC Rcd 15975, para. 21 (2000).

[19] 47 C.F.R. § 22.901(d).

[20] *NPRM* at para. 23.

[21] *Id.* at para. 24.

[22] *Id.* at para. 26.

[23] *Id.*

effects on those with hearing disabilities,[24] and emphasized that we would not take any action that would undermine service to these individuals.[25]

7.    Certain commenters assert that, due to the growth of the mobile telephony services market and increased competitiveness, the analog standard has served its original purposes and is no longer necessary.[26]  They further argue that compliance with the rule imposes significant costs and creates inefficiency.[27]  These commenters agree with our suggestion in the *NPRM* that the current market no longer requires us to be involved in regulating technical standards.[28]  Other commenters, however, argue that until digital systems are built out more extensively, an analog requirement is still needed to facilitate roaming.[29]  Further, certain commenters contend that there are analog-only consumers that will be unduly affected by the immediate removal of the analog requirement.[30]

8.    After reviewing the record, we conclude that in light of the present competitive state of mobile telephony, the nationwide coverage achieved by cellular carriers, and the clear market demand for nationwide, ubiquitous coverage by carriers, the analog requirement has substantially achieved its purpose of ensuring that the public has access to low-cost, compatible equipment and to nationwide roaming.  Not only do we determine that the rule is no longer necessary to achieve its purposes, we conclude that it imposes costs and impedes spectral efficiency.  The development of the mobile telephony industry further leads us to find that these objectives can largely be accomplished by market forces without the need for regulation.  We therefore conclude that the analog requirement should be removed.  However, eliminating the rule immediately without a reasonable transition period would be extremely disruptive to certain consumers, particularly those with hearing disabilities as well as emergency-only consumers, who currently continue to rely on the availability of analog service and lack digital alternatives.  Accordingly, we modify our rules requiring application of the analog compatibility standard to include a sunset period of five years, during which time we anticipate that problems regarding access will likely be resolved.  In order to enable us to monitor the adequacy of access to mobile telephony by those currently reliant on analog service, certain CMRS carriers[31] will be required to file reports prior to the sunset, describing the extent to which hearing aid-compatible digital devices are available to and usable by consumers with hearing disabilities, and the progress made in informing their customers of the impact of the 5-year sunset

---

[24] *Id.* at para. 27.

[25] *Id.* at para. 30.

[26] AT&T Wireless Comments at 2-3; Cingular Comments at 3; CTIA Comments at 8-10; Ericsson Comments at 2-3.

[27] AARP Comments at 1; AT&T Wireless Comments at 3; CNH Comments at 4; Cingular Comments at 3-5; Sprint Comments at 2; U.S. Cellular Comments at 3; Verizon Comments at 10; Cingular Reply Comments at 2, 6-7.

[28] CTIA Comments at 9.

[29] *See e.g.* Bristol Bay Cellular Comments at 3; Qwest Comments at 2-3; Sprint Comments at 2-4; Verizon Comments at 3-4.

[30] *See e.g.* ATX Technologies Comments at 13-16; Bristol Bay Comments at 3; Qwest Comments at 2-3; Sprint Comments at 2-4.

[31] In the United States, there are six mobile telephony operators that analysts typically describe as nationwide: AT&T Wireless, Sprint, Verizon, VoiceStream Wireless Corporation, Cingular, and Nextel Communications, Inc. Three of these carriers, AT&T Wireless, Verizon, and Cingular, operate analog facilities.  When an operator is described as being "nationwide," it does not necessarily mean that the operator's license areas, service areas, or pricing plans cover the entire land area of the United States.  The six mobile telephony carriers that analyst reports typically describe as nationwide all offer service in at least some portion of the western, midwestern, and eastern United States.  In addition, based on FCC internal analysis, the six national operators, including affiliates and partnerships, have licenses covering between 230 and 285 million people, while the next largest provider of mobile telephony service has licenses covering fewer than 60 million people.

date on 911-only phones and analog-only phones, as well as the availability of digital replacements for donated analog phones.

### 2.    Indefinite Retention of the Analog Requirement is not Warranted.

9.    *Background.* When the rules for cellular service were initially established, the Commission's goals for the cellular service included the creation of a nationwide, technologically compatible service.[32] The Commission sought to give mobile telephony subscribers the ability to roam --- that is, to use their existing mobile handsets in a different cellular system in a different part of the country.[33] The Commission set out detailed technical requirements and specifications regarding analog cellular service in order to be consistent with this goal of nationwide, compatible cellular service.[34] Moreover, the Commission was concerned about the competitive implication of the cellular duopoly it had created through the issuance of two licenses per market, and used these compatibility standards as a means to foster competition by ensuring reasonable costs to subscribers in the event they wished to change carriers. Compatibility of technology promoted competition and ensured lower prices and convenience for consumers by eliminating the need to acquire additional handsets in order to roam or switch between the two competing carriers in their home market area. In the *NPRM*, we observed that use of the analog compatibility standard may have been helpful in facilitating competition in the initial stages of the cellular service, but that, in light of the present competitive market for mobile telephony services, it may not be necessary to maintain this rule in order to facilitate competition or to ensure nationwide roaming.[35]

10.    *Discussion.* As described more fully below, a number of factors leads us to conclude that the public interest does not support an indefinite retention of the analog requirement. We find that it is not necessary to retain the analog requirement in order to ensure competition. Indeed, we conclude that continuing to require carriers to operate consistent with the AMPS standard may hinder competition by causing spectral inefficiencies and increased costs to those carriers who would prefer to concentrate on digital technology. Additionally, the robust mobile telephony market leads us to conclude that the analog requirement is no longer necessary to ensure reasonable costs, as well as the continued availability of roaming to the vast majority of consumers. Removal of the requirement is consistent with our desire to move toward a less regulatory approach, as well as a congressional directive to treat similarly-situated CMRS in a like manner. We are unpersuaded by arguments made by certain service providers that we must continue to impose a twenty-year old technical standard on cellular carriers as a whole in order to prevent possible disruptions to their operations.

11.    *The analog requirement is no longer needed to foster competition.* As noted, one of the underlying rationales behind the analog requirement was to provide consumers with a choice between service providers within a market. The Commission sought to ensure that there was competition, albeit

---

[32] *See* An Inquiry Relative to the Future Use of the Frequency Band 806-960 MHz; and Amendment of Parts 2, 18, 21, 73, 74, 89, 91, and 93 of the Rules Relative to Operations in the Land Mobile Service Between 806 and 960 MHz, Docket No. 18262, *Second Report and Order*, 46 FCC 2d 752, 801, Appendix C, III(f) (1974); *Memorandum Opinion and Order*, 51 FCC 2d 945, 1009, Appendix F, IV(f) (1975); *see also* An Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems, 78 FCC 2d 984, 1002, paras. 52-63 (1980).

[33] *Id.*

[34] In The Matter Of An Inquiry Relative to the Future Use of the Frequency Band 806-960 MHz; Amendment Of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems, CC Docket No. 79-318, *Notice of Inquiry and Notice of Proposed Rulemaking*, 78 FCC 2d (1980).

[35] *NPRM* at para. 23.

limited, within any given market by compelling carriers to operate consistent with AMPS specifications as well as requiring that carriers serve all subscribers using AMPS-compatible handsets. The mobile telephony industry, however, has changed immensely in the two decades since the establishment of the cellular service. The market for mobile telephony service now includes the Personal Communications Services (PCS) and the Specialized Mobile Radio (SMR) service in addition to cellular. As noted in our *Seventh CMRS Competition Report,* 268 million people, or 94 percent of the total U.S. population, currently reside in areas in which three or more different operators (cellular, broadband PCS, and/or digital SMR providers) offer mobile telephony service in the counties in which they live.[36] Over 229 million people, or 80 percent of the U.S. population, live in counties with five or more mobile telephony operators offering service,[37] while 151 million people, or 53 percent of the population live in counties with at least six different mobile telephony operators.[38] Accordingly, we find that the analog requirement is no longer necessary to ensure that consumers have a choice of more than one wireless service provider.

12.    Indeed, rather than encouraging competition, we conclude that, in many instances, the analog requirement harms competition by imposing unnecessary operating costs and impeding the spectral efficiency of the two cellular providers in the market. First, the analog requirement places a financial burden on cellular licensees who would prefer to use their spectrum and other resources on digital technology rather than setting aside a portion to support their analog facilities. Cellular licensees that deploy digital technologies must also maintain a minimum scale analog network. These cellular licensees incur operation and maintenance costs for two mobile telephony networks in order to comply with Commission rules.[39] Also, by maintaining two networks, operation and maintenance costs associated with the digital network may be higher because the carrier is not able to optimize the system as efficiently as it would if there was only one network. Second, we also agree with commenters who argue that imposition of the analog requirement impedes spectral efficiency. Digital technologies are more efficient than analog, use less bandwidth,[40] and give consumers access to advanced services not feasible with analog.[41] The analog requirement prevents cellular licensees from choosing to efficiently utilize their spectrum by installing an all-digital network and potentially providing additional advanced services.[42] Further, the analog requirement may result in certain carriers being capacity constrained in certain geographic markets depending on the amount of spectrum dedicated to AMPS, usage by AMPS customers, type of digital technology, and how intensively their digital customers utilize their services.[43]

---

[36] In the Matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993 Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, *Seventh Report;* Appendix C, Table 4, at C-5 (2002) (*Seventh CMRS Competition Report*) (2002).

[37] *Id.*

[38] *Id.*

[39] These costs include stocking sufficient spare parts, training technicians and the maintenance of extra facilities to transport traffic throughout the network. *See* AT&T Wireless January 30, 2002 *Ex Parte* Presentation at 2.

[40] AT&T Wireless Comments at 3; Cingular Comments at 3; and U.S. Cellular Comments at 3; CNH Comments at 4; AARP Comments at 1.

[41] AT&T Wireless Comments at 3; Cingular Comments at 3-5; Cingular Reply Comments at 2, 6-7; Sprint Comments at 2; Verizon Comments at 10 and U.S. Cellular Comments at 3.

[42] Cingular Comments at 3.

[43] Cingular estimates that freeing up analog channels to convert to digital technologies would yield a 25 percent capacity gain. Cingular Comments at 5. Cingular estimates that cellular carriers are required to dedicate approximately 16 percent of their spectrum to provide minimum analog service. Sprint PCS Comments at 5, citing Declaration of Richard J. Lynch on behalf of Verizon Wireless, WT Docket No. 01-14 at 6, paras.18-19 (May 14, 2001). Sprint cites to estimates submitted in our *Spectrum Cap* proceeding that the minimum amount of spectrum a cellular carrier needs to dedicate to the provision of analog service is 5 MHz. Therefore, according to this estimate,

Federal Communications Commission                FCC 02-229

Thus, to the extent that a cellular carrier incurs costs to operate an analog network that it would not maintain but for the analog requirement, we conclude that the rule imposes unnecessary financial burdens and hinders spectral efficiency. These factors in turn impede the ability of the cellular carrier to compete vis-à-vis other mobile telephony providers who are not subject to the requirement.

13.    *Access to reasonably priced equipment is not dependent on the continued imposition of the analog requirement.* It is no longer the case that the analog requirement is needed to ensure reasonably priced equipment and, as a result, increased competition. Because early cellular mobile equipment was expensive, the Commission concluded that it was cost-prohibitive for consumers to switch providers in the event the two carriers in the market utilized different technical standards.[44] The Commission found that consumers would be discouraged from switching cellular providers if they had to purchase additional equipment in order to be served by the second carrier. The Commission found that mandating a specific technology would enable consumers to choose between carriers without regard to cost of equipment, thereby encouraging competition between the carriers. Today, however, mobile handsets are much less expensive.[45] As noted in the *NPRM*, the declining cost of such equipment as well as the frequent carrier subsidy of the cost of the telephones have diminished the handset disincentives for consumers switching between providers (whether cellular or other CMRS). Consumers are now able to easily choose from a panoply of carriers and technologies. Given the wide variety of equipment and service offerings available to consumers today, we conclude it is not necessary to continue to mandate the analog requirement for this purpose.

14.    *Roaming is not dependent on the analog requirement.* We continue to consider the existence of a nationwide, compatible service to be a major goal for the cellular service. However, given the current competitive state of mobile telephony, we conclude that consumers will continue to have the ability to roam outside of their home markets even in the absence of the analog requirement. We disagree with commenters who assert that small and regional carriers that primarily serve Rural Service Areas (RSAs), and their subscribers will be unduly harmed by the elimination of the analog service requirement.[46] In the years since the cellular service was established, many CMRS providers using digital technology, particularly broadband PCS and SMR services, have developed and established a strong market presence. When the rules for market-based PCS and SMR services were established, the Commission declined to impose technological compatibility rules, and allowed carriers the flexibility to implement air interface technologies of their own choosing.[47] In the absence of a Commission-mandated

---

a mobile telephony provider with a 25 MHz cellular license may need to dedicate at least 1/5 of its licensed spectrum to provide analog service. Verizon, however, asserts that eliminating the analog service requirement will not result in significant capacity gains because spectrum dedicated to analog service is small especially in high-density markets, and is expected to continue to decline over the next two to three years. Verizon Comments at 10-12. Verizon estimates that on average analog usage in former Bell Atlantic markets represents only about 12 percent of its minutes of use (MOU) in these areas. In high-density areas this falls to six percent. Verizon expects analog MOU to fall to approximately 1 to 2 percent in the next two to three years.

[44] *See NPRM* at para. 7, n. 9.

[45] For example, in the early 1980s, a car phone sold for approximately $5,000 and cellular phones could cost $3,000. Currently, mobile handsets may be purchased for less than $100, and often for substantially lower prices in situations where a subscriber signs a service agreement with a carrier for one or more years.

[46] ATX Technologies Reply Comments at 5, 8; Bristol Bay Comments at 2-3, 6-7; Mid-Missouri Cellular et al. Comments at 4, 6-10; Secure Alert Comments at 3; Verizon Comments at 7; WCA Comments at 4; CNH Reply Comments at 3; Mid-Missouri Cellular et al. Reply Comments at 5-6; RCA Comments at 5-8; RTG Comments at 3-6; NE Colorado Reply Comments at 2; Century Tel Comments at 4.

[47] Today, digital mobile telephony carriers deploy one or more of four digital technologies: Time Division Multiple Access (TDMA), Code Division Multiple Access (CDMA), Global System Mobile Communications (GSM) and integrated Digital Enhanced Network (iDEN). In 1988, the Commission noted that, while the AMPS compatibility

Federal Communications Commission                    FCC 02-229

standard for PCS and SMR, carriers have nonetheless established systems providing seamless nationwide service in response to customer demand. Service providers have been successful in establishing nationwide systems, even though they employ different air interface technologies, by acquiring licenses in as many markets as possible, establishing roaming agreements with other carriers who have implemented the same digital technology, and providing multimode[48] handsets that allow customers to roam using analog cellular service where interoperable digital service is not available. This year, many of the larger carriers are implementing next generation (or 2.5G) voice and data services on their networks, partnering with other carriers to expand digital services to rural markets, and investigating multimode handsets capable of roaming across digital platforms.[49]

15.     We do not agree that application of the analog compatibility standard must be retained indefinitely in order to prevent possible disruption to the operations of small and regional carriers. We are not persuaded by arguments that elimination of the analog requirement will force small and regional carriers to convert to digital earlier than they would otherwise in order to ensure seamless service to their customers and other consumers,[50] or that such a transition will be cost-prohibitive for such service

---

standard was successful in encouraging compatibility among systems, it also impeded the implementation of newer, more-advanced technology. Accordingly, the Commission permitted cellular carriers to utilize digital technology in addition to analog. In declining to specify a digital standard, the Commission stated that "[i]ndustry is in a better position to evaluate the technical advantages and disadvantages of the various advanced cellular technologies and develop approaches to compatibility." *See* In the Matter of Amendment of Parts 2 and 22 of the Commission's Rules to Permit Liberalization of Technology and Auxiliary Service Offerings in the Domestic Public Cellular Radio Telecommunications Service, GEN Docket No. 87-390, *Report and Order*, 3 FCC Rcd 7033 at paras. 51-52 (1988). In the same vein, when it set out technical rules for PCS and other CMRS, the Commission declined to set out a digital compatibility standard, seeking instead to provide licensees flexibility in developing their systems. *See* In the Matter of Amendment of the Commission's Rules to Establish New Personal Communications Services, GEN Docket No. 90-314, *Second Report and Order*, 8 FCC Rcd 7700 at para. 137 (1993). *See also* In the Matter of Implementation of Sections 3(N) and 332 of the Communications Act -- Regulatory Treatment of Mobile Services, GN Docket No. 93-252; Amendment of Part 90 of the Commission's Rules to Facilitate Future Development of SMR Systems in the 800 MHz Frequency Band, PR Docket No. 93-144; Amendment of Parts 2 and 90 of the Commission's Rules to Provide For the Use of 200 Channels Outside the Designated Filing Areas in the 896-901 MHz and 935-940 MHz Band Allotted to the Specialized Mobile Radio Pool, PR Docket No. 89-553, *Third Report and Order*, 9 FCC Rcd 7988 at paras. 165-168 (1994).

[48] Multimode handsets operate in digital mode where such service is available and in analog mode otherwise.

[49] GSM/ANSI-136 Interoperability Team (GAIT) handsets allow seamless operation between GSM and TDMA networks in a single handset. Sony Ericsson, Nokia and Siemens have developed GAIT-compliant handsets. *See, e.g.*, "Sony Ericsson unveils the T62u, a GAIT-phone with Java for the Americas," *Press Release* (Mar. 5, 2002). They are scheduled to be available sometime in 2002.

[50] Bristol Bay Comments at 6-7; RCA Comments at 5-7; RTG Comments at 3-6. Verizon states that consumers in markets with analog-only networks would need to replace their handsets or may not have access to roaming services. *See* Verizon Comments at 7. Commenters argue that even if subscribers could afford to switch handsets, the various digital technologies are not interoperable and handsets currently on the market do not have the ability to switch between two different digital protocols; therefore, analog networks remain necessary to ensure nationwide, ubiquitous roaming services. Century Tel Comments at 4; Mid-Missouri Cellular et al. Comments at 9. For example dual mode/single band phones can switch between analog and a single digital technology within one frequency band (*i.e.* 800 MHz CDMA and analog) and tri-mode/dual band phones can switch between analog and a single digital technology using an additional frequency band (*i.e.* 800 MHz and 1900 MHz CDMA and 800 MHz analog). Commenters argue that it may be possible that carriers in adjacent RSAs will not be deploying the same digital technology. This situation may arise in many RSAs since there are four digital technologies used in the United States, and the choice of roaming partners may be limited to the two cellular licensees. *Spectrum Cap Order* at para. 89. In that case, these parties argue if the analog service requirement is eliminated and both cellular licensees in one market discontinue providing analog service, then some mobile telephony subscribers in

Federal Communications Commission                    FCC 02-229

providers or their customers. The choice to switch from analog to digital technology, as well as the rate at which the transition occurs, are business decisions made by the individual carrier. Such determinations, as well as any decisions regarding roaming, are today being market driven. As one commenter observes, a carrier's choice of digital technology is a business decision and any roaming problems that arise are a result of business decisions.[51] Other carriers should not continue to be competitively disadvantaged because of these choices.[52] Absent other factors arguing against the immediate removal of the analog requirement,[53] we agree that market forces --- and not government regulation --- should determine whether and when analog service should be discontinued.[54] We note that if hearing-aid compatible devices are not available, or market conditions change, we will not eliminate the rule at the conclusion of the five-year period.

16.     Indeed, we conclude that market forces are already at work with respect to small and regional carriers. After reviewing current and future market trends in mobile telephony, we find that many small and regional carriers are or will be shifting their systems towards digital technology. We expect that construction by PCS licensees in rural areas will continue to increase, thereby providing digital services to customers in rural areas. With the introduction of digital services by PCS providers, cellular licensees are likely to find it competitively necessary to install or expand their digital network, regardless of whether or not the analog requirement is retained. Moreover, we expect that the increasing presence of multimode handsets will minimize the necessity for small and regional carriers to completely switch to a digital system. We need not keep in place a twenty year-old technical standard to ensure roaming, as we are confident that demand from consumers for ubiquitous access generally will provide sufficient incentive to cellular carriers to resolve problems relating to roaming and interoperability. Accordingly, we conclude that roaming and interoperability concerns held by small and regional carriers are not a sufficient basis to require the continued application of the analog requirement.

17.     We do note that the five-year sunset period we are establishing for other reasons should mitigate the concerns of small or regional carriers, such as the disruptions to operations that an immediate elimination of the analog requirement might cause. For example, a transition period permits carriers to evaluate their current and future technology choices as well as those of their current roaming partners. Carriers will have the opportunity to negotiate new contracts where needed to ensure the availability of roaming services to their customers. Also, the elimination of the cellular analog requirement will increase the demand for the development and commercial implementation of multimode/multiband handsets, a process that is already occurring.[55] By the end of the transition period, these handsets should be widely

---

geographically proximate markets will no longer be able to roam. RCA Comments at 8; Mid-Missouri Cellular *et al.* Comments at 9-10.

[51] Cingular Reply Comments at 4.

[52] *Id.* Factors influencing the decision to convert to a digital technology include increasing digital coverage to more areas of the country and changing consumer preferences for regional and nationwide interoperability. *See Id.* at 5. Also, the availability of multimode handsets affects a carrier's decision in converting from analog to digital technology. *See* Cingular Reply Comments at 5 and Verizon Comments at 7.

[53] *See infra* paras. 22-31.

[54] *See* AT&T Wireless Comments at 4; Cingular Comments at 2-3, 6; Cingular Reply Comments at 1-2; Ericsson Comments at 5.

[55] See Roaming Between CDMA and GSM Networks Moves One Step Closer to Reality, WIRELESS INSIDER (Oct. 8, 2001) and Peggy Albright, A Vodafone-Verizon 3G Solution Coming?, WIRELESS WEEK (Jan. 7, 2002) at 4.

[56] Telematics can be generally defined as the use of location technology and wireless communications to enhance the functionality of motor vehicles, and to provide wireless data applications in vehicles. Telematics services provide a number of automotive and mobile applications, including safety and productivity services. Among the

available and customers may choose to migrate to these new handsets depending on their roaming needs. Further, the transition period provides additional time for PCS licensees in both RSAs and Metropolitan Statistical Areas (MSAs) to further build out their licensed service areas in order to enhance opportunities for roaming for all consumers. Therefore, we believe that consumers, in both RSAs and MSAs, will continue to roam nationwide after a five-year transition period.

18.     *The possible impact on telematics providers does not justify retention of the analog requirement.* We are unpersuaded by arguments made by telematics providers that the analog compatibility standard should continue to be mandated because analog service is necessary for their service offerings.[56] In the *NPRM*, we sought comment on how our proposed changes would affect telematics systems such as OnStar.[57] In response, telematics providers argue that the elimination of the rule will significantly impair their ability to provide service because these systems require analog technology due to its ubiquitous coverage,[58] and that there is currently no other widely-deployed technology available to adequately support telematics services.[59] While digital service providers are continuing to expand their service area footprint, commenters argue that there are still large gaps in coverage, and note that the various digital standards are not interoperable.[60] Commenters argue that digital systems cannot yet transmit both voice and data on the same call, a feature that commenters argue is important for telematics providers.[61] Commenters assert that the interoperability problem is particularly difficult for telematics devices because manufacturers must choose a technology that is embedded in a vehicle that will have a useful life of ten or more years.[62] Telematics providers contend that, unlike the typical cellular subscriber who can readily switch to digital handsets if necessary, the development cycle (the length of time necessary to design, test, and install equipment in vehicles) and hardware basis of telematics-equipped vehicles prevents users of such services from quickly and easily

---

applications are automatic crash notification systems that have the capability to automatically call the appropriate emergency dispatch for help.  ATX Technologies Comments at 3; CNH Comments at 1-2; OnStar Comments at 1-2; MBUSA Reply Comments at 3; NAEMSP January 1, 2002 *Ex parte* at 1; Deere Reply Comments at 3.

[57] *NPRM* at para. 29.

[58] ATX Technologies Comments at 13; CNH Comments at 3-4; Deere Comments at 5; OnStar Comments at 5-8; Secure Alert Comments at 3; ATX Technologies Reply Comments at 6-7; CNH Reply Comments at 4; Deere Reply Comments at 2-3; MBUSA Reply Comments at 5-6; OnStar Reply Comments at 4; Honda June 24, 2002 *Ex Parte* Presentation at 2; NAEMSP January 1, 2002 *Ex parte* at 2; Toyota July 26, 2002 *Ex Parte* Presentation at 2.

[59] ATX Technologies Comments at 16; Deere Comments at 5, 7; Secure Alert Comments at 3; Deere Reply Comments at 2; MBUSA Reply Comments at 5; OnStar Reply Comments at 2; Toyota July 26, 2002 *Ex Parte* Presentation at 2.

[60] *See e.g.* CNH Comments at 3-4; Deere Comments at 7-8; OnStar Comments at 8; Secure Alert Comments at 3; ATX Technologies Reply Comments at 9-13; Deere Reply Comments at 2-3; MBUSA Reply Comments at 5-6.

[61] ATX Technologies Reply Comments at 12; Audi May 3, 2002 *Ex Parte* Presentation at 2; Honda June 24, 2002 *Ex Parte* Presentation at 2; Onstar July 26, 2002 *Ex Parte* Presentation at 1; Toyota July 26, 2002 *Ex Parte* Presentation at 2. We note, however, telematics service providers have begun the development work to enable their devices to operate on a digital system and we anticipate those efforts will continue.  At least one telematics provider anticipates digital deployment as early as model year 2005. MBUSA April 18, 2002 *Ex Parte* Presentation at 2-3.

[62] Deere Comments at 9; CNH Reply Comments at 4; Deere Reply Comments at 3; MBUSA Reply Comments at 6; Toyota July 26, 2002 *Ex Parte* Presentation at 2.

migrating to a new technology.[63] One commenter states that this is particularly the case for telematics devices deployed in automobiles.[64] Because the devices are designed for maximum crash survivability, the devices are embedded in a location in the vehicle that makes replacing the devices time-consuming, difficult and costly.[65] Commenters argue that, in evaluating this issue, we should take into account the useful life of the vehicle, the vehicle development cycle, as well as investments made by owners of vehicles with embedded telematics systems.[66]

19.    We conclude that arguments advanced by telematics providers do not constitute sufficient basis to warrant the indefinite imposition of an outdated technical standard. Each of the factors identified by telematics providers --- e.g. development cycles of vehicles, choice of hardware and technology platforms[67] --- are considerations within the control of the individual provider or the original equipment manufacturer with whom it partners. We are not persuaded that the public interest requires us to accommodate the voluntary business decisions of telematics providers to offer services that require wide-area wireless coverage, and to deploy such services using analog technology.

20.    However, as in the case of regional carriers, we find that the sunset period we are establishing for other reasons should also mitigate any significant impacts that might affect telematics providers. During the transition period, we anticipate that telematics providers will be able to partner with cellular, PCS, and SMR carriers in order to secure service on the carriers' digital networks. Based on the record, we conclude that within the next five years, the telematics industry will make great strides towards developing multimode devices that will provide interoperability and facilitate roaming on digital networks.[68] Moreover, the majority of commenters concede that a reasonable transition period would ease any concerns regarding the elimination of the analog requirement.

21.    *Modification of the rule is supported by section 332 of the Communications Act.* Another factor supporting the modification of the analog requirement to include a five-year sunset is section 332 of the Act, which directs the Commission to regulate CMRS providers to technical and operational rules comparable to those that apply to providers of substantially similar common carrier services.[69] Section 332 requires that differences between rules governing competing services should be conformed if we determine that the differences distort competition by placing unequal regulatory burdens on different

---

[63] Deere Comments at 6; CNH Reply Comments at 4-5; Deere Reply Comments at 3.

[64] MBUSA Reply Comments at 6.

[65] MBUSA Reply Comments at 8.

[66] OnStar Comments at 6; EDS Reply Comments at 3, Honda June 24, 2002 *Ex Parte* Presentation at 3; Toyota July 26, 2002 *Ex Parte* Presentation at 2.

[67] As noted in the text above, telematics providers claim that the development cycle and hardware basis of telematics-equipped vehicles prevents users of such services from quickly and easily migrating to a new technology. Deere Comments at 6; CNH Reply Comments at 4-5; Deere Reply Comments at 3.

[68] *See* Verizon Reply Comments at 5; MBUSA March 12, 2002 *Ex Parte* Presentation.

[69] In the Matter of Implementation of Sections 3(N) And 332 of the Communications Act Regulatory Treatment of Mobile Services, GN Docket No. 93-252, *Second Report and Order*, 9 FCC Rcd 1411, para. 13 (1994); In the Matter of Implementation of Sections 3(N) And 332 of the Communications Act -- Regulatory Treatment of Mobile Services, GN Docket No. 93-252 -- Amendment of Part 90 of the Commission's Rules to Facilitate Future Development of SMR Systems in the 800 MHz Frequency Band PR Docket No. 93-144 -- Amendment of Parts 2 And 90 of the Commission's Rules to Provide for the Use of 200 Channels Outside the Designated Filing Areas in the 896-901 MHz And 935-940 MHz Band Allotted to the Specialized Mobile Radio Pool, PR Docket No. 89-553, *Third Report and Order*, 9 FCC Rcd 7988, para. 11 (1994).

Federal Communications Commission                    FCC 02-229

types of CMRS providers. Over the years, we have shifted towards taking a less regulatory approach in setting out technical standards for the various wireless services. Yet in the case of cellular, while we have afforded carriers the flexibility to deploy new technologies and to offer digital services similar to that offered by PCS providers, cellular carriers must nonetheless continue to provide analog service. The analog standard forces cellular carriers to incur costs and burdens not assumed by other CMRS licensees despite the similarity of services provided by cellular carriers as compared with other providers. Certain commenters agree that the rule requiring cellular carriers to provide analog service does not apply to other types of wireless providers with whom cellular carriers directly compete,[70] and generally agree that removal of the analog requirement would be consistent with Congress' directive that all CMRS providers be subject to similar regulation in order to facilitate competition in the mobile telephony market.[71] Accordingly, we conclude that section 332 supports removing the analog requirement should we find that there are no circumstances that would warrant treating cellular licensees differently than other wireless carriers.

### 3.    Sunset of the Analog Requirement.

22.    In light of the factors discussed *supra*, we conclude that, as a general matter, it is no longer necessary in the public interest to impose the analog compatibility standard to encourage competition or to facilitate nationwide roaming. The immediate elimination of the analog requirement, however, could have a significant impact on some consumers. In the *NPRM*, we noted that, although there are multiple wireless technologies and services available today, certain consumers may not have readily available and accessible economic or technological alternatives to analog service.[72] Similarly, while the comments suggest that elimination of the analog requirement would not affect the majority of wireless consumers that are already using digital service, we are aware that there are particular classes of consumers, such as those that use emergency-only telephones and persons with hearing disabilities, who do not currently have readily available digital alternatives and would be unduly affected by the immediate elimination of analog service. Accordingly, we conclude that the public interest favors the adoption of a five-year transition prior to elimination of the analog rule.

### a.    911-only phones and unsubscribed emergency phones.

23.    *Background.* A primary reason for the growth of mobile telephony is the safety and security functions of wireless telephones. Indeed, some consumers acquire wireless telephones that can only make 911 calls. These 911-only consumers can be categorized as: (1) "unsubscribed" consumers of recycled phones that were previously, but are no longer, service-initialized by a wireless carrier, and have been reissued under some type of donor program, such as phones donated to victims of domestic violence, and (2) subscribers of newly manufactured 911-only phones that can only make 911 calls but are incapable of receiving any incoming calls.[73] Consumers of the latter are often elderly persons who can not afford basic wireless service or do not want typical wireless service, but desire immediate access to emergency services.[74] Commenters assert that the number of unsubscribed analog handsets in use ranges

---

[70] AT&T Wireless Comments at 2; Cingular Comments at 4.

[71] CTIA Comments at 7; Cingular Comments at 4-5.

[72] *NPRM* at para. 23.

[73] Allan Dixon Comments at 4; Bristol Bay Comments at 4; ICSA/MT Communications Comments at 5-7; Qwest Comments at 3; RCA Comments at 7; Secure Alert Comments at 2-5; Sprint Comments at 4, n. 10; U.S. Cellular Comments at 3; Verizon Comments at 5-6; WCA Comments at 3.

[74] Secure Alert Comments at 2.

Federal Communications Commission                    FCC 02-229

from 20 to 30 million.[75] Also, in many areas of the United States, digital subscribers with dual-mode handsets roaming outside their home territories are dependent on analog networks to make wireless 911 calls. In light of the public safety uses of mobile telephones, we requested comment on the possible effects that elimination of the analog requirement might have on those using mobile phones for emergency purposes only.[76]

        24.    *Discussion.* We conclude that a transition period is warranted in order to mitigate possible negative effects to emergency-only consumers that might otherwise occur with an immediate elimination of the analog requirement. While certain commenters argue that the analog service requirement should be maintained indefinitely so that those using unsubscribed or 911-only handsets will be assured of service,[77] we conclude that a transition period is needed to provide for an orderly migration of consumers with analog handsets to digital multimode handsets. Also, in some geographic areas in which digital coverage is currently insufficient, a transition period will allow carriers time to enhance coverage. The transition period will allow for the continued expansion of digital networks and further conversion of analog networks to digital, thereby providing for a more extensive network of digital technologies. During the transition period, service providers can conduct customer outreach in order to educate consumers that analog services may be discontinued on a certain date, thereby providing emergency-only consumers with time to migrate from analog to digital handsets.

        25.    We note that, although there is currently a sizable number of unsubscribed analog and 911-only consumers,[78] it can be assumed that the total number of such users will decline in the future, as digital networks expand and carriers migrate current analog customers to digital services. Accordingly, we disagree with commenters who argue that the analog requirement must be retained indefinitely because consumers that carry unsubscribed handsets cannot afford to trade them in for digital phones, or that programs that recycle used handsets may be discontinued if cellular carriers no longer offer analog service on their networks.[79] We expect that unsubscribed consumers will have access to digital equipment as digital handsets are being donated as well as analog handsets.[80] It is reasonable to assume that the number of digital handsets will increase over time because the number of digital subscribers is approximately three times that of analog subscribers,[81] and a consumer uses a handset on average for 1.5 to 2.5 years before acquiring a new one. Because handsets are recycled every 18 to 30 months, we conclude that a transition period should ensure that recipients of donated mobile telephones have access

---

[75] WCA Comments at 3; RCA Comments at 7 (estimates that there are 20 million unsubscribed analog handsets); ICSA/MT Communications Comments at 6 (estimates that there are 30 million unsubscribed analog handsets); Secure Alert Comments at 4 (estimates that there are 24 million unsubscribed analog handsets).

[76] *NPRM* at para. 29.

[77] AARP Comments at 1; Allan Dixon Comments at 4; ICSA/MT Communications Comments at 6-7; NAD Comments at 10; Secure Alert Comments at 4-5; WCA Comments at 3-4.

[78] *See supra* note 75.

[79] AARP Comments at 1; Secure Alert Comments at 4-5; WCA Comments at 4 (proposing that carriers that discontinue analog service must replace all existing analog phones in their licensed service area).

[80] Verizon estimates that, since 1995, approximately 30 percent of handsets donated under the Verizon program have been digital. Verizon Comments at 5-6.

[81] There are approximately 137 million wireless subscribers. *See* <http://www.wow-com.com> (last visited August 12, 2002).

Federal Communications Commission                    FCC 02-229

to digital equipment. Accordingly, we conclude that a five-year sunset period should resolve any issues faced by unsubscribers or 911-only subscribers.[82]

### b.     Accessibility issues.

26.     *Background.* When we sought comment in the *NPRM* on the possible effects of the elimination of the analog requirement, we noted that we were particularly interested in the possible impacts on persons with hearing disabilities,[83] and stated that we will not take any action that would undermine service to persons with disabilities.[84] We have for some time been cognizant of the concerns held by persons with hearing disabilities regarding their ability to access wireless technologies and services. Although most consumers have a variety of mobile technologies and services available to them, persons with hearing disabilities desiring to use wireless devices must currently rely on analog service or the small number of digital phones that are currently compatible with hearing aids --- a compatibility that is limited to certain types of hearing aids.[85] Unlike analog handsets, digital technologies have been shown to cause interference to hearing aids and cochlear implants. For the most part, analog wireless equipment does not pose interference problems for hearing aid wearers because they transmit signals at a steady rate; no extraneous audible noise is produced because these signals are not demodulated by the handset and in turn amplified by the hearing aid. Unlike analog equipment, however, digital wireless telephones do not transmit electromagnetic energy at a steady rate, and the fluctuations can cause disruptive interference to hearing aids or cochlear implants. The hearing aid demodulates the pattern of pulsing as clicks, pings or

---

[82] A number of local governmental entities have submitted *ex parte* filings regarding the impact that removal of the analog requirement could have on highway call boxes. Regional California agencies, generally known as Service Authorit[ies] for Freeways and Expressways (SAFEs), are responsible for the installation and operation of motorist-aid call boxes along highways, state routes and county roads. These agencies state that they have installed callboxes that use analog equipment and argue that switching from analog service to digital would be financially burdensome. They request that, in the event the Commission removes the analog requirement, that a transition to digital be conducted in a manner that enables SAFEs to maintain the callbox program. *See* Capitol Valley Regional Service Authority for Freeways and Expressways July 30, 2002 *Ex Parte* Letter; Metropolitan Transportation Commission Service Authority for Freeways and Expressways July 30, 2002 *Ex Parte* Letter; Los Angeles County Service Authority for Freeway Emergencies July 12, 2002 *Ex Parte* Letter; Monterey County Service Authority for Freeways and Expressways July 5, 2002 *Ex Parte* Letter; Santa Cruz County Regional Transportation Commission July 18, 2002 *Ex Parte* Letter; Santa Cruz County Regional Transportation Commission July 23, 2002 *Ex Parte* Letter; San Diego Service Authority for Freeway Emergencies July 29, 2002 *Ex Parte* Letter; Riverside County Transportation Commission August 1, 2002 *Ex Parte* Letter; San Bernardino Associated Governments July 16, 2002 *Ex Parte* Letter; Glenn County Transportation Commission July 18, 2002 *Ex Parte* Letter; Santa Barbara County Association of Governments July 22, 2002 *Ex Parte* Letter. While we note that callboxes are not mobile devices by definition, and thus service to such equipment is not covered by the analog requirement, we anticipate that the sunset period adopted in this proceeding will nonetheless provide such agencies with a reasonable length of time to transition their callboxes to digital technology if necessary.

[83] *NPRM* at para. 30.

[84] *Id.*

[85] Some equipment manufacturers have developed neck loop devices that make it possible for some people who have a telecoil (T-coil) in their hearing aids to use digital mobile phones. The neck loop is connected to the head phones jack of the mobile phone and transmits analog signals to certain T-coil equipped hearing aids. The T-coil turns off the hearing aid's microphone and changes the analog signals into sounds, eliminating noise and interference. Unlike digital handsets, however, some analog handsets have T-coils installed that are compatible with some T-coil equipped hearing aids, obviating the need for the separate neck loop. But not all hearing aid wearers have T-coil equipped hearing aids, and these people are unable to use neck loops with digital mobile phones or T-coil equipped analog phones.

Federal Communications Commission                          FCC 02-229

buzzing. Currently, nearly all digital equipment can cause some interference to many types of hearing aids and cochlear implants.

     27.    We recognize that telecommunications technology has become an essential component of everyday life, and that those without ready access are at a disadvantage in areas such as emergency services as well as routine daily activities. Accordingly, we have in recent years taken steps to address these concerns by implementing a number of proceedings aimed at ensuring that persons with disabilities have access to wireless services. For example, we conducted proceedings that set out deadlines for digital equipment to be compatible with text telephone, or TTY, devices.[86] With respect to telephone handsets, the Hearing Aid Compatibility Act of 1988 (HAC Act) requires almost all new telephones to "provide internal means for effective use with hearing aids that are designed to be compatible with telephones which meet established technical standards for hearing aid compatibility," but provides an exemption for certain categories of phones including those used with CMRS and private mobile radio services (or PMRS).[87] In November 2001, we initiated a proceeding to examine whether this exemption continues to remain necessary, or whether the statutory criteria for revocation or limitation of the exemption have been satisfied.[88] We also adopted a 1999 *Report and Order*[89] implementing section 255 of the Communications Act, which requires that manufacturers and telecommunications services providers ensure that telecommunications equipment and telecommunications services are accessible to persons with disabilities, if readily achievable.[90] In light of prior measures taken to facilitate access to wireless services, we requested comment on whether existing provisions will sufficiently address any accessibility problems for persons with hearing disabilities in the event we remove the analog requirement.[91]

     28.    *Discussion.* Our review of the record leads us to conclude that immediately removing the requirement that cellular carriers operate consistent with the analog compatibility standard would indeed

---

[86] In our *E-911 First Report and Order*, we mandated that wireless carriers must be able to transmit 911 calls from individuals with hearing disabilities through means other than mobile radio handsets, such as through the use of TTY devices. *See* In the Matter of Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems, CC Docket No. 94-102, *Report and Order and Further Notice of Proposed Rulemaking*, 11 FCC Rcd 18676, 18701 (1996) (*E911 First Report and Order*). In light of progress made towards TTY solutions, we set June 30, 2002 as the deadline by which wireless services providers must be capable of transmitting digital 911 calls using TTY devices. *See* In the Matter of Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems, CC Docket No. 94-102, *Fourth Report and Order*, 15 FCC Rcd 25216, 25217 at para. 3 (2000). While this capability became available in most areas of the country beginning July 1, 2002, we note that the Wireless Telecommunications Bureau recently granted certain petitions for temporary waiver of the June 30, 2002 deadline filed by certain carriers experiencing difficulty in implementing digital TTY-capability due in large part to unexpected vendor delays. *See* In the Matter of Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems, CC Docket No. 94-102, *Order*, DA 02-1540 (WTB rel. June 28, 2002).

[87] 47 U.S.C. § 610(b)(1); *see* 47 C.F.R. § 68.4(a). The rules implementing the provisions of the HAC Act are set out in Part 68 of our rules.

[88] *See* In the Matter of Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones, WT Docket No. 01-309, *Notice of Proposed Rulemaking*, 16 FCC Rcd 20558 (2001) (*HAC Proceeding*).

[89] In the Matter of Implementation of Sections 255 and 251(a)(2) of the Communications Act of 1934, as Enacted by the Telecommunications Act of 1996, Access to Telecommunications Service, Telecommunications Equipment and Customer Premises Equipment by Persons with Disabilities, WT Docket No. 96-198, *Report and Order and Further Notice of Inquiry*, 16 FCC Rcd 6417 (1999).

[90] 47 U.S.C. § 255(c). Specifically, section 255(c) of the Act requires that "[a] provider of telecommunications service shall ensure that the service is accessible to and usable by individuals with disabilities, if readily achievable."

[91] *NPRM* at para. 30.

be detrimental to persons with hearing disabilities. We find that, given the scarcity of digital devices that may be used with hearing aids, persons with hearing disabilities could be left without access to mobile telephony services in the event that the analog requirement is removed immediately and carriers are able to shut down their analog facilities. While we anticipate that market mechanisms will, for the most part, ensure access to digital services for most consumers, we agree with commenters who argue that the same economic incentives do not exist that would ensure that persons with hearing disabilities have adequate access to digital wireless service because they account for only a small percentage of mobile telephony users.[92] Because persons with hearing disabilities must continue to rely on analog technology for access to wireless service at this time, we find that the record supports implementing a transition period during which time we anticipate that digital solutions to the hearing aid-compatibility problem will be developed and made widely available.

29.     In order to ensure that analog service remains available to persons with hearing disabilities while industry seeks to develop accessible digital technologies, we provide for a five-year transition period before the elimination of the analog requirement. Certain commenters assert that a transition period of five years is insufficient[93] and argue that the analog requirement cannot be sunset until digital technologies are fully compatible with hearing aid devices.[94] We conclude that a five-year period provides a reasonable time frame for the development of solutions to hearing aid-compatibility issues. The progress made in developing digital TTY solutions leads us to determine that the industry will also likely be able to develop digital solutions for telephones within a five-year period. Moreover, mandating a shorter timeframe may result in persons with hearing disabilities gaining access to digital handsets more quickly than if we set out a longer period. Because we are reserving the right to extend the sunset period in the event that solutions to hearing aid-compatibility problems are unsatisfactory,[95] the industry has an incentive to develop digital solutions to the access problem. Accordingly, we conclude that a five-year period provides the wireless industry with a reasonable time frame during which they may continue developing solutions to the problem of hearing aid-compatibility while ensuring that persons with hearing disabilities continue to have access to mobile telephony.

30.     We note that we are establishing a transition period to safeguard the ability of persons with hearing disabilities to access mobile telephony services even though carriers are otherwise obligated to ensure that telecommunications service is accessible to persons with disabilities. As noted, section 255 of the Act requires that "[a] provider of telecommunications service shall ensure that the service is accessible to and usable by individuals with disabilities, if readily achievable."[96] In the *NPRM*, we observed that were we to eliminate the analog requirement, section 255 would still require that carriers to make digital services compatible with hearing aid devices.[97] We requested comment on the sufficiency of section 255 of the Act in addressing accessibility problems for persons with disabilities in the event that we eliminated the analog requirement. Although a few commenters argue that mobile telephony providers and manufacturers can circumvent the provisions of section 255,[98] we conclude that section 255 requires providers to ensure that their services remain accessible to persons with hearing disabilities. However, the independent requirements of section 255 notwithstanding, we find that it is appropriate to

---

[92] NAD Reply Comments at 7-8.

[93] Telecommunications for the Deaf Reply Comments at 8.

[94] *E.g.* NAD Reply Comments at 12-13; SHHH Reply Comments at 3-4.

[95] *See supra* at para. 27.

[96] *See* 47 U.S.C. § 255(c).

[97] *NPRM* at para. 30.

[98] *See* SHHH Comments at 6; Telecommunications for the Deaf Reply Comments at 6-7.

also establish a five-year transition period in order to address the particular current problem of hearing aid-compatibility with digital handsets, and ensure access to mobile telephony service for persons with hearing disabilities.

31.     *Reporting requirement.* In order to monitor the progress made by the wireless and hearing aid industries in developing solutions, and to ensure that wireless services are continuing to be made available to persons with hearing disabilities as well as 911-only consumers, we will require that, no later than the third and fourth anniversary of the effective date of this order, certain CMRS licensees and other entities file reports with the Commission. The reports will be required from all cellular licensees providing nationwide coverage. In addition, the reports must inform the Commission whether each carrier intends to discontinue analog service, identify the markets in which it plans to discontinue analog service, and for how long it plans to continue analog service and in which markets. If a carrier intends to discontinue analog service, the carrier must certify and provide information in its report that there are hearing aid-compatible digital devices available to persons with hearing disabilities at the time of filing, or, if no such equipment is available at the time of filing, describe the extent to which, by the end of the fifth year, digital equipment will be available to persons with hearing disabilities in market(s) where the carrier intends to discontinue analog service. Carriers may also be required to show in their reports that they are in compliance with the provisions of section 255 of the Act, as well as with any obligations required of them as a result of our *HAC Proceeding*. Such carriers, in their reports, may also be required to describe their plan for informing its subscribers, the public and other interested parties regarding plans to discontinue analog service. Finally, other interested parties will be able to file reports or comments as appropriate, and we encourage joint efforts (*e.g.*, the TTY forum).[99]

32.     We will make these Reports publicly available to all interested parties who may file supplemental information as appropriate to ensure that the Commission has a full record. The information contained in the reports will be used to determine whether or not the Commission will initiate a proceeding to extend the sunset date or take appropriate enforcement action under section 255. As noted, we are examining in the *HAC Proceeding* whether CMRS and PMRS providers should continue to be exempted from the HAC Act's requirement that telephones "must provide internal means for effective use with hearing aids that are designed to be compatible with telephones which meet established technical standards for hearing aid compatibility."[100] Our action here does not preclude the Commission from independently requiring carriers to comply with HAC requirements, even during the 5-year transition period, in the event that the Commission determines in the *HAC Proceeding* that the statutory criteria for revocation or limitation of the exemption have been satisfied.[101] Finally, the Wireless Telecommunications Bureau, in conjunction with the Consumer & Governmental Affairs Bureau, will work closely with the Food and Drug Administration and the Commission's Office of Engineering and Technology in the development of standards for hearing aid design that alleviate interference.

33.     We note that, although we are establishing the date upon which we will no longer require carriers to provide cellular service consistent with AMPS specifications, the removal of the requirement

---

[99] The TTY Forum, which was formed in 1997, is an organization comprised of wireless carriers, wireless handset manufacturers, wireless infrastructure manufacturers, TTY manufacturers, emergency and relay service providers, and consumer groups representing people with hearing disabilities.

[100] *See* para. 27.

[101] Specifically, the HAC Act directs us to revoke or otherwise limit the exemption if we find that 1) revocation or limitation of the exemption is in the public interest; 2) continuation of the exemption would have an adverse effect on persons with hearing disabilities; 3) compliance with the HAC Act is technically feasible; and 4) compliance with the HAC Act would not increase costs to such an extent that the telephones could not be successfully marketed. 47 U.S.C. § 610(b)(2)(C).

does not preclude carriers from continuing to provide analog service.  Indeed, we do not anticipate that, as a general matter, carriers will immediately discontinue such service as it is reasonable to conclude that analog service will continue to be available as long as consumers demand it.

**C.      Electronic Serial Number Rule.**

34.      *Background.*  In the *NPRM*, we proposed to remove section 22.919 of our rules, which sets forth electronic serial number (ESN) design requirements for manufacturers of cellular telephones.[102] The purpose of this rule was to address the problem of cellular "cloning" fraud that was prevalent in the mid-1990s.[103]  Over the years, however, other measures have developed to combat cloning fraud.  For example, Congress enacted the Wireless Telephone Protection Act of 1998 to address fraudulent and unauthorized use of wireless telecommunications services.[104]  Further, the cellular industry has developed a more secure access protocol, known as authentication.[105]  Other anti-fraud countermeasures developed by the industry include "radio frequency fingerprinting," which identifies a mobile handset by its unique radio transmission characteristics,[106] as well as "call profiling," which enables carriers to monitor for unusual, sudden changes in calling patterns.[107]

35.      Accordingly, we tentatively concluded that the original basis for setting out the hardened ESN design requirements in Part 22 is no longer compelling given federal legislation and use of advanced fraud control technologies.[108]  Further, because section 22.919 requires that the ESN host component not be transferable or removable, we noted in the *NPRM* that the ESN rule by definition precludes the use of

---

[102] *NPRM* at para. 36.  Section 22.919 imposes a number of requirements.  Each cellular mobile unit must have a unique factory-set ESN that is not "alterable, transferable, removable or otherwise able to be manipulated."  47 C.F.R. § 22.919(a), (c).  Further, the equipment must be designed in such a way that any attempt to remove, tamper with, or change the ESN chip and other related components will render the mobile transmitter inoperative.  This is referred to as a "hardened ESN."  47 C.F.R. § 22.919(c).  Section 22.919 also specifies certain physical design and firmware programming requirements.

[103] Cloning occurs when a third party copies onto a second handset the three identifying numbers of a legitimate subscriber's handset --- the internally stored telephone identification number (MIN), system identification number (SID) and the unique factory-set ESN.  Because early cellular systems relied solely on these three numbers, which were transmitted over the airwaves, to identify a particular cellular telephone for access and billing purposes, copying these three numbers allowed the third party to use the cloned telephone to make calls that would later be billed to the legitimate subscriber.

[104] The Wireless Telephone Protection Act of 1998 provides, *inter alia*, that an individual has committed fraud if he or she "knowingly and with intent to defraud uses, produces, traffics in, has control or custody of, or possesses a telecommunications instrument that has been modified or altered to obtain unauthorized use of telecommunications services," or "knowingly uses, produces, traffics in, has control or custody of, or possesses hardware or software, knowing it has been configured to insert or modify telecommunication identifying information associated with or contained  in a telecommunications instrument so that such instrument may be used to obtain telecommunications service without authorization."  18 U.S.C.A. § 1029(a)(7), (a)(9).

[105] Authentication works by sending a series of encoded passwords over the airwaves between the cellular telephone and the cellular network to validate a customer each time a call is placed or received.  With authentication, the key to use authorization is not transmitted over the airwaves and accordingly can not be intercepted by third parties.

[106] This helps to prevent cloning because the cloned mobile equipment can not duplicate the legal phone's radio-frequency fingerprint.

[107] *See NPRM* at para. 33.

[108] *Id.* at para. 36.

"smart card" subscriber identity modules[109] in AMPS-compatible cellular telephones. We stated that this could be counterproductive in controlling fraud, as there is evidence that smart cards arguably may provide better protection from tampering than the "hardened ESN" components required by the ESN rule.[110] We indicated that, as a general rule, we prefer that market forces determine technical standards and do not mandate hardware design requirements unless necessary in the public interest. Moreover, we observed that we do not impose similar requirements on other CMRS providers.[111]

36.      *Discussion.* After reviewing the original purpose of the rule, the anti-fraud techniques that have been developed since the adoption of the rule, as well as the comments in this proceeding, we conclude that the ESN rule is no longer necessary in the public interest and adopt our proposal to eliminate section 22.919. The concerns that led to the adoption of this rule have been addressed and no longer require retention of this rule. We find that it is unnecessary to continue to mandate detailed hardware design requirements given the success the wireless industry has had in developing other more effective anti-fraud measures. A number of commenters support the proposal to remove section 22.919,[112] arguing that the rule prevents carriers from deploying advanced technologies such as smart cards.[113]

37.      As we stated in the *NPRM,* our general policy is to allow market forces to determine technical standards wherever possible, and, accordingly, we refrain from adopting rules mandating detailed hardware design requirements, unless doing so is necessary to achieve a specific public interest goal. In this case, the original purpose was to assist in curtailing the cloning fraud that, in the mid-1990s was costing the cellular industry as a whole hundreds of millions of dollars per year in appropriated service.[114] The advent of new anti-fraud measures that have emerged as the industry developed from analog to digital makes it unnecessary for us to continue to mandate technical standards for anti-fraud purposes. As CTIA observes, "The wireless industry . . . is capable of protecting its customers and itself against fraud. These advancements in fraud detection and prevention, the steady transition to digital wireless, and robust competition have all led to a significant drop in the cost of wireless service, and thus obviated the need for Commission-imposed ESN security standards."[115] Moreover, as noted, anti-fraud legislation was enacted to prohibit individuals from manipulating telephones or other devices (*e.g.* hardware, software, or scanning receivers) in order to obtain telecommunications service without authorization. Accordingly, it is not necessary to retain section 22.919 as a preventative measure against cellular cloning fraud. Pursuant to our obligation to repeal any regulation determined to be no longer in the public interest, we eliminate section 22.919.

---

[109] Smart card subscriber identity modules are small, postage stamp-sized cards containing an embedded electronic chip that is programmed with the subscriber's identification, billing and preference information. Generally tamper-proof, smart cards can be switched from one mobile telephone to another, making it easy to change from one system to another. Smart card technology protects a subscriber's identity and preference from theft or disclosure, yet is easily transferable from one telephone to another.

[110] *NPRM* at para. 36.

[111] *Id.*

[112] Cingular Comments at 16-17; CTIA Comments at 12-14; Qualcomm Comments at 3-5.

[113] Ericsson Comments at 11-12; Qualcomm Comments at 3-4; TIA Comments at 5-6.

[114] CTIA notes that cloning has resulted in as much as $600 million dollars per year in lost revenue. CTIA Comments at 12.

[115] CTIA Comments at 14.

Federal Communications Commission                    FCC 02-229

38.     Two commenters, CenturyTel and Verizon, argue that removing the ESN rule would be disruptive to other aspects of cellular service.[116] CenturyTel believes that elimination of this rule section would require them to replace their billing system.[117] While we understand that certain providers may be using ESNs for tracking and billing purposes, we note that elimination of the rule does not require carriers to cease using ESNs. In fact, the general specification for a unique ESN is already contained in the current industry standard for AMPS, and we believe that it is unnecessary to duplicate this in our rules.[118] We also note that the rule was not adopted in order to facilitate uses such as billing and equipment validation by carriers, nor does the record in this proceeding support retaining this requirement solely for such purposes. We are not persuaded that carriers will be prejudiced with respect to billing and other cellular functions to such an extent that it would be necessary to retain the ESN rule.[119]

39.     Finally, we note that the Independent Cellular Service Association ("ICSA"), which has sought elimination of the ESN rule for several years, supports our current proposal because it believes that it should be legal to clone cellular telephones (in particular, as a small business activity) for customers who are already legitimate cellular subscribers, as opposed to those who are not subscribers.[120] In the absence of section 22.919, cloning of phones in this manner is no longer a violation of the Commission's rules. The issue of cellular cloning by a legitimate cellular subscriber would become a contractual issue, and would be judged according to the terms of the applicable service contract.[121]

**D.     Channelization Requirements.**

---

[116] CenturyTel Comments at 5; Verizon Comments at 17-18.

[117] CenturyTel Comments at 5.

[118] ANSI/TIA/EIA-553-A-1999, section 2.3.2.

[119] We do not anticipate that there will be immediate changes to equipment; we conclude that carriers will have sufficient opportunity to modify their administrative systems if necessary. With regard to the impact of our determination on other cellular functions, for example, we do not intend our treatment here to be dispositive of pending consideration of possible application of ESNs for public safety purposes. *See* Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems, Non-initialized Phones, CC Docket No. 94-102, RM-8143, *Report and Order*, 17 FCC Rcd 8481 (2002), *recon. pending*; "Wireless Telecommunications Bureau Seeks Comment on Petition for Reconsideration Regarding the Commission's Rules on Non-initialized Phones and on Filing Request for Stay," *Public Notice*, 67 Fed. Reg. 46909 (July 17, 2002).

[120] ICSA/MT Communications Comments at 3-6; ICSA/MT Communications Reply Comments at 5-8. Such cloning makes it technically possible for these subscribers to use one or more additional cellular telephones (which ICSA refers to as "extension cellular telephones") on a cellular system without the carrier's knowledge, and thereby avoid being billed monthly fees (other than per-minute usage charges) that the carrier normally charges for additional cellular telephones. ICSA ascribes various benefits to the use by legitimate subscribers of cloned telephones, including the ability to have multiple cellular telephones with the same telephone number (for example a powerful vehicular telephone and a hand-held portable telephone). There are also significant operational limitations, however, that make the claimed benefits questionable. For example, the legitimate cellular telephone and the cloned cellular telephone generally cannot be turned on at the same time without triggering the carrier's fraud-detection systems, which could result in denial of service to both telephones.

[121] When we established the ESN rule in the *Part 22 Rewrite*, we stated that the altering of cellular phones to "emulate" ESNs without receiving the permission of the relevant cellular licensee should not be permitted because: 1) the simultaneous use of cellular telephones fraudulently emitting the same ESN without the licensee's permission could cause problems in some cellular systems such as erroneous tracking or billing; 2) the use of such phones without the licensee's permission could deprive cellular carriers of monthly per telephone revenues to which they are entitled; and 3) such altered phones not authorized by the carrier, would not fall within the licensee's blanket license. *Part 22 Rewrite*, 9 FCC Rcd at para. 60.

40.    *Background.*  Section 22.905 identifies the part of the electromagnetic spectrum that is allocated to the Cellular Radiotelephone Service and divides it into two blocks, labeled A and B.  It also sets forth a channelization plan that sub-divides each block into 416 paired 30 kHz channels and designates 21 of these paired channels as control channels.  This channelization plan is the basic scheme for the original analog cellular technology.  Alternative technologies, including the principal digital technologies many cellular licensees have overlaid on top of their analog networks, are exempt from this channelization plan rule.[122]  We proposed in the *NPRM* to remove the channelization plan for compatible AMPS cellular systems from section 22.905 of our rules, and to rephrase the remainder of that section such that it specifies only the portions of the electromagnetic spectrum allocated to the Cellular Radiotelephone Service and which frequency ranges make up the two initial blocks.[123]  We reasoned that the analog technology to which the channelization plan is applicable is well-established nationwide, and thus removing the plan would not pose any risk of decreased cellular technical compatibility.

41.    *Discussion.*  A majority of the commenters addressing this issue support our proposal.[124]  For example, CTIA notes that, even in the absence of a mandatory channel plan, "carriers can be expected to continue to deploy analog technology that is interoperable with other analog systems notwithstanding the absence of a Commission rule mandating such interoperability."[125]  Verizon, however, opposes the elimination of the channelization plan rule prior to the elimination of the analog service requirement.  It believes that some cellular carriers could begin providing analog service using a different and incompatible analog channel plan, which would leave some subscribers without roamer service.[126]  CenturyTel also opposes removal of the channelization plan because it believes that it provides a legal basis for "frequency protection" from adjacent systems using digital technologies.

42.    Based on the record before us, however, we find that it is unnecessary to retain the AMPS channelization plan in the rules.  With respect to Verizon's concern, given the number of standard analog base stations and handsets in use today and the efficiencies to be gained by implementing alternative digital (not analog) technologies, it appears highly unlikely that any carrier would have the incentive to deploy an alternative analog technology during the five-year sunset adopted in this proceeding.  Although Verizon warns of incompatible analog deployment, it provides no rationale explaining why it believes any carrier might take this approach.  Further, carriers will continue to be bound by existing roaming agreements for at least some portion of the sunset, again making it highly unlikely that there would be any incentive to deploy an alternative analog technology.  With respect to CenturyTel's concern, we note that the channelization plan in the rule was not established for the purpose of "protecting frequencies" and does not serve that function today.  In fact, different rules, sections 22.907 and 22.917, limit emissions and require cellular licensees to coordinate channel use with adjacent systems in order to maximize efficient utilization of the cellular spectrum.[127]  Finally, we note that the AMPS channelization plan is the current industry standard for AMPS and will presumably continue to provide guidance to licensees through the sunset of the analog requirement.[128]  Accordingly, we adopt our proposal to remove the

---

[122]  47 C.F.R. § 22.901(d)(2).  Of the technologies commonly used to provide cellular service, TDMA uses the same spacing and channel center frequencies as are specified for the original analog technology, whereas CDMA uses an entirely different channel plan.

[123]  *NPRM* at para. 38.

[124]  Ericsson Comments at 6; Cingular Comments at 17; CTIA Comments at 15; TIA Comments at 6.

[125]  CTIA Comments at 15.

[126]  Verizon Comments at 19; Verizon Reply Comments at 10.

[127]  47 C.F.R. §§ 22.907 and 22.917.

[128]  ANSI/TIA/EIA-553-A-1999, section 2.1.1.1.

channelization plan from our rules as no longer necessary in the public interest in light of current market conditions.

### E.    Modulation Requirements and In-band Emissions Limitations.

43.    *Background.* In the *NPRM*, we sought comment on our proposal to modify section 22.915 of our rules, which sets out a number of technical specifications for, *inter alia*, the performance of audio filter and deviation limiter circuitry in analog cellular telephones, and adjustment of the modulation levels in analog cellular telephones.[129] As noted, we have sought to avoid specifying the particular technology to be used or to specify technical details, such as modulation parameters, of any given technology in our rules with respect to PCS and other similar market-based services.[130] With limited exception, we instead have given providers in these services the latitude to determine for themselves the most appropriate technology that allows them to operate most effectively.[131] In contrast, our cellular service rules, including section 22.915, specify numerous technical parameters. Accordingly, consistent with our less regulatory approach with PCS and other CMRS, as well as our proposal to eliminate the analog requirement, we proposed to eliminate the provision set out in section 22.915 requiring cellular systems to have the capability to provide service using the modulation types specified in OET 53 (analog compatibility standard).[132] We also proposed to remove all rules governing audio filter and deviation limiter performance, modulation levels, and in-band radio frequency emission limits.[133]

44.    Further, we also proposed changes to section 22.917 of our rules, which prescribes emission masks limiting both in-band and out-of-band radio frequency emissions.[134] As with the proposal to remove the channelization requirements, we proposed changes to the introductory paragraph of section 22.917, which requires that analog modulated emissions be transmitted only on the communication channels.[135] Further, we sought comment regarding how we should define the out-of-band emission limit in order to provide an adequate measure of interference protection to other licensees and service, while also allowing licensees the flexibility to establish a different limit where appropriate.[136] Specifically, we asked whether licensees should be permitted to operate transmitters on frequencies closer to the edge of their authorized spectrum than full compliance with section 22.917 would normally allow, as long as all potentially affected parties (*i.e.* adjacent licensees) agree to such a provision.[137] We noted that our Wireless Communications Service (WCS) rules provide this flexibility, and we indicated that cellular and broadband PCS licensees would also benefit from such flexibility.[138] Accordingly, we sought to conform the language and provisions of the out-of-band emission limit rules specific to the cellular service and broadband PCS with those applicable to WCS.[139]

---

[129] 47 C.F.R. § 22.915.

[130] *NPRM* at para. 39.

[131] *Id.* at para. 40-41.

[132] *Id.* at paras. 39-40.

[133] *Id.* at paras. 39-40.

[134] 47 C.F.R. § 22.917.

[135] *NPRM* at para. 41.

[136] *Id.* at para. 42.

[137] *Id.*

[138] *Id.*

[139] *Id.* In the *NPRM*, we proposed that section 22.917 be modified to:

Federal Communications Commission                    FCC 02-229

45.    *Discussion.*  We amend our rules as proposed in the *NPRM*, with certain modifications. We agree with several commenters that our cellular rules should be more technology-neutral in order to encourage greater deployment of advanced technologies.[140]  As we are moving toward a less regulatory approach with respect to our service rules and are permitting carriers to deploy technologies that best fit the needs of the market, we adopt our proposal with certain modifications.  Further, we conclude that, because we seek to ensure regulatory conformity wherever practical, our rules regarding out-of-band emissions limits for the various services should be similar.

46.    Certain commenters, however, object to the specific language we proposed for the out-of-band emission limit measurement rule in section 22.917.[141]  These parties point out that implementation of the measurement resolution bandwidth specified in the proposed rule would have the effect of imposing a stricter out-of-band emission limit than that which currently applies.  Specifically, the commenters object to the proposed rule's specification that compliance with the out-of-band emissions limit should be measured by using instrumentation employing a resolution bandwidth of 1 MHz or more from the center of the band. [142]  We agree that we should modify the proposed language.  In proposing the rule change, we sought only to harmonize certain procedures in the WCS, PCS and cellular services, and did not intend to make the out-of-band emission limits more restrictive.  Several commenters, such as

---

"§ 22.917  Emission limitations for cellular equipment.

The rules in this section govern the spectral characteristics of emissions in the Cellular Radiotelephone Service.

(a)  *Out of band emissions.*  The power of any emission outside of the authorized operating frequency ranges must be attenuated below the transmitting power (P) by a factor of at least $43 + 10 \log(P)$ dB.

(b)  *Measurement procedure.*  Compliance with the limitation in paragraph (a) is based on the use of measurement instrumentation employing a resolution bandwidth of 1 MHz or more. However, for measurements within 1 MHz of the center of the main emission bandwidth, a resolution bandwidth of not less than 1% of the main emission bandwidth may be employed.  For the purpose of this section, the main emission bandwidth is the continuous width of the signal outside of which all emissions are attenuated by at least 26 dB below the transmitting power.  Either peak or average measurements may be used, provided that both the emissions and the reference transmitter power are measured the same way.  When measuring emissions, the transmitter must be set to operate as close to each of the upper and lower channel block edges as the design permits for normal operation.

(c)  *Alternative out of band emission limit.*  Licensees in this service may establish an alternative out of band emission limit to be used at specified band edge(s) in specified geographical areas, in lieu of that set forth in this section, pursuant to a private contractual arrangement of all affected licensees and applicants.  In this event, each party to such contract shall maintain a copy of the contract in their station files and disclose it to prospective assignees or transferees and, upon request, to the FCC.

    (d)  *Interference caused by out of band emissions.*  If any emission from a transmitter operating in this service results in interference to users of another radio service, the FCC may require a greater attenuation of that emission than specified in this section."

[140] CTIA Comments at 14-15; TIA Comments at 4 (advocating proposal to remove in-band emissions limits); Western Wireless (supporting proposal to remove rules relating to 22.915).  One commenter states that section 22.915 should be eliminated because the rule's requirements are specific to the AMPS analog compatibility standard, and, as such, are contrary to the goal of allowing carriers to implement the technologies of their choice, and stifles the development of technologically advanced systems.  Ericsson Comments at 7.

[141] Cingular Comments at 10-14; Ericsson Comments at 7-11; Qualcomm Comments at 6-8; TIA Comments at 6-10; Sprint Reply Comments at 13-14.

[142] Cingular Comments at 10-11; Ericsson Comments at 7-11; Qualcomm Comments at 6-8; TIA Comments at 6-10; Sprint Reply Comments at 13-14.