Ericsson, submitted alternative language that more accurately reflects our intended goal.[143]  Ericsson recommended language to permit the use of narrower resolution bandwidths and also noted that International Telecommunications Union - Radiocommunications Sector ("ITU-R") Recommendation SM.329 specifies that the measurement bandwidth is "100 kHz for emissions below 1 GHz" and "1 MHz for emissions above 1 GHz."[144]  Accordingly, Ericsson recommended that the Commission amend section 22.917 to permit measurement instrumentation employing a resolution bandwidth of 100 kHz or greater.[145]  Ericsson also recommended modification of the measurement bandwidth aspects in both sections 22.917 and 24.238 "to explicitly permit the use of integration to improve measurement accuracy."[146]  Ericsson proposed modifying these sections to state that "[a] narrower resolution bandwidth is permitted in all cases to improve measurement accuracy provided the measured power is integrated over the full required measurement bandwidth (i.e. 100 KHz or 1% of emission bandwidth, as specified)."[147]  We modify the proposed rules by substituting the language suggested by Ericsson, which is consistent with recently adopted ITU standards for emissions.[148]  We find that sections 22.917(b) and 24.238(b) are no longer necessarily in the public interest as currently written.  We therefore modify both sections 22.917(b) and 24.238(b) accordingly.[149]

      **F.**     **Vertical Wave Polarization Requirement.**

---

[143] Cingular Comments at 14; Ericsson Comments at 9-10; TIA Comments at 9-10.  The modified version permits the use of narrower resolution bandwidths, defines the "out-of-band" region as extending for 1 MHz from the edge of the licensed frequency block, and uses a measurement bandwidth of 1% of emission bandwidth up to the edge of the block.

[144] Ericsson Comments at 9-10.  The ITU is an arm of the United Nations responsible for the global oversight and implementation of international telecommunications policy.

[145] Id. at 9.

[146] Id. at 9-10.

[147] Id.

[148] ITU-R SM.329.  TIA also suggested similar language that is consistent with ITU recommendations.  See TIA Comments at 8-10.

[149] Section 22.917(b) will be modified to read as follows:

     (b)    *Measurement procedure.*  Compliance with these provisions is based on the use of measurement instrumentation employing a resolution bandwidth of 100 kHz or greater.  In the 1 MHz bands immediately outside and adjacent to the frequency block a resolution bandwidth of at least one percent of the emission bandwidth of the fundamental emission of the transmitter may be employed.  A narrower resolution bandwidth is permitted in all cases to improve measurement accuracy provided the measured power is integrated over the full required measurement bandwidth (*i.e.* 100 kHz of 1 percent of emission bandwidth, as specified).  The emission bandwidth is defined as the width of the signal between two points, one below the carrier center frequency and one above the carrier center frequency, outside of which all emissions are attenuated at least 26 dB below the transmitter power.

Section 24.238(b) will be modified to read as follows:

     (b)    Compliance with these provisions is based on the use of measurement instrumentation employing a resolution bandwidth of 1 MHz or greater.  However, in the 1 MHz bands immediately outside and adjacent to the frequency block a resolution bandwidth of at least one percent of the emission bandwidth of the fundamental emission of the transmitter may be employed.  A narrower resolution bandwidth is permitted in all cases to improve measurement accuracy provided the measured power is integrated over the full required measurement bandwidth (*i.e.* 100 kHz of 1 percent of emission bandwidth, as specified).  The emission bandwidth is defined as the width of the signal between two points, one below the carrier center frequency and one above the carrier center frequency, outside of which all emissions are attenuated at least 26 dB below the transmitter power.

Federal Communications Commission                    FCC 02-229

47.     *Background.* Section 22.367(a)(4) of the Commission's rules provides that electromagnetic waves radiated by base, mobile, and auxiliary test transmitters in the Cellular Radiotelephone Service must be vertically polarized.[150] This rule was originally adopted in order to promote technical compatibility for cellular systems, as well as to reduce the likelihood of interference from cellular transmitters to broadcast television (TV) reception on the upper UHF TV channels.[151] We tentatively concluded in the *NPRM* to relax section 22.367 of our rules to provide that cellular stations no longer be limited as to the polarization of the transmitted waves.[152] We specifically sought comment on what interference or adverse effects might be caused to mobile, fixed, and broadcast services operating in the cellular service spectrum or adjacent spectrum.[153]

48.     *Discussion.* We eliminate the vertical polarization requirement because it is no longer necessary in the public interest. The original purposes of the rule no longer warrant this requirement on cellular carriers. We are persuaded that, on the facts before us, relaxation of this requirement will have little effect on interoperability or UHF television channels. As noted in the record, even if a base station's transmissions are vertically polarized, many hand-held mobile units may not benefit from vertical polarization because they are either held in a manner such that their antenna is not vertical, or because the transmission's polarization will be shifted due to reflections from man-made structures.[154] Accordingly, a vertically polarized transmission generally will provide little interoperability benefit to users of hand-held mobile phones. Furthermore, as Cingular notes, cellular base stations transmit on frequencies above 869 MHz (a minimum separation of 63 MHz from the closest UHF television frequency), thereby reducing the likelihood of interference with upper-band UHF television channels.[155] In addition, Cingular notes "mobile units, which are located much closer to television, have been operating with essentially random polarization for years without any evidence of interference to television."[156]

49.     Most commenters agree with our proposal to remove the vertical polarization requirement due to the technical flexibility that elimination of the rule will provide carriers.[157] One commenter asserts that such flexibility will reduce multipath fading and improve signal quality in urban areas.[158] Indeed, we anticipate that with this greater flexibility, carriers will be able to design more aesthetically pleasing

---

[150] 47 C.F.R. § 22.367(a)(4).

[151] *See Part 22 Rewrite*, 9 FCC Rcd at 6558. We note that alternative services are exempt from the wave polarization requirement pursuant to § 22.901(d)(2).

[152] *NPRM* at para. 47.

[153] *Id.* We note that during the pendency of this rulemaking the Commercial Wireless Division of the Wireless Telecommunications Bureau granted a limited waiver of the vertical polarization requirement to Cingular. *See In the Matter of Cingular Wireless LLC Request for Waiver of the Cellular Vertical Wave Polarization Requirement, Order,* DA 02-558 (rel. Mar. 8, 2002) (*Cingular Waiver*). *See also* Cingular Wireless LLC, Petition for Waiver of Section 22.367 of the Rules Concerning Wave Polarization in the Cellular Radiotelephone Service (filed Nov. 20, 2001) ("Petition for Waiver"); Cingular Wireless LLC, Petition for Waiver of Section 22.367 of the Rules Concerning Wave Polarization in the Cellular Radiotelephone Service, Supplement to Petition for Waiver (filed Jan. 14, 2002) ("Supplement to Petition for Waiver"). We have incorporated the comments filed in response to Cingular's waiver request in the record in this proceeding.

[154] *See* Cingular Petition for Waiver at 7; AT&T Wireless Reply Comments (waiver proceeding) at 3.

[155] Cingular Petition for Waiver at 8.

[156] *Id.*

[157] *See* Qualcomm Comments at 5; Ericsson Comments at 15; Verizon Comments at 29; Cingular Comments at 18-19; Western Wireless Comments at 12; CTIA Comments at 14; TIA Comments at 10.

[158] Ericsson Comments at 15.

antenna, reduce the number of antennas necessary at given sites (and, as noted by one commenter, reduce the need for local zoning clearances), enabling collocation of multiple carriers' facilities on a single tower, and reducing site deployment costs.[159] Moreover, we note that other providers of commercial mobile radio service, such as PCS and SMR providers, are not subject to the vertical wave polarization requirement. Allowing cellular carriers to deploy non-vertically polarized antennas will promote regulatory symmetry and flexibility.

50.     We are not persuaded by arguments advanced by OnStar that the vertical polarization requirement should not be removed because it could result in reduced RF coverage for its end users, and impair telematics' ability to provide geographic location information for emergency services.[160] OnStar expresses concern that relaxing the rule, particularly with respect to rural areas, would "adversely affect[ ] the delivery of automatic crash notification and other emergency and telematics services."[161] We note that OnStar's concerns are limited to rural areas, where cellular carriers are unlikely to use other than vertical polarization because they have little incentive to do so. In addition, we would expect cellular carriers to make the appropriate technical adjustments to account for varying polarization of transmit and receive antennas, and thereby obtain equivalent analog cellular performance at the boundaries of a rural cell sites when using alternative technologies. We also note that cellular carriers already have the flexibility to reduce coverage or turn off their systems for short or long periods without seeking prior approval of the Commission or notifying customers of their intended action.[162] Further, telematics carriers may negotiate with cellular carriers and may enter into voluntary contractual relationships to accommodate specific coverage needs. Finally, we believe that the industry and not regulation should dictate technical specifications wherever possible. Given these reasons, we are not persuaded that it is necessary to retain this rule simply to ensure coverage for telematics subscribers attempting calls on the fringe of rural cell sites.

51.     Similarly, we are unpersuaded by arguments advanced by U.S. Cellular to retain this requirement in order to facilitate the provision of cellular services to persons onboard aircraft by AirCell and its partners.[163] One of the means AirCell uses to ensure protection of terrestrial cellular systems is by using horizontally-polarized signals. The difference in polarization provides some level of isolation from systems using exclusively vertically polarized transmissions. In waiving the prohibition against airborne cellular operation for AirCell, and its partners, the Bureau did so on a secondary basis with respect to terrestrial cellular operations.[164] In fact, the Bureau made clear that "AirCell cellular partners may not

---

[159] Cingular Comments at 19.

[160] OnStar Comments to Cingular Waiver Request at 6-7. OnStar utilizes analog cellular technology to provide location-based telematics service offerings, such as automatic crash notification, through systems embedded in vehicles of certain automobile manufacturers. *See Id.* at 1, 4. In this connection, OnStar has attempted to maximize the reception distance for its mobile equipment (which is important in rural areas, for example) based on the assumption that cell sites transmit vertically-polarized signals.

[161] *Id.* at 6.

[162] Cellular carriers may reduce coverage at a cell site and notify the Commission within 30 days of the change (47 C.F.R. § 1.947); they may discontinue operations for up to 90 days without notifying the Commission (47 C.F.R. § 22.317); and they may permanently discontinue operations without providing advanced notice to the Commission or customers (4 7 C.F.R. § 20.15).

[163] *Id.* at 6. U.S. Cellular partners with AirCell, to provide cellular communications to aircraft. AirCell partners provide service to aircraft via a waiver granted by the Wireless Telecommunications Bureau. Under the terms of this waiver, AirCell transmissions are secondary to terrestrial cellular communications.

[164] *See In the Matter of AirCell, Inc. Petition, Pursuant to Section 7 of the Act, For a Waiver of the Airborne Cellular Rule, or, in the Alternative, for a Declaratory Ruling, Order,* 14 FCC Rcd 806, at para. 13 (WTB 1998). Section 22.925 of the Commission's rules provides that cellular phones may not be operated on airborne airplanes. 47

assert the claim that AirCell's secondary operations are in any way entitled to protection from the signals of non-participating cellular licensees. As the licensees with primary status in this band, the non-participating cellular licensees would not be under any obligation to alter their operations in any way."[165] We note that AirCell itself did not comment in this proceeding regarding any potential negative impact of a rule change to its operation. Accordingly, we adopt our proposal to remove the vertical wave polarization requirement.[166]

### G.    Assignment of System Identification Numbers.

52.    *Background.* Section 22.941 of the Commission's rules sets forth the procedure by which the Commission assigns system identification numbers (SIDs) to systems in the Cellular Radiotelephone Service. SIDs are used by cellular systems to identify the home system of a cellular telephone and by cellular telephones to determine their roaming status. SIDs are also used by cellular systems as part of the mobile identification process for billing purposes. Today, SIDs are treated by the Commission as a required element of the cellular system license, *i.e.*, they appear in the official license record. They are first assigned to cellular systems by the Commission during initial license grant; new SIDs may be obtained, if needed, at a later date. The Commission began assigning cellular SIDs in the early 1980s at the request of the Electronics Industry Association (EIA). Although other CMRS providers such as PCS and SMR also have a means to perform the functions described above, these means do not involve the Commission and the identifiers used are not listed on their licenses.

53.    In the *NPRM*, we proposed to no longer consider SIDs as a term of the cellular license and to remove the requirement in section 22.941 of our rules that cellular licensees notify the Commission of the use of additional SIDs. We proposed to retain portions of that rule that provide that a cellular system may transmit another system's SID only if that system consents to such use. Further, we invited proposals under which SID coordination functions would be carried out by an industry organization, rather than by the Commission.

54.    *Discussion.* We conclude that it is not necessary in the public interest to retain the current cellular SID rules as set out in section 22.941 of our rules. As we noted in the *NPRM*, there is no public policy reason that SIDs must be a term of cellular authorizations.[167] The comments overwhelmingly support our proposal.[168] The commenters agree that there is no regulatory purpose in retaining SIDs as a term of cellular licenses. As Cingular and CTIA point out, there are no SID rules for

---

C.F.R. § 22.925. The Wireless Telecommunications Bureau's decision was later affirmed by the Commission, In the Matter of AirCell, Petition, Pursuant to Section 7 of the Act, For a Waiver of the Airborne Cellular Rule, or, in the Alternative, for a Declaratory Ruling, 15 FCC Rcd 9622 (2000), as well as the United States Court of Appeals, District of Columbia Circuit. *AT&T Wireless Services, Inc., et al. v. FCC*, 270 F.3d 959 (D.C. Cir. 2001), petition for rehearing denied January 29, 2002. The D.C. Circuit Court of Appeals remanded the matter back to the Commission only to the extent that it required the Commission to more fully explain its conclusions regarding interference levels caused by the AirCell system.

[165] *Id.*

[166] We clarify that, because we are now eliminating the requirement entirely, as of the effective date of this action Cingular is no longer bound by the conditional nature of the *Cingular Waiver*.

[167] *See NPRM* at para. 50.

[168] Qualcomm Comments at 6; Cingular Comments at 19, CenturyTel Comments at 6; CTIA Comments at 15; Verizon Comments at 30.

PCS, SMR, or other CMRS, and this administrative function is carried out successfully within those radio services by the private sector without Commission involvement.[169]

55.    Further, we agree with Cingular's suggestion that the Commission remove the SID rule in its entirety, providing cellular licensees with the same treatment as PCS and other CMRS carriers.[170] Verizon disagrees with this conclusion in part, recommending instead that the Commission retain the "consent for use" portion of the rule (*i.e.* allowing the usage of another system's SID only pursuant to consent), and that the Commission be available to resolve disputes over SIDs.[171] Based on the record before us, however, we see no reason to retain a portion of the rule or intervene when the private sector has shown, as in the case of PCS, for example, that it is capable of coordinating these types of administrative functions on its own. For the reasons stated above, we are eliminating the SID rule in favor of administration of this function by the private sector.

56.    In eliminating this rule, we must take certain steps to provide a smooth transition of the SID administration function to the private sector. These steps include identifying a party or parties to administer the function, transitioning the Commission's SID database to the party(s), and publicizing the change to the cellular industry. Therefore, we authorize and direct the Wireless Telecommunications Bureau to take all necessary steps to privatize this function.[172]

## H.    Determination of Cellular Geographic Service Area.

57.    *Proposal.* Section 22.911(a) of our rules sets forth a standardized method for determining the CGSA of a cellular system. A system's CGSA is defined as the geographic area served by the system, within which that system is entitled to protection and adverse effects are recognized for the purpose of determining whether a petitioner has standing.[173] Cellular licensees must provide the Commission with certain technical parameters describing each cell site that makes up the external boundary of its system. These technical parameters (latitude, longitude, height above average terrain, and power), or in some cases, an alternative study, are used to determine the service area boundary (SAB) for each cell site.[174] In this vein, the geographic area within the aggregated SAB contours of a system (excluding areas outside the market boundary) is its CGSA. The method for determining the CGSA uses a general mathematical

---

[169] Cingular Comments at 19; CTIA Comments at 16.

[170] Cingular Comments at 19.

[171] Verizon Comments at 23-24.

[172] In a somewhat similar situation, we previously delegated authority to the Wireless Telecommunications Bureau to privatize the issuance of maritime mobile service identities (MMSIs). *See* In the Matter of Amendment of Part 0 of the Commission's Rules to Delegate Authority to the Wireless Telecommunications Bureau Concerning Procedures for Assigning Domestic Maritime Mobile Service Identities (MMSI)s, *Order*, 14 FCC Rcd 21517 (1999); "Commission Announces Revision of Procedures for Assigning Maritime Mobile Service Identities," *Public Notice*, 16 FCC Rcd 918 (WTB 2001).

[173] *See* 47 C.F.R. § 22.99.

[174] *See* 47 C.F.R. § 22.911.

formula to calculate distances from the cell site along the cardinal radials[175] to the SAB of each cell in the system.[176]

58.    Paragraph (b) of section 22.911 provides, however, that any cellular licensee may apply for a modification of its licensed CGSA if it believes that the standard method produces a CGSA that is substantially different from the actual coverage of its system.  In adopting this alternative approach for calculating the CGSA, the Commission stated that alternative showings would only be accepted where the change to the CGSA is substantial and justified by unique or unusual circumstances, or where the SAB formula is clearly inapplicable.[177]  When preparing to file an application requesting such a modification, the licensee must employ alternative methods (actual measurements, more accurate prediction models or a combination of the two) to determine the location of the median 32 dBμV/m field strength contour and the distances along cardinal radials to that contour.  In describing how these distances to the median 32 dBμV/m contours must be used to determine the CGSA, paragraphs (b)(1) and (b)(3) of section 22.911 use the term SAB in several places.  In our experience, this occasionally leads licensees to believe that they may employ the alternative methods to determine an SAB, as opposed to the CGSA, and then to use that "alternate" SAB in connection with various other rules such as the SAB extension rule[178] or the traffic capture protection rule.[179]  In the *NPRM*, we sought to clarify that the SAB of a cell derived using the standard method and the 32 dBμV/m contour that is used when preparing an alternative CGSA determination are different and not interchangeable.[180]  Accordingly, we proposed to reword paragraphs (b)(1) and (b)(3) of section 22.911 to replace the word "SAB" with "32 dBμV/m contour."

59.    *Discussion.*  We adopt the rule clarification as proposed.  In setting out the standard method, we sought to establish a method that would simplify and remove a measure of uncertainty from the process of calculating and plotting CGSAs.[181]  We sought to prevent disagreements between parties and the Commission regarding the accuracy of methods used by parties to predict or measure actual coverage for a particular location or terrain.[182]  Although there may be certain situations in which it may not represent actual coverage as closely as other methods, the standard formula provides a simple and

---

[175] Cardinal radials are eight imaginary straight lines extending radially on the ground from an antenna location, defined according to specified azimuths. *See Id.* at § 22.99 (defining cardinal radials).

[176] An SAB measures the service area of a particular cell site and is a component of the CGSA, which is a composite of the service areas of all of the cells in the particular cellular system.  It also is used to evaluate extensions and traffic capture. *See Id.* at §§ 22.911-12.

[177] *See* In the Matter of Amendment of Part 22 of the Commission's Rules to Provide for Filing and Processing of Applications for Unserved Areas in the Cellular Service and to Modify Other Cellular Rules, *Second Report and Order*, CC Docket No. 90-6, 7 FCC Rcd 2449 (1992).

[178] 47 C.F.R. § 22.912.

[179] 47 C.F.R. § 22.911(d)(2).  In other words, the 32 dB:V/m contour determined in an alternative CGSA showing is to be used only to calculate a licensee's protected service area.  It is not to be used for other purposes such as determining whether a carrier is causing interference or is capturing the subscriber traffic of adjacent systems.

[180] The SAB is the boundary calculated using the standard method set out in section 22.911(a), regardless of the actual median field strength along the boundary (as actually measured or predicted by alternative propagation methods).  In contrast, the 32 dB:V/m contour is the locus of points where the predicted or measured median field strength drops to 32 dB:V/m.

[181] *See* In the Matter of Amendment of Part 22 of the Commission's Rules to Provide for Filing and Processing of Applications for Unserved Areas in the Cellular Service and to Modify Other Cellular Rules, CC Docket No. 90-6, *Second Report and Order*, 7 FCC Rcd 2449 (1992).

[182] *Id.*

consistent method by which to calculate cellular system coverage. Our decision to clarify section 22.911(a) is consistent with the Commission's original intent in limiting the scope of alternate CGSA showings, *i.e.*, to expedite Commission processing of applications, thereby avoiding delays in the provision of cellular service to the public.

60.     In their comments, both Cingular and Verizon seek to change the underlying purpose of the alternate CGSA determination method by expanding its scope and effect.[183]  Both Cingular and Verizon argue that alternative propagation methods should not be limited to CGSA determinations. They argue that in instances in which an alternative CGSA method has been approved, there is no reason that the carrier should not be able to use the alternative method in order to determine, for example, whether individual SABs are encroaching upon the CGSA of another licensee.[184]  Their proposed expansion of section 22.911 could lead to carriers asking the Commission's staff to review alternate showings in situations where one party seeks to place cell sites closer to neighboring systems than would be allowed by our existing rules.  While we note that their arguments are not without merit, we conclude that to expand the use of alternative propagation methods to calculate, for example, SAB extensions, runs counter to our goal of setting out a means of determining cellular system coverage that carriers will find to be straightforward and predictable in all circumstances.  We do not foreclose, however, the ability of carriers in adjacent markets to agree to the use of an alternative propagation method, or to enter into contract agreements, pursuant to section 22.912, to allow SAB extensions calculated using the standard method into the other carrier's CGSA.  We believe that a process that affords carriers flexibility and permits parties to enter into contractual agreements will expedite service to subscribers, in comparison to a more protracted process whereby parties must present and argue the merits of conflicting engineering studies before the Commission.  Accordingly, we conclude that such situations can be more quickly settled by inter-carrier negotiations, rather than relying on individual review by the Commission's staff.

### I.     Service Commencement and Construction Periods.

61.     *Background.* In the *NPRM*, we noted that section 22.946 sets out construction requirements relating to the deployment of new cellular systems.[185]  This rule section was previously amended in the *Universal Licensing System* proceeding.[186]  In implementing the *ULS Report and Order*, however, a table entitled "H-1 - Commencement of Service," was inadvertently deleted from section 22.946.  Because certain information in the table was out-dated, we proposed to correct section 22.946 by re-inserting the table, and to reflect updated information.  We also proposed to delete the final phrase of section 22.946(b), which prohibits cellular system licensees from "intentionally serv[ing] only roamer

---

[183] Cingular prefers that we allow alternative propagation methods to be used for evaluating signal extensions into adjacent systems, in lieu of the formula in section 22.911(a). Cingular Comments at 20-21.  Verizon argues that when a carrier has determined its CGSA by use of an alternative method, it is "illogical and inconsistent" to require that cell SABs be used for all other purposes.  Verizon Reply Comments at 14.  Verizon argues that sometimes alternative methods are used to demonstrate that CGSAs should be smaller than predicted by the mathematical formula method, and that in these situations, the alternative method 32 dBμV/m contour should be used instead of the cell SABs to determine whether there are signal extensions into the adjacent system's CGSA requiring consent.

[184] Cingular Comments at 20-21; Verizon Comments at 24-25.

[185] *NPRM* at para. 55.

[186] *See* In the Matter of Biennial Regulatory Review--Amendment of Parts 1, 13, 22, 24, 26, 27, 80, 87, 90, 95, 97, and 101of the Commission's Rules to Facilitate the Development and Use of the Universal Licensing System, WT Docket No. 98-20, *Report and Order*, 13 FCC Rcd 21027 (1998) (*ULS Report and Order*); In the Matter of Biennial Regulatory Review--Amendment of Parts 1, 13, 22, 24, 26, 27, 80, 87, 90, 95, 97, and 101of the Commission's Rules to Facilitate the Development and Use of the Universal Licensing System, WT Docket No. 98-20, *Memorandum Opinion and Order on Reconsideration*, 14 FCC Rcd 11145 (1999).

stations."[187]  We noted that this rule was originally implemented because there are only two cellular carriers in a market, and, at the time the rule was established, no other mobile telephony options were available.  If one cellular carrier served only roamers, there would be no competition to the other carrier with respect to subscribers.[188]  Given the mobile telephony choices that consumers now have, we tentatively concluded that the rule was no longer necessary.

62.    *Discussion.*  We conclude that the competitive state of the mobile telephony market makes unnecessary the rule prohibiting carriers from serving only roamer stations.  As consumers now have numerous mobile telephony offerings from which to choose, the concern regarding lack of competition no longer exists.  Accordingly, we will remove the provision that prohibits service only to roamer stations.

63.    We also find that section 22.946 should reflect accurate cellular service construction information.  After we adopted the *NPRM*, we issued a *Report and Order* in WT Docket No. 97-112 regarding cellular service in the Gulf of Mexico.[189]  In that proceeding, we amended section 22.946 to reflect construction requirements for licensees in the Gulf of Mexico.  Because it was necessary to amend section 22.946 to add the Gulf of Mexico construction requirements, we decided to re-insert the inadvertently omitted Table H-1 at that time.  We note that section 22.946 was amended to re-insert Table H-1 after the comment period in this proceeding had run, and that no one filed comments opposing that correction to this rule section.  Accordingly, it is unnecessary to take further action regarding Table H-1 in rule section 22.946.

## J.    Incidental Services Rule.

64.    *Background.*  Adopted in 1983, section 22.323 of the Commission's rules[190] authorizes carriers operating in the Part 22 Public Mobile Radio Services to provide other communications services incidental to the primary public mobile service, provided certain conditions are met.  In general, section 22.323 requires carriers providing incidental services to protect mobile subscribers by ensuring that: (1) the costs and charges of subscribers not wishing to use incidental services are not increased as a result of the carrier's provision of incidental services to other subscribers; (2) the quality and availability of primary public mobile service does not materially deteriorate; and (3) provision of such incidental services is not inconsistent with the Communications Act of 1934 or the Commission's rules and policies.

65.    In the 1996 *CMRS Flex First Report and Order*, we amended our rules to allow CMRS carriers (including all Part 22 licensees) to provide fixed wireless services on a co-primary basis with commercial mobile services.[191]  We did not, however, modify section 22.323 as it applies to incidental services offered by Part 22 licensees.  We further amended our rules in the *CMRS Flex Second Report and Order* to clarify that fixed wireless services provided pursuant to section 22.901(d) of the

---

[187] 47 C.F.R. § 22.946(b).

[188] *NPRM* at para. 55.

[189] *See* In the Matter of Cellular Service and Other Commercial Mobile Radio Services in the Gulf of Mexico, WT Docket No. 97-112, Amendment of Part 22 of the Commission's Rules to Provide for Filing and Processing of Applications for Unserved Areas in the Cellular Service and to Modify Other Cellular Rules, CC Docket No. 90-6, *Report and Order*, 17 FCC Rcd 1209 (2002).

[190] 47 C.F.R. § 22.323.  This rule was originally adopted as rule section 22.308.

[191] *See* Amendment of the Commission's Rules to Permit Flexible Service Offerings in the Commercial Mobile Radio Services, WT Docket No. 96-6, *First Report and Order and Further Notice of Proposed Rulemaking*, 11 FCC Rcd 8965 (1996) (*CMRS Flex First Report and Order*).

Federal Communications Commission                    FCC 02-229

Commission's rules[192] are not subject to the incidental services restrictions set forth in section 22.323.[193] At the same time, we also eliminated the section 22.323 condition that licensees notify the Commission prior to providing incidental services.[194] Additionally, we indicated that the continuing need for section 22.323 would be revisited as part of the biennial review of all regulations that apply to providers of telecommunications service.[195] In the *NPRM*, we proposed to eliminate the conditions imposed by paragraphs (a)-(c) of section 22.323, and sought comment on whether we should also remove the remaining provision (*i.e.*, the statement that incidental services are permitted) as it applies to some or all Part 22 services.

66.    In a related matter, the *NPRM* also sought comment on FreePage Corporation's (FreePage) request that section 22.323 be amended to include the "Limited Program Distribution Service" (LPDS) service proposed by FreePage as an "incidental service." In February 2000, the Bureau sought comment on a petition for rulemaking filed by FreePage requesting that we amend section 22.323 to permit paging licensees to use their assigned channels to transmit audio programming of interest to a narrow or specialized audience. Possible services cited by FreePage included, without limitation, children's programming, foreign language programming, and reading services for persons who have sight disabilities. By Public Notice, the Bureau requested comments on whether section 22.323 should be amended to include the LPDS service proposed by FreePage as an "incidental service" and on whether any other Commission rules should be amended to permit more flexible use of spectrum licensed to CMRS providers.[196] Four parties, including FreePage, filed comments.[197] In the *NPRM*, we invited comments on whether spectrum assigned to CMRS licensees could be used for the LPDS service proposed by FreePage. In particular, we sought comments addressing whether the service proposed by FreePage is in fact a broadcast service, and, therefore, whether we would need to change existing spectrum allocation and service rules to permit LPDS service in spectrum assigned to CMRS licensees. More generally, we also requested comments on what effects, if any (*e.g.*, interference, service preclusion, or redundancy of service offerings), the implementation of FreePage's LPDS proposal would have on other authorized service offerings or services proposed in pending Commission rulemaking proceedings. Finally, we solicited comments from members of the disability community regarding how they might benefit from a revision of the Commission's rules that would permit use of the spectrum for programming to narrow or specialized audiences.

---

[192] 47 C.F.R. § 22.901(d).

[193] See Amendment of the Commission's Rules to Permit Flexible Service Offerings in the Commercial Mobile Radio Services, WT Docket No. 96-6, Second Report and Order and Order on Reconsideration, 15 FCC Rcd 14680 (2000) (CMRS Flex Second Report and Order).

[194] *See Id.* at para. 13.

[195] *See Id.* at para. 14.

[196] *See* "Wireless Telecommunications Bureau Seeks Public Comment on Petition to Amend 47 C.F.R. Section 22.323 to Allow CMRS Licensees to Provide Limited Program Distribution Service," *Public Notice*, 15 FCC Rcd 2561 (WTB 2000). A separate order denied FreePage's request for a waiver, a developmental license or an experimental license to offer its proposed service. *See In the Matter of FreePage Corporation, Order*, 15 FCC Rcd 2556 (WTB 2000).

[197] In addition to FreePage's comments, comments in support of FreePage's petition were filed by Chadmoore Wireless Group, Inc. and Arch Communications Group, Inc., and comments opposing FreePage's petition were filed by the National Association of Broadcasters. Reply comments were filed by FreePage.

67.    *Discussion.*  We agree with commenters that the imposing of conditions on the provision of incidental services by Part 22 licensees is no longer necessary.[198]  Section 22.323(a) imposes the condition that the costs and charges to subscribers not wishing to receive incidental services may not be increased as a result of the provision of incidental services to other subscribers.  Because of the competitive wireless environment, however, CMRS licensees are not subject to federal rate regulation and are not permitted to file tariffs with the Commission.  Under these circumstances, we conclude that this rate restriction is unnecessary, as any dissatisfied subscriber will have the option of switching to a competing carrier.  In addition, the meaning of the restriction in a deregulated, detariffed environment is unclear.  For the same reasons, we conclude that the section 22.323(b) condition regarding the quality and availability of the primary public mobile service is no longer necessary.  We also conclude that it is unnecessary to remind carriers of their obligation to comply with applicable provisions of the Act and of our rules and policies.   In light of the development of meaningful economic competition since section 22.323 was adopted, therefore, we find that imposing these conditions in our rules is no longer necessary in the public interest.

68.    Having concluded that the conditions limiting the provision of incidental service by Part 22 licensees should be eliminated, we further conclude that there is no reason to retain the remainder of the rule in the absence of those conditions.  We recognize that some commenters advocated that we retain this portion of the rule on the grounds that having an express provision for incidental services codified in the rules is helpful in demonstrating to state commissions that certain services must be treated as CMRS exempt from state and local regulation of rates and entry.[199]  We emphasize that our elimination of the rule in no way diminishes or otherwise alters either the right of Part 22 licensees to provide incidental services or the regulatory treatment of those services as CMRS, which we have repeatedly affirmed in prior orders.[200]

69.    With respect to FreePage's request to include a provision in section 22.323 that LPDS is an incidental service within the meaning of the rule, we deny the request but grant alternative relief as follows.  First, we find that it is unnecessary to determine whether FreePage's LPDS service constitutes an incidental service, because pursuant to the Commission's decisions in the *CMRS Flex First Report and Order* and *CMRS Flex Second Report and Order*, FreePage may provide any form of fixed or mobile service under a Part 22 authorization, provided only that its service does not constitute broadcasting.[201]  Second, to the extent FreePage's intended service offering constitutes broadcast service, we find that it is in the public interest to provide FreePage with the flexibility to provide its LPDS service pursuant to the terms of a developmental authorization.  We therefore direct the staff to waive the allocation if necessary in order to process the developmental license.  Accordingly, FreePage may file an application for developmental authority with the Commission, which will be processed by the Bureau pursuant to the regulations set forth in section 22.401 of our rules.[202]  We believe that a developmental license will afford FreePage the opportunity to assess consumer demand for its LPDS service offering.

---

[198] CenturyTel Comments at 6; CTIA Comments at 17; Cingular Comments at 21; Verizon Comments at 27; Verizon Reply Comments at 15; RTG Comments at 6-10; Western Wireless Comments at 14-15.

[199] *See e.g.* CenturyTel Comments at 6; Cingular Comments at 21-22; RTG Comments at 6-10.

[200] In the Matter of Implementation of Sections 3(n) and 332 of the Communications Act - Regulatory Treatment of Mobile Services, Second Report and Order, 9 FCC Rcd 1411, 1424, para. 36 (1994); *CMRS Flex First Report and Order*, 11 FCC Rcd at 8968-69 (holding that mobile or fixed incidental services offered by CMRS carriers fall within the definition of mobile service and are subject to CMRS regulation).

[201] The current allocation for Part 22 does not permit broadcasting in Part 22 spectrum.

[202] 47 C.F.R. § 22.401 *et seq.*

Federal Communications Commission                    FCC 02-229

### K.    Cellular Anti-Trafficking Rules.

70.    *Background.* In the *NPRM*, we noted that sections 22.937,[203] 22.943,[204] and 22.945[205] were originally adopted to prevent speculation and trafficking in cellular licenses that were awarded by random selection.[206] Because we are now required to resolve mutually exclusive applications for initial cellular licenses through competitive bidding,[207] we proposed to eliminate or substantially modify rule sections 22.937, 22.943, and 22.945 as they are now unnecessary and no longer serve the public interest.[208]

71.    *Discussion.* We find, and commenters agree, that these rules are no longer necessary in the post-lottery era and should be removed or substantially modified.[209] In adopting section 22.937,[210] the Commission stated that it was requiring applicants to show financial qualification because of the large capital investment required to finance the complex and sophisticated technology associated with cellular

---

[203] 47 C.F.R. § 22.937. Pursuant to section 22.937, an applicant for a new cellular system must, at the time of application filing, make a demonstration of financial qualification that it has a separate market-specific firm financial commitment or available financial resources to construct and operate a cellular system for one year. The applicant must include with the application an assessment of estimated costs, source of financing, a lender's statement or certain financial statements in cases of personal or internal financing.

[204] 47 C.F.R. § 22.943. Section 22.943 sets out limitations on assignments and transfers of cellular authorizations, and specifies that such assignments or transfers are, with certain exceptions, subject to anti-trafficking provisions of former rule section 22.139. The Commission incorporated former section 22.139 into consolidated rule section 1.948(i), 47 C.F.R. § 1.948(i). *See ULS Report and Order*, 13 FCC Rcd at App. E. Section 22.943 exceptions to the anti-trafficking rule permit the filing of: 1) applications reflecting the trading of an ownership interest in an authorized but unconstructed cellular system in one market for a commensurate interest in a cellular system in another market; and 2) applications to transfer or assign a cellular authorization obtained by lottery after commencement of service.

[205] 47 C.F.R. § 22.945. Section 22.945 for the most part prohibits parties from having any direct or indirect interest in more than one application for authority to operate a new cellular system in the same cellular market. Exceptions to this prohibition include licensees of existing systems whose CGSA abuts a proposed CGSA and ownership interests in public traded corporations of less than 5 percent. The Commission sought to prevent abuses of the lottery process by prohibiting the filing of multiple applications in the same market by those with either a majority interest in an entity or a minority interest that may have *de facto* control of the applicant. Because the process of reviewing whether an applicant can exercise control over an applicant is difficult and time-consuming, the Commission sought to avoid protracted challenges to the selection process by precluding participation in more than one application per market in cellular lotteries. *See* 98 FCC 2d at 218.

[206] Cellular licenses in the first 30 MSAs were awarded by comparative hearing. Later, the Commission adopted rules to award licenses for other MSAs and RSAs by random selection. In the Matter of Amendment of the Commission's Rules to Allow the Selection from Among Mutually Exclusive Competing Cellular Applications Using Random Selection or Lotteries Instead of Comparative Hearings, CC Docket 83-1096, *Report and Order*, 98 FCC 2d 175 (1984).

[207] As of July 1, 1997, the Commission was prohibited by the Balanced Budget Act of 1997 from issuing any license or permit through random selection. The Commission is now required to resolve mutually exclusive applications for initial licenses through competitive bidding. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 at section 3002(a); 47 U.S.C. § 309(i), (j) (1997).

[208] *See NPRM* at para. 66.

[209] Cingular Comments at 22-23; Verizon Comments at 29-31; Western Wireless Comments at 15-16.

[210] Section 22.937 was originally adopted as section 22.917.

operations.[211] The Commission noted that cellular service was viewed as a relatively high-cost business venture because the service was still at an early stage of development.[212] We conclude that section 22.937 is no longer necessary as a general matter because the cellular radiotelephone service has matured and there are two authorized cellular carriers in all MSAs and virtually all RSAs.[213] As we noted in the *NPRM*, our cellular rules have been amended to permit interested parties to file applications for any areas not serviced by cellular carriers after the expiration of the applicable build-out period,[214] and such applications are now subject to competitive bidding.[215] Although we proposed to retain section 22.937 in the context of comparative renewal proceedings, we find that the rule is not necessary. We have the authority to seek financial qualification information in a comparative renewal proceeding if we so choose. We therefore eliminate section 22.937 in its entirety.

72.     We similarly conclude that section 22.943 should be removed as unnecessary. Our anti-trafficking rules were developed to deter speculation on cellular licenses. In setting out the anti-trafficking rules, the Commission sought to balance the public interest in liberal transferability of licenses with a means to deter insincere applicants from speculating on unbuilt facilities.[216] Accordingly, we proposed in the *NPRM* to eliminate section 22.943 to the extent that it prohibits trafficking in cellular licenses and precludes unserved area licensees from assigning or transferring an authorization until they have provided service to subscribers for at least one year.[217] We noted that the cellular service-specific anti-trafficking rule set out in section 22.943 may be unnecessary and duplicative as there are similar provisions in Part 1 of our rules that are applicable to all wireless services.[218]

73.     We noted in the *NPRM* that, while section 22.943 was useful in deterring speculation during the time period in which we used lotteries to select licensees, we now use competitive bidding to resolve mutual exclusivity. Mutually exclusive applications for licenses in other CMRS are also required to be resolved through the use of competitive bidding. Yet in those cases, we do not impose service-specific anti-trafficking rules, or mandate specific holding periods prior to assignment or transfer of licenses acquired through competitive bidding.[219] Accordingly, we eliminate the portions of section 22.943 that prohibit trafficking in cellular licenses, and that require carriers who acquired unserved area licenses to provide service to subscribers for at least one year before such licenses may be assigned or

---

[211] *See* In the Matter of An Inquiry into the Use of the Bands 825-845 MHz and 879-890 MHz for Cellular Communications Systems, CC Docket No. 79-318, *Report and Order*, 86 FCC 2d 469 (1981).

[212] *Id.* at 501.

[213] *NPRM* at para. 67. We note that three of the remaining four RSAs were auctioned on June 4, 2002, although licenses have not yet been granted. Accordingly, there should be two cellular carriers in all but one RSA in the near future.

[214] *See* section 22.947. The two initial licensees of a cellular market are given a five year period within which they have exclusive right to expand (with certain exceptions).

[215] *See* 47 C.F.R. §§ 22.131, 22.949.

[216] *See* 98 FCC 2d at 217.

[217] *NPRM* at para. 68.

[218] *Id.* Section 1.948(i) states that "[a]pplications for approval of assignment or transfer may be reviewed by the Commission to determine if the transaction is for purposes of trafficking in service authorizations." 47 C.F.R. § 1.948(i). Pursuant to section 1.948(i), we may require applicants to submit an affirmative showing demonstrating that the assignor did not acquire the authorization for the principal purpose of speculation or profitable resale of the authorization. 47 C.F.R. § 1.948(i)(2).

[219] One exception is for PCS entrepreneur blocks. Limits were specified for these licenses because the entrepreneur blocks were limited to small business applicants.

transferred. We further find that that the cellular service-specific anti-trafficking rule set out in section 22.943 is unnecessary, given the presence of the anti-trafficking provisions of section 1.948(i), which is applicable to all services.[220]

74.      Similarly, because section 22.945 was adopted for the sole purpose of preventing lottery system abuses,[221] our obligation to resolve mutual exclusivity through competitive bidding also makes this rule unnecessary. An applicant filing more than one application for a specific unserved area under our current rules would have no advantage over other applicants seeking authorization to serve the same geographic area. One commenter agrees that section 22.945 is obsolete.[222] Because this provision was adopted to prevent lottery abuses and is thus no longer relevant,[223] we therefore eliminate section 22.945 as no longer necessary in the public interest.

## L.      Other Rule Changes Recommended by Commenters.

75.      In the *NPRM*, we not only sought comment on our specific proposals, but also invited comment on whether we should modify any additional provisions of our Part 22 rules as a result of competitive or technological developments. In the sections below, we address these additional recommendations made by the commenters in this proceeding.

### 1.      Overhaul of the Unserved Area Licensing Rules.

76.      *Background.* Section 22.941 sets forth the "unserved area" licensing process for the cellular service. Briefly, initial licensees in a market are given five years in which to construct cell sites without the possibility of competing applications from neighboring carriers. At the end of the initial five-year period, the unserved area licensing process governs the expansion of a carrier's system by making all areas in the market that are not yet served available for licensing to other carriers. The unserved area process begins with Phase I, which is a one-time, one-day window for all interested parties to file for licenses in the unserved portions of the market. After disposal of any Phase I application(s), the cellular market proceeds to Phase II procedures, whereby carriers file applications under a 30-day notice and cut-off filing window.[224] In other words, if a carrier files for unserved area under Phase II procedures and its application is not mutually exclusive with another application filed within 30 days of the public notice of the initial filing, the initial filing is granted. If mutually exclusive applications are filed, the matter is resolved via competitive bidding. The unserved area licensing approach provides ample time for the initial licensee to construct facilities within the market, and later provides a means for other carriers to serve portions of the market that the initial licensee does not wish to serve. In this situation, carriers are only licensed for areas that they intend to serve.

---

[220] Our conclusion to remove service-specific anti-trafficking provisions of section 22.943 extends to section 22.943(c), which states that we will not accept applications for consent to assign or transfer a cellular authorization acquired by a current licensee for the first time as a result of a comparative renewal proceeding until the system have provided service to subscribers for at least three years. *See* 47 C.F.R. § 22.943(c). We noted in the *NPRM* that we would leave intact portions of section 22.937 relating cellular renewal proceedings, but requested comment on whether to retain section 22.943(c). *See NPRM* at para. 69. Although section 22.943(c) also relates to cellular renewals, it is nonetheless an anti-trafficking provision and should be removed as duplicative of rule section 1.948(i).

[221] *NPRM* at para. 70.

[222] Western Wireless Comments at 16.

[223] Verizon Comments at 30.

[224] 47 C.F.R. §§ 22.131(b)(3), 22.949(b).

77.     Certain carriers recommend that we replace the unserved area licensing process. In general, the commenters point out that the current site-by-site approach requires pre-approval each time a licensee wishes to expand its system. Proposals by two of the commenters favor a one-time process that licenses the remaining unserved areas, so that pre-approval of future expansions is no longer necessary. For example, Western Wireless recommends that the Commission abandon the per-application approach of the unserved area rules and instead: (1) automatically incorporate areas of 50 square miles or less into the CGSAs of the first-authorized incumbent adjoining the unserved area; and (2) open a filing window for all unserved areas exceeding 50 square miles, resulting in either the incorporation of the unserved area into the incumbent carrier's CGSA, or an auction among mutually exclusive applicants.[225] Cingular also proposes a similar approach.[226] AT&T Wireless proposes a more limited change, eliminating filings for unserved areas of less than 50 square miles that are completely surrounded by an incumbent's CGSA (i.e., the incumbent is the only one eligible under the rules to file an application).[227] Further, Dobson proposes that incumbents should be able to cover unserved areas of less than 50 square miles on a secondary basis without having to obtain prior Commission approval.[228] Commenters supporting an alternative unserved area licensing scheme collectively argue that the current approach must be replaced because it is administratively inefficient, delays service to rural areas, and is dissimilar to PCS and SMR wide-area licensing approaches.[229]

78.     *Discussion.* While we applaud the commenters' initiative in recommending a significant overhaul of the cellular unserved licensing process, the suggestions made by commenters constitute a fundamental change to our cellular service licensing model, and, as such, are beyond the scope of this proceeding. We also note that under our current process, the Commission receives approximately 40 unserved area applications each month, disposing of each usually within 45-60 days.[230] Given that so few unserved area applications are filed with the Commission today and are processed quickly, we question whether the burdens on all licensees of a major overhaul at this point warrants any corresponding benefits.

79.     In considering the wisdom of making significant changes within the cellular unserved licensing context, we would need to identify an alternative approach that is administratively efficient, less complicated than the current approach, represents an improvement over the status quo in terms of speed of licensing and convenience for licensees, and continues to provide small as well as large carriers with reasonable opportunities to serve currently unserved areas. Given that the current system results in little administrative delay, we do not find that commenters have done so.

80.     Further, commenters have failed to adequately address construction, interference protection, and market structure issues that would need to be addressed under a new processing regime. First, we would need to address the construction requirements that would be placed on auction winners and incumbents under their proposal. For example, the small number of unserved areas remaining are characterized by sparse, widely-distributed populations. What type of population-based or geographic-

---

[225] Western Wireless Comments at 6-9. Western Wireless also proposes to exempt "first in" incumbents from certain of the filing requirements under this approach.

[226] Cingular Comments at 24.

[227] AT&T Wireless Comments at 5.

[228] Dobson Comments at 4.

[229] Cingular Comments at 25; Western Wireless Comments at 3-4.

[230] One reason for the small number of unserved area applications filed is that only 15 percent of the geography within the continental United States is outside of the licensed service area boundaries of existing A block cell sites, and only 12 percent for B block cell sites.

based coverage requirements make sense for these areas? Further, we would need to address the method(s), in the context of an overlay auction, that would be used to limit the potential for in-band interference to licensees in neighboring markets. In other geographically-licensed services like PCS, for example, we have specified a maximum signal strength at the market boundary (unless the licensees agree to a higher signal strength), and in the cellular service we require licensees to coordinate facilities based on mileage.

81.    Also, the commenters' proposal assumes that the remaining unserved areas would be licensed via an overlay auction based on MSAs and RSAs. We question whether it would be more appropriate to use an alternative scheme, particularly one that does not auction unserved areas spanning multiple markets as separate license areas.[231] Commenters have not recognized the significance of these issues in our reform. Finally, there are a number of administrative burdens associated with the commenters' proposal. For example, it would be a major undertaking by the Commission's staff and licensees to locate every unserved area of less than 50 square miles, and to determine which adjacent incumbent licensee would obtain the area under the suggested approach. Likewise, the recommended approach would require detailed analysis of the licensing history of each market in order to determine which incumbent licensees were "first in" in order to exempt them from certain of the proposed filing requirements.

82.    In sum, even in assuming commenters' proposals fell within the scope of this proceeding, given that so few unserved area applications are filed with the Commission today and are processed quickly, we question whether the burdens on all licensees of a major overhaul at this point warrants any corresponding benefits. We believe that a more complete record must be developed before any Commission action is warranted. Carriers may propose modifications to the cellular unserved licensing process in the form of a petition for rule making, which would facilitate the development of a full record with respect to this matter.

### 2.    CGSA Expansion Notifications.

83.    *Background.* Dobson seeks to have removed the requirement that licensees notify the Commission of each CGSA expansion for markets within the initial five-year construction period.[232] Currently, section 22.165(e) requires licensees to notify the Commission within 15 days of expanding their CGSAs, even during the initial five-year construction period. As discussed *supra*, cellular licensees are free to construct facilities anywhere within their markets without the possibility of competing applications during the initial construction period. Dobson recommends that we simply require the licensee to file a system information update at the end of the five-year period, *i.e.*, identify the areas that are served and unserved in preparation for the unserved area Phase I process.

84.    *Discussion.* We agree with Dobson that generally the Commission and other licensees have no interest in knowing the precise location of an initial licensee's CGSA until end of the initial five-year period. At that point, the CGSA must be a matter of record available to potential Phase I unserved area applicants as well as the Commission's staff in order to process the unserved area applications. Presently, there are only eleven cellular markets that are still within the initial five-year construction period. In addition, we will soon issue initial licenses in three of the remaining RSAs. Even though very few licensees will be in a position to take advantage of this change, we will revise the rule substantially as

---

[231] For example, under the commenters' proposal, if a contiguous unserved area spans multiple markets, an applicant would need to bid on each of the multiple markets in order to become licensed to serve the area. We question whether this is more efficient than the current process.

[232] Dobson Comments at 5.

requested.  Therefore, we will revise section 22.165(e) to require licensees in their initial five-year build-out period to notify the Commission of cell sites making up their CGSAs once yearly on the anniversary of license grant, rather than requiring licensees to file notifications within 15 days of initiating service at each site.[233]  We conclude that revising this requirement to provide for an annual reporting obligation will minimize unnecessary regulatory burdens for initial cellular licensees while providing a reasonably up-to-date source of data for other cellular licensees and Commission staff.[234]

### 3.    Contract Extension Clarification.

85.    *Background.*  Section 22.912 of the Commission's rules provides that any SAB extensions into an adjacent carrier's CGSA requires the consent of the adjacent carrier.[235]  In its comments, Verizon asks the Commission to clarify that, in the case where an adjacent carrier has already consented to analog SAB extensions into its CGSA, a separate agreement is not required in order to extend the SAB of a digital signal into the CGSA so long as it does not exceed boundary established by the initial analog agreement.[236]  Verizon points out that revisiting carrier consent can be a "difficult and costly process."

86.    *Discussion.*  In response to Verizon's request, we take this opportunity to clarify that our rules do not limit the scope of private, contractual agreements between cellular licensees in this case.  To the extent that a carrier enters into an agreement that provides for extensions of both analog and digital signals into an adjacent carrier's CGSA, our rules do not require separate notification to the Commission of such extensions; a single notification of the scope of that extension will be adequate notice.

### 4.    Symmetry for Cellular and PCS Renewal Rules.

87.    CTIA states that in December 1999, it filed a Petition for Rulemaking requesting that the Commission extend the current two-step cellular renewal process to PCS.[237]  In its comments, CTIA asks the Commission to take this opportunity to revise the Part 24 (PCS) renewal rule, making it identical to the Part 22 (cellular) renewal rule.[238]  CTIA's position regarding renewals calls for the revision of the Part 24 PCS rules and is therefore beyond the scope of this Part 22 Biennial Review proceeding.  Accordingly, we will take no action on CTIA's request at this time.

### 5.    Maximum Base Station Transmit Power.

88.    *Background.*  Qualcomm recommends that we modify section 22.913(a) of our rules such that the output power of a base station is specified in terms of a power per bandwidth in a specified

---

[233] The licensee must notify the Commission of these sites by modifying its license electronically via the Commission's Universal Licensing System (ULS).  As in the past, the licensee will also need to file the system information update pursuant to 47 C.F.R. § 22.947(c).

[234] The technical information submitted by cellular licensees regarding their cell sites may be used by other licensees who wish to coordinate frequency usage along market borders or wish to seek contract extensions into a neighboring market.  The Commission's staff also may use this information to analyze market conditions and service availability.

[235] Verizon Comments at 31.

[236] *Id.*

[237] *See* 47 C.F.R. § 22.935.

[238] CTIA Comments at 18.

angular region.[239] Qualcomm asserts that the current 500-Watt ERP (effective radiated power) limit is "generally taken to be per carrier." Qualcomm argues, however, that the assumed "per carrier" fixed limit is inappropriate and counterproductive with respect to higher bandwidth techniques such as CDMA.[240]

89.    *Discussion.* We initiated this biennial review in order to identify whether any rule is no longer in the public interest as a result of meaningful economic competition and whether such rules should be modified or removed. While its recommendation may have some merit, Qualcomm essentially seeks to have us re-examine the effects of one of our fundamental technical rules on various technologies. Accordingly, because Qualcomm's request is beyond the scope of this specific proceeding, we decline to address it at this time. Of course, we note that Qualcomm may always file a petition for rule making to address its proposed modification of section 22.913(a).[241]

## IV.    ADMINISTRATIVE MATTERS.

### A.    Final Regulatory Flexibility Act Analysis.

90.    The Final Regulatory Flexibility Analysis for this Report and Order, as required by the Regulatory Flexibility Act of 1980, see 5 U.S.C. § 604, is set forth in Appendix B.

### B.    Paperwork Reduction Act Analysis.

91.    The actions taken in this Report and Order have been analyzed with respect to the Paperwork Reduction Act of 1995, Pub. L. No. 104-13, and found to impose no new or modified recordkeeping requirements or burdens on the public.

## V.    ORDERING CLAUSES.

92.    IT IS ORDERED that, pursuant to the authority of sections 4(i), 7, 303(c), 303(f), 303(g), 303(r), and 332 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 303(c), 303(f), 303(g), 303(r), and 332, the rule changes specified in Appendix A are adopted.

---

[239] Qualcomm Comments at 8-9. Section 22.913(a) establishes the maximum effective radiated power of base transmitters and cellular repeaters. 47 C.F.R. § 22.913(a).

[240] Qualcomm Comments at 8-9.

[241] We also decline to address Ericsson's proposal regarding TIA's distribution of ESNs as beyond the scope of this proceeding. The Commission ceased assigning or maintaining a list of manufacturer codes for cellular equipment in August 1997. TIA assumed the responsibilities of managing and coordinating manufacturer codes for various wireless services once the Commission discontinued assigning cellular manufacturer codes. In its comments, Ericsson asks the Commission to take a critical look at TIA's Assignment Guidelines and Procedures (Guidelines) for the distribution of ESNs. Ericsson Comments at 12-13. Ericsson notes that TIA has the responsibility of assigning ESNs to manufacturers, but the current guidelines prepared by TIA for assigning ESNs do not permit TIA to fully control the use of ESNs. This, argues Ericsson, threatens the integrity of TIA's function as administrator. Ericsson calls on TIA to amend its Guidelines to incorporate discrete enforcement procedures (*i.e.* clear consequences for misuse) in order to maintain the integrity of the assignment process. As explained above, we initiated this biennial review proceeding to identify any Commission regulation that is no longer necessary in the public interest as a result of meaningful economic competition and to repeal or modify such regulation. Accordingly, this proceeding is not the appropriate forum to discuss changes to guidelines developed by a private industry association regarding functions not regulated by the Commission. We also observe that none of the commenters, including Ericsson, indicates that any Commission action is needed or possible at this time in order to address this situation.

93.    IT IS FURTHER ORDERED that the rule changes set forth in Appendix A WILL BECOME EFFECTIVE 60 days after publication in the *Federal Register*.

94.    IT IS FURTHER ORDERED that certain commercial mobile radio service carriers and other entities must submit reports regarding access to mobile telephony services by emergency-only consumers and persons with hearing disabilities at one and two years prior to the sunset of the rules requiring cellular carriers to provide analog service compatible with Advanced Mobile Phone Service (AMPS) specifications.

95.    IT IS FURTHER ORDERED that the Wireless Telecommunications Bureau is authorized to carry out such actions necessary to transfer the administration of cellular system identification numbers as identified herein.

96.    IT IS FURTHER ORDERED that the Commission's Consumer Information Bureau, Reference Information Center, SHALL SEND a copy of this *Report and Order*, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

Federal Communications Commission                    FCC 02-229

APPENDIX  A

RULE CHANGES

I.        Title 47, part 22 of the Code of Federal Regulations, 47 CFR part 22, is amended as follows:

1.        The authority citation for part 22 continues to read as follows:

AUTHORITY:  47 U.S.C. 154, 222, 303, 309 and 332.

2.        Section 22.165 is amended by revising paragraph (e) to read, as follows:

* * * * *

(e)        *Cellular radiotelephone service.*  During the five-year build-out period, the service area boundaries of the additional transmitters, as calculated by the method set forth in § 22.911(a), must remain within the market, except that the service area boundaries may extend beyond the market boundary into the area that is part of the CGSA or is already encompassed by the service area boundaries of previously authorized facilities.  After the five-year build-out period, the service area boundaries of the additional transmitters, as calculated by the method set forth in § 22.911(a), must remain within the CGSA.  Licensees must notify the Commission (FCC Form 601) of any transmitters added under this section that cause a change in the CGSA boundary.  The notification must include full size and reduced maps, and supporting engineering, as described in § 22.953(a)(1) through (3).  If the addition of transmitters involves a contract service area boundary (SAB) extension (see § 22.912), the notification must include a statement as to whether the five- year build-out period for the system on the relevant channel block in the market into which the SAB extends has elapsed and whether the SAB extends into any unserved area in the market.  The notification must be made electronically via the ULS, or delivered to the filing place (*see* § 1.913 of this chapter) once yearly during the five-year build-out on the anniversary of the license grant date.

* * * * *

3.        Section 22.323 is removed.

4.        Section 22.367 is amended by removing and reserving paragraph (a)(4) and by revising paragraph (d), to read as follows:

§ 22.367  Wave polarization.

* * * * *

(a)        * * *

(4)        [Reserved]

* * * * *

(d)    *Any polarization.* Base, mobile and auxiliary test transmitters in the Cellular Radiotelephone Service are not limited as to wave polarization. Public Mobile Service stations transmitting on channels higher than 960 MHz are not limited as to wave polarization.

5.    Section 22.377 is amended by removing paragraph (c).

6.    Section 22.901 is revised to read as follows:

**§ 22.901  Cellular service requirements and limitations.**

* * *

(d) *Alternative technologies and co-primary services.* Licensees of cellular systems may use alternative cellular technologies and/or provide fixed services on a co-primary basis with their mobile offerings, including personal communications services (as defined in part 24 of this chapter) on the spectrum within their assigned channel block.

(1) * * *

(2) * * *

(e) *Sunset of cellular compatibility requirement.* Until [FIVE YEARS FROM THE EFFECTIVE DATE OF ORDER], each cellular system that provides two-way cellular mobile radiotelephone service must –

(1) Maintain the capability to provide compatible analog service ("AMPS") to cellular telephones designed in conformance with the specifications contained in sections 1 and 2 of the standard document ANSI TIA/EIA-553-A "Mobile Station – Base Station Compatibility Standard" (published November 1999 – available for purchase from Global Engineering Documents, 15 Inverness East, Englewood, CO 80112-5704); or, the corresponding portions, applicable to mobile stations, of whichever of the predecessor standard documents was in effect at the time of the manufacture of the telephone.

(2) Provide AMPS, upon request, to subscribers and roamers using such cellular telephones while such subscribers are located in any portion of the cellular system's CGSA where facilities have been constructed and service to subscribers has commenced. *See also* § 20.12 of this chapter. Cellular licensees must allot sufficient system resources such that the quality of AMPS provided, in terms of geographic coverage and traffic capacity, is fully adequate to satisfy the concurrent need for AMPS availability.

7.    Section 22.905 is revised to read as follows:

**§ 22.905  Frequency bands.**

The following frequency bands are allocated for assignment to service providers in the Cellular Radiotelephone Service.

(a)  Channel Block A:  869 – 880 MHz paired with 824 – 835 MHz, and 890 – 891.5 MHz paired with 845 – 846.5 MHz.

(b)  Channel Block B:  880 – 890 MHz paired with 835 – 845 MHz, and 891.5 – 894 MHz paired with 846.5 – 849 MHz

Federal Communications Commission                    FCC 02-229

8.      Section 22.911 is amended by revising paragraphs (b)(1) and (b)(3), to read as follows:

## § 22.911  Cellular geographic service area.

* * * * *

(b) * * *

(1) The alternative CGSA determination must define the CGSA in terms of distances from the cell sites to the 32 dBμV/m contour along the eight cardinal radials, with points in other azimuthal directions determined by the method given in paragraph (a)(6) of this section.  * * *

* * * * *

(3) The provision for alternative CGSA determinations was made in recognition that the formula in paragraph (a)(1) of this section is a general model that provides a reasonable approximation of coverage in most land areas, but may under-predict or over-predict coverage in specific areas with unusual terrain roughness or features, and may be inapplicable for certain purposes, *e.g.*, cells with a coverage radius of less than 8 kilometers (5 miles).  * * *

* * * * *

9.      Section 22.915 is removed.

10.     Section 22.917 is revised to read as follows:

## § 22.917  Emission limitations for cellular equipment.

The rules in this section govern the spectral characteristics of emissions in the Cellular Radiotelephone Service.

(a)  *Out of band emissions.*  The power of any emission outside of the authorized operating frequency ranges must be attenuated below the transmitting power (P) by a factor of at least $43 + 10 \log(P)$ dB.

(b)  *Measurement procedure.*  Compliance with these provisions is based on the use of measurement instrumentation employing a resolution bandwidth of 100 kHz or greater.  In the 1 MHz bands immediately outside and adjacent to the frequency block a resolution bandwidth of at least one percent of the emission bandwidth of the fundamental emission of the transmitter may be employed.  A narrower resolution bandwidth is permitted in all cases to improve measurement accuracy provided the measured power is integrated over the full required measurement bandwidth (*i.e.* 100 kHz of 1 percent of emission bandwidth, as specified).  The emission bandwidth is defined as the width of the signal between two points, one below the carrier center frequency and one above the carrier center frequency, outside of which all emissions are attenuated at least 26 dB below the transmitter power.

(c)  *Alternative out of band emission limit.*  Licensees in this service may establish an alternative out of band emission limit to be used at specified band edge(s) in specified geographical areas, in lieu of that set forth in this section, pursuant to a private contractual arrangement of all affected licensees and applicants. In this event, each party to such contract shall maintain a copy of the contract in their station files and disclose it to prospective assignees or transferees and, upon request, to the FCC.

(d) *Interference caused by out of band emissions.* If any emission from a transmitter operating in this service results in interference to users of another radio service, the FCC may require a greater attenuation of that emission than specified in this section.

11.    Section 22.919 is removed.

12.    Section 22.921 is amended to read as follows:

### § 22.921  911 call processing procedures; 911-only calling mode.

Mobile telephones manufactured after February 13, 2000 that are capable of operating in the analog mode described in the standard publication ANSI TIA/EIA-553-A-99 "Mobile Station – Base Station Compatibility Standard" (published November 1, 1999 - available for purchase from Global Engineering Documents, 15 Inverness East, Englewood, CO 80112), must incorporate a special procedure for processing 911 calls. Such procedure must recognize when a 911 call is made and, at such time, must override any programming in the mobile unit that determines the handling of a non-911 call and permit the call to be transmitted through the analog systems of other carriers. This special procedure must incorporate one or more of the 911 call system selection processes endorsed or approved by the FCC.

13.    Section 22.933 is removed.

14.    Section 22.937 is removed.

15.    Section 22.941 is removed.

16.    Section 22.943 is amended by revising it to read as follows:

### § 22.943  Limitations on transfer of control and assignment for authorizations issued as a result of a comparative renewal proceeding.

Except as otherwise provided in this section, the FCC does not accept applications for consent to transfer of control or for assignment of the authorization of a cellular system that has been acquired by the current licensee for the first time as a result of a comparative renewal proceeding until the system has provided service to subscribers for at least three years.

(a) The FCC may accept and grant applications for consent to transfer of control or for assignment of the authorization of a cellular system that is to be transferred as a part of a *bona fide* sale of an on-going business to which the cellular operation is incidental.

(b) The FCC may accept and grant applications for consent to transfer of control or for assignment of the authorization of a cellular system that is to be transferred as a result of the death of the licensee.

(c) The FCC may accept and grant applications for consent to transfer of control or for assignment of authorization if the transfer or assignment is *pro forma* and does not involve a change in ownership.

17.    Section 22.945 is removed.

18.    Section 22.946 is amended by revising it to read as follows:

### § 22.946  Service commencement and construction periods for cellular systems.

Federal Communications Commission                    FCC 02-229

* * * * *

b) To satisfy this requirement, a cellular system must be interconnected with the public switched telephone network (PSTN) and must be providing service to mobile stations operated by its subscribers and roamers. A cellular system is considered to be providing service only if mobile stations can originate telephone calls to and receive telephone calls from wireline telephones through the PSTN.

(c) *Construction period for specific facilities.* The construction period applicable to specific new or modified cellular facilities for which a separate authorization is granted is one year, beginning on the date the authorization is granted.

II.     Title 47, part 24 of the Code of Federal Regulations, 47 CFR part 24, is amended as follows:

1.   The authority citation for part 24 continues to read as follows:

AUTHORITY:  47 U.S.C. 154, 301, 302, 303, 309 and 332.

2.     Section 24.238 is revised to read as follows:

§ 24.238  Emission limitations for Broadband PCS equipment.

The rules in this section govern the spectral characteristics of emissions in the Broadband Personal Communications Service.

(a) *Out of band emissions.* The power of any emission outside of the authorized operating frequency ranges must be attenuated below the transmitting power (P) by a factor of at least 43 + 10 log(P) dB.

(b) *Measurement procedure.* Compliance with these provisions is based on the use of measurement instrumentation employing a resolution bandwidth of 1 MHz or greater. However, in the 1 MHz bands immediately outside and adjacent to the frequency block a resolution bandwidth of at least one percent of the emission bandwidth of the fundamental emission of the transmitter may be employed. A narrower resolution bandwidth is permitted in all cases to improve measurement accuracy provided the measured power is integrated over the full required measurement bandwidth (*i.e.* 100 kHz of 1 percent of emission bandwidth, as specified). The emission bandwidth is defined as the width of the signal between two points, one below the carrier center frequency and one above the carrier center frequency, outside of which all emissions are attenuated at least 26 dB below the transmitter power.

(c) *Alternative out of band emission limit.* Licensees in this service may establish an alternative out of band emission limit to be used at specified band edge(s) in specified geographical areas, in lieu of that set forth in this section, pursuant to a private contractual arrangement of all affected licensees and applicants. In this event, each party to such contract shall maintain a copy of the contract in their station files and disclose it to prospective assignees or transferees and, upon request, to the FCC.

(d) *Interference caused by out of band emissions.* If any emission from a transmitter operating in this service results in interference to users of another radio service, the FCC may require a greater attenuation of that emission than specified in this section.

## APPENDIX B

## FINAL REGULATORY FLEXIBILITY ANALYSIS

1.        As required by the Regulatory Flexibility Act (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the Notice of Proposed Rulemaking in WT Docket No. 01-108, released May 17, 2001 (*NPRM*).[2]  The Commission sought written public comment on the proposals in the Second Further Notice, including comment on the IRFA.  The comments received are discussed below.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

### A.        Need for, and Objectives of, the Order.

2.        In the Telecommunications Act of 1996, Congress added sections 11 and 202(h) to the Communications Act of 1934, as amended, requiring the Commission to 1) review biennially its regulations that pertain to the operations or activities of telecommunications service providers, and 2) determine whether those regulations are no longer necessary in the public interest as a result of meaningful economic competition.  Following such review, the Commission is required to modify or repeal any such regulations that are no longer in the public interest.[4]  Accordingly, as part of the Commission's year 2000 Biennial Review of regulations, the *Report and Order* amends Part 22 of the Commission's rules by modifying or eliminating various rules that have become outdated due to technological change, increased competition in the Commercial Mobile Radio Services (CMRS) market, or supervening rules.

3.        In particular, the *Report and Order* removes the cellular analog requirement after a five-year transition period and requires reports by certain CMRS licensees and other entities showing the level of access to mobile telephony had by persons with hearing disabilities or those using emergency-only phones.  The *Report and Order* also removes the manufacturing requirements governing Electronic Serial Numbers (ESNs) in cellular telephones, as well as modifying several other technical rules.[5]  In the same vein, the Commission found some of the cellular anti-trafficking rules to be outdated because they were adopted during a period when the Commission resolved mutually exclusive applications for initial cellular services through lottery, rather than the current system of resolving such mutually exclusive applications through competitive bidding.[6]  The Commission also reevaluated certain other Part 22 rules that apply both to cellular and to other CMRS, specifically section 22.323, which imposes conditions on the provision of "incidental" services by Public Mobile Services providers.[7]

---

[1] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601 *et. seq.*, has been amended by the Contract With America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat. 847 (1996) (CWAAA).  Title II of the CWAAA is the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA).

[2] Year 2000 Biennial Regulatory Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting the Cellular Radiotelephone Service and other Commercial Mobile Radio Services, *Notice of Proposed Rulemaking*, 16 FCC Rcd 11169 (2001) (*NPRM*).

[3] *See* 5 U.S.C. § 604.

[4] 47 U.S.C. § 11(b); *see also* the Telecommunications Act of 1996 § 202(h).

[5] The specific technical rules include:  sections 22.367(a)(4), 22.901, 22.905, 22.911, 22.915, 22.917, 22.919, 22.933, 22.941, and 22.946 of the Commission's rules.

[6] The specific cellular anti-trafficking rules include:  sections 22.937, 22.943, and 22.945 of the Commission's rules.

[7] *See* 47 C.F.R. § 22.323.

Federal Communications Commission   FCC 02-229

**B.**   **Summary of Significant Issues Raised by Public Comments in Response to the IRFA.**

4.   Although we have received numerous comments in response to the *NPRM,* we received no comments in response to the IRFA.  However, as described in section E. below, we have nonetheless considered potential significant economic impacts of the rules on small entities.

5.   **Analog Compatibility Requirement.**  Although the comments suggest that elimination of the analog requirement would not affect the majority of wireless consumers that are already using digital service, some commenters contend that there are particular classes of consumers and service providers that would be harmed by elimination of the rule.  These commenters focus particularly on the possibility that, if the rule were eliminated, cellular carriers in major markets would be likely to drop analog service in those markets to provide more capacity for their digital systems.[8]  Commenters argue that, at the very least, the requirement should be eliminated only after a transition period.[9]  The unavailability of analog service in these markets, commenters contend, would have an adverse impact on the following groups:

6.   *Small and regional carriers.*  Small and regional carriers argue that, if the analog requirement is eliminated, they will be forced to transition from solely analog services to digital in order to ensure that their customers will have service outside of their home market, as well as to continue to provide roaming service to customers of the large nationwide carriers.[10]  They argue that eliminating the analog requirement will force them to bear the financial burden of immediately converting to digital, regardless of consumer demand within their particular markets.  Further, these commenters assert that a decision to adopt any particular digital technology will be dictated by a small/regional carrier's larger roaming partner.[11]  Moreover, commenters argue that, in certain areas, a small or regional licensee may be positioned between major markets whose licensees have chosen incompatible digital technologies, forcing it to choose between roaming partners and multiple digital standards in the absence of analog technology.[12]  These commenters argue that, in the absence of interoperable digital technology, the analog requirement should not be eliminated.

7.   *Analog-only consumers.*  It is estimated that there are approximately 26 million analog-only subscribers.[13]  These include consumers who use analog-only handsets because their carriers do not provide digital service (mainly rural cellular carriers) as well as subscribers who have purchased 911-only mobile phones.  Remaining analog-only users are non-subscribers, such as certain elderly or victims of domestic violence, who have received recycled analog equipment for use for emergency purposes.  Presently, a customer using analog-only equipment can roam on other cellular networks in the event the

---

[8] Bristol Bay Comments at 2-3; Mid-Missouri Cellular et al. Comments at 7-8, 11; RCA Comments at 7-8; RTG Comments at 3; Verizon Comments at 7; WCA at 4; CNH Reply Comments at 3.

[9] Bristol Bay Comments at 6-7; RCA Comments at 5-7; RTG Comments at 3-6.

[10] ATX Technologies Reply Comments at 5, 8; Bristol Bay Comments at 2-3, 6-7; Mid-Missouri Cellular et al. Comments at 4, 6-10; Secure Alert Comments at 3; Verizon Comments at 7; WCA Comments at 4; CNH Reply Comments at 3; Mid-Missouri Cellular et al. Reply Comments at 5-6; RCA Comments at 5-8; RTG Comments at 3-6; NE Colorado Reply Comments at 2; Century Tel Comments at 4.

[11] RCA Comments at 8; Mid Missouri Cellular *et al.* Comments at 4, 6.

[12] RCA Comments at 9; Mid Missouri Cellular *et al.* Comments at 4-6.

[13] *See* In the Matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions with Respect to Commercial Mobile Services, *Seventh Report,* 17 FCC Rcd 12985 (2002).

Federal Communications Commission                    FCC 02-229

consumer is outside of his/her home market. Commenters argue that these cellular customers would lose the ability to roam with their current analog-only handset if the analog standard is eliminated and both carriers within a given area shut down their analog networks.

8.    *Telematics.* Telematics services providers have, for the most part, relied on analog technology to ensure interoperable communications nationwide. Telematics advocates assert that analog service is vital, due to the ambulant nationwide nature of telematics technology.[14] It is argued that digital systems cannot yet transmit both voice and data on the same call, a feature that commenters argue is important for telematics providers.[15] These commenters assert that the interoperability problem is particularly difficult for telematics devices because manufacturers must choose a technology that is embedded in a vehicle that will have a useful life of ten or more years.[16] Moreover, these providers assert that, unlike the typical cellular subscriber who can readily switch to digital handsets if necessary, the development cycle (the length of time necessary to design equipment, test, and install in compatible vehicles) and hardware basis of telematics-equipped vehicles prevents users of such services from quickly and easily migrating to a new technology. These providers argue that telematics devices are imbedded into vehicles in such a way as to make it cost prohibitive to retrofit legacy vehicles with analog-based equipment. Given the development cycles and life spans of such vehicles (often longer than ten years), commenters argue that the immediate elimination of the analog rule would be a setback for telematics providers and their customers. Instead, certain telematics providers argue that if the analog requirement must be eliminated, the industry must be given a reasonable transition period, and suggest that such a transition period would be ten years.

9.    *Persons with hearing disabilities.* Persons with hearing disabilities desiring to use wireless devices must currently rely on analog service or the small number of digital phones that are currently compatible with only certain hearing aids. Unlike analog handsets, digital technologies have been shown to cause interference to hearing aids and cochlear implants. Accessibility advocates and those with hearing disabilities note that market forces (*e.g.* need for spectrum efficiency, enhanced services such as wireless data) make a shift to digital technology inevitable. These commenters argue that at this point, however, due to the lack of hearing aid-compatible digital equipment, persons with hearing disabilities must rely on analog equipment to access mobile telephony, thereby settling for inferior sound quality, fewer service options, and higher prices. Commenters argue that, because persons with hearing disabilities account for only a small percentage of mobile telephony users, there are not sufficient economic incentives for carriers to expend resources to ensure that these individuals have access to wireless service. Accessibility advocacy groups maintain that the analog requirement should not be eliminated (if at all) until new digital services are accessible and readily available to persons with hearing disabilities.

10.    **Electronic Serial Number.** Numerous commenters support the proposal to remove section 22.919.[17] Commenters agree that the industry is capable of developing anti-fraud measures on its own and that the rule prevents carriers from deploying advanced technologies such as smart cards.[18] Verizon, however, supports elimination of the detailed design requirements in the rule, but would keep

---

[14] ATX Technologies Comments at 16; Deere Comments at 5, 7; Secure Alert Comments at 3; Deere Reply Comments at 2; MBUSA Reply Comments at 5; OnStar Reply Comments at 2.

[15] ATX Technologies Reply Comments at 12.

[16] Deere Comments at 9; CNH Reply Comments at 4; Deere Reply Comments at 3; MBUSA Reply Comments at 6.

[17] Cingular Comments at 16-17; CTIA Comments at 12-14; Qualcomm Comments at 3-5.

[18] Ericsson Comments at 11-12; Qualcomm Comments at 3-4; TIA Comments at 5-6.

Federal Communications Commission                 FCC 02-229

the requirement that cellular telephones have a unique ESN.[19] Further, CenturyTel and Verizon, argue that removing the ESN rule would be disruptive to other aspects of cellular service.[20] CenturyTel believes that elimination of this rule section would require them to replace their billing system.[21] Alternatively, ICSA supports our current proposal, but does so because it believes that it should be legal to clone cellular telephones (in particular, as a small business activity) for customers who are already legitimate cellular subscribers, as opposed to those who are not subscribers.[22]

      11.    **Channelization Requirements.** A majority of the commenters addressing this issue support our proposal.[23] Verizon, however, opposes the elimination of the channelization plan rule prior to the elimination of the analog service requirement. Verizon believes that some cellular carriers might start providing analog service using a different and incompatible analog channel plan, which would leave some subscribers without roamer service.[24] CenturyTel also opposes removal of the channelization plan because it believes that that the rule provides a legal basis for "frequency protection" from adjacent systems using digital technologies.

      12.    **Modulation Requirements and In-band Emissions Limitations.** We received a number of comments supporting various aspects of our proposal to a number of technical specifications for, *inter alia*, the performance of audio filter and deviation limiter circuitry in analog cellular telephones, and adjustment of the modulation levels in analog cellular telephones.[25] One commenter states that section 22.915 should be eliminated because the rule's requirements are specific to the AMPS analog compatibility standard, and, as such, are contrary to the goal of allowing carriers to implement the technologies of their choice, and stifles the development of technologically advanced systems.[26] Certain commenters, however, object to the specific language we proposed for the out-of-band emission limit measurement rule in section 22.917.[27] These parties point out that implementation of the measurement resolution bandwidth specified in the proposed rule would have the effect of imposing a stricter out-of-band emission limit than that which currently applies.[28] A few commenters submitted alternative

[19] Verizon Comments at 24-25.

[20] CenturyTel Comments at 5; Verizon Comments at 17-18.

[21] CenturyTel Comments at 5.

[22] ICSA/MT Communications Comments at 3-6; ICSA/MT Communications Reply Comments at 5-8. Such cloning makes it technically possible for these subscribers to use one or more additional cellular telephones (which ICSA refers to as "extension cellular telephones") on a cellular system without the carrier's knowledge, and thereby avoid being billed monthly fees (other than per-minute usage charges) that the carrier normally charges for additional cellular telephones. ICSA ascribes various benefits to the use by legitimate subscribers of cloned telephones, including the ability to have multiple cellular telephones with the same telephone number (for example a powerful vehicular telephone and a hand-held portable telephone). There are also significant operational limitations, however, that make the claimed benefits questionable. For example, the legitimate cellular telephone and the cloned cellular generally cannot be turned on at the same time without triggering the carrier's fraud-detection systems, which could result in denial of service to both telephones.

[23] Ericsson Comments at 6; Cingular Comments at 17; CTIA Comments at 15; TIA Comments at 6.

[24] Verizon Comments at 19; Verizon Reply Comments at 10.

[25] CTIA Comments at 14-15; TIA Comments at 4 (supports proposal to remove in-band emissions limits); Western Wireless (supports proposal to remove rules relating to 22.915).

[26] Ericsson Comments at 7.

[27] Cingular Comments at 10-14; Ericsson Comments at 7-11; Qualcomm Comments at 6-8; TIA Comments at 6-10; Sprint Reply Comments at 13-14.

[28] Cingular Comments at 10-11; Ericsson Comments at 7-11; Qualcomm Comments at 6-8; TIA Comments at 6-10; Sprint Reply Comments at 13-14.

language which more accurately reflect our intended goal of harmonizing certain procedures in the wireless communications services (WCS), personal communications services (PCS) and cellular services.[29]

13.      **Wave Polarization Requirement.** A majority of the commenters addressing this issue generally support relaxation of the rule requiring electromagnetic waves radiated by transmitters to be vertically polarized because of the technical flexibility it will provide cellular carriers.[30] Ericsson notes that flexibility in polarization is beneficial in order to reduce multipath fading and to improve signal quality.[31] Likewise, Cingular points out that eliminating the vertical polarization requirement will permit carriers to reduce the antenna space needed on towers, thereby benefiting carriers as well as the public by fostering more aesthetically pleasing antenna sites, reducing the number of antennas required at a particular site (thereby reducing the need for local zoning clearance in many cases), permitting collocation of multiple carriers' facilities on the same tower, and reducing site deployment costs.[32]

14.      OnStar, however, objects to relaxing the rule on the basis that non-vertical antenna polarization could result in reduced RF coverage for its end users and impair telematics' ability to provide geographic location information for emergency services.[33] Specifically, OnStar notes that it utilizes analog cellular technology to provide location-based telematics service offerings, such as automatic crash notification, through systems embedded in vehicles of certain automobile manufacturers.[34] In this connection, OnStar has attempted to maximize the reception distance for its mobile equipment (which is important in rural areas, for example) based on the assumption that cell sites transmit vertically-polarized signals. OnStar expresses concern that relaxing the rule, particularly with respect to rural areas, would "adversely affect[ ] the delivery of automatic crash notification and other emergency and telematics services."[35] Likewise, U.S. Cellular objects to relaxing the requirement because of the "isolation" it provides to cellular systems from co-channel and adjacent-channel transmitters.[36] U.S. Cellular also notes that eliminating the vertical polarization requirement may inhibit the ability of AirCell to provide cellular services to commercial aviation.[37]

---

[29] Cingular Comments at 14; Ericsson Comments at 9-10; TIA Comments at 9-10.

[30] Qualcomm Comments at 5; Ericsson Comments at 15; Verizon Comments at 29; Cingular Comments at 18-19; Western Wireless Comments at 12; CTIA Comments at 14; TIA Comments at 10.

[31] Ericsson Comments at 15.

[32] Cingular Comments at 19. We note that during the pendency of this rulemaking the Commercial Wireless Division of the Wireless Telecommunications Bureau granted a limited waiver of the vertical polarization requirement to Cingular. *See* In the Matter of Cingular Wireless LLC Request for Waiver of the Cellular Vertical Wave Polarization Requirement, *Order*, DA 02-558 (rel. Mar. 8, 2002). We have incorporated the comments filed in response to Cingular's waiver request in the record in this proceeding.

[33] OnStar Comments to Cingular Waiver Request at 6-7.

[34] *Id.* at 1, 4.

[35] *Id.* at 6.

[36] U.S. Cellular Comments at 5.

[37] *Id.* at 6. U.S. Cellular partners with AirCell, to provide cellular communications to aircraft. AirCell partners provide service to aircraft via a waiver granted by the Wireless Telecommunications Bureau. Under the terms of this waiver, AirCell transmissions are secondary to terrestrial cellular communications. One of the means AirCell uses to ensure protection of terrestrial cellular systems is by using horizontally-polarized signals. The difference in polarization provides some level of isolation from systems using exclusively vertically polarized transmissions.

Federal Communications Commission                    FCC 02-229

15.   **Assignment of System Identification Numbers.**  Commenters generally support our proposal to eliminate the procedures and rules set forth in section 22.941 by which the Commission administers cellular system identification numbers (SIDs).  The commenters agree that there is no regulatory purpose in retaining SIDs as a term of cellular licenses.  As Cingular and CTIA point out, there are no SID rules for PCS, Specialized Mobile Radio (SMR), or other CMRS, and this administrative function is carried out successfully within those radio services by the private sector without Commission involvement.

16.   **Determination of Cellular Geographic Service Area.**  Several cellular carriers oppose our intent to clarify the language in section 22. 911(b) regarding the term "SAB" (service area boundary) in situations in which a carrier employs alternative methods to calculate the Cellular Geographic Service Area (CGSA) of its system. Cingular advocates that we in fact allow alternative propagation methods to be used for evaluating signal extensions into adjacent systems, in lieu of the formula in section 22.911(a). Verizon argues that when a carrier has determined its CGSA by use of an alternative method, it is "illogical and inconsistent" to require that cell SABs be used for all other purposes.  Verizon argues that sometimes alternative methods are used to demonstrate that CGSAs should be smaller than predicted by the mathematical formula method, and that in these situations, the alternative method 32 dBµV/m contour should be used instead of the cell SABs to determine whether there are signal extensions into the adjacent system's CGSA requiring consent.

17.   **Incidental Services Rule.**  Commenters generally agree that we should modify section 22.323 of our rules that permits carriers operating in the Public Mobile Radio Services to provide other communications services incidental to the primary public mobile service.[38]  Commenters, on the other hand, believe that the provision in section 22.323 that states that incidental services are permitted should be retained.  Several of the carriers addressing this issue point out that an express provision for incidental services is helpful in demonstrating to state commissions that certain services must be treated as CMRS exempt from state and local regulation of rates and entry.[39]

C.   **Description and Estimate of the Number of Small Entities to which the Rules Will Apply.**

18.   The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[40]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[41]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[42]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of

[38] CenturyTel Comments at 6; CTIA Comments at 17; Cingular Comments at 21; Verizon Comments at 27; Verizon Reply Comments at 15; RTG Comments at 6-10; Western Wireless Comments at 14-15.

[39] CenturyTel Comments at 6; CTIA Comments at 17; Cingular Comments at 21; Verizon Comments at 27; Verizon Reply Comments at 15; RTG Comments at 6-10; Western Wireless Comments at 14-15.

[40] 5 U.S.C. § 603(b)(3).

[41] 5 U.S.C. § 601(6).

[42] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

Federal Communications Commission                    FCC 02-229

operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[43]

19.    This *Report and Order* results in rule changes that could affect small businesses that currently are or may become Cellular Radiotelephone Service providers that are regulated under Subpart H of Part 22 of the Commission's rules. In addition, changes to section 22.323 of the Commission's rules could affect service providers that are regulated under any provisions of Part 22 of the Commission's rules. These include, in addition to Cellular Radiotelephone Service providers, providers of Paging and Radiotelephone (Common Carrier Paging), Air-Ground Radiotelephone, Offshore Radiotelephone, and Rural Radiotelephone services. In addition, pursuant to section 90.493(b) of the Commission's rules, paging licensees on exclusive channels in the 929-930 MHz bands are subject to the licensing, construction, and operation rules set forth in Part 22.[44] As this rulemaking proceeding applies to multiple services, we will analyze the number of small entities affected on a service-by-service basis. In addition to service providers, some of the proposed rule changes may also affect manufacturers of cellular telecommunications equipment. We will include a separate discussion regarding the number of small cellular equipment manufacturing entities that are potentially affected by the proposed rule changes.

20.    **Cellular Radiotelephone Service.** The SBA has developed a small business size standard for small businesses in the category "Cellular and Other Wireless Telecommunications."[45] Under that SBA category, a business is small if it has 1,500 or fewer employees.[46] According to the Bureau of the Census, only twelve firms from a total of 1,238 cellular and other wireless telecommunications firms operating during 1997 had 1,000 or more employees.[47] Therefore, even if all twelve of these firms were cellular telephone companies, nearly all cellular carriers were small businesses under the SBA's definition. In addition, we note that there are 1,807 cellular licenses; however, a cellular licensee may own several licenses. According to the most recent *Trends in Telephone Service* data, 806 carriers reported that they were engaged in the provision of either cellular service, PCS, or SMR telephony services, which are placed together in that data.[48] We have estimated that 323 of these are small under the SBA small business size standard.[49] Accordingly, based on this data, we estimate that not more than 323 cellular service providers will be affected by these revised rules.

21.    **Paging.** The Commission has adopted, and the SBA has approved, a two-tier definition of small businesses in the context of auctioning licenses in the paging services. Under this definition, a small business is defined as either (1) an entity that, together with its affiliates and controlling principals, has average gross revenues for the three preceding years of not more than $3 million, or (2) an entity that,

---

[43] 15 U.S.C. § 632.

[44] *See* 47 C.F.R. § 90.493(b).

[45] 13 C.F.R. § 121.201, North American Industry Classification System (NAICS) code 513322.

[46] *Id.*

[47] U.S. Department of Commerce, U.S. Census Bureau, 1997 Economic Census, Information - Subject Series, Establishment and Firm Size, Table 5 – Employment Size of Firms Subject to Federal Income Tax at 64, NAICS code 513322 (October 2000).

[48] *See Trends in Telephone Service*, Industry Analysis Division, Common Carrier Bureau , Table 5.3 - Number of Telecommunications Service Providers that are Small Businesses (August 2001). Data found in *Trends in Telephone Service* is based on information filed by service providers on FCC Form 499-A worksheets, in combination with employment information obtained from Automated Reporting and Management Information System (ARMIS) and Securities and Exchange Commission filings as well as industry employment estimates published by the Bureau of Labor Statistics.

[49] *Id.*

Federal Communications Commission                        FCC 02-229

together with affiliates and controlling principals, has average gross revenues for the three preceding calendar years of not more than $15 million. The Commission has estimated that as of January 1998, there were more than 600 paging companies in the United States.[50] In the August 2001 *Trends in Telephone Service* data, 427 carriers reported that they were engaged in the provision of paging and messaging service; 407 of these firms identified themselves as having 1,500 or fewer employees.[51] We do not have data specifying the number of these carriers that are not independently owned and operated or meet the small business thresholds set forth above, or the number of these carriers that are regulated under Part 22 of the Commission's rules, and thus are unable at this time to estimate with precision the number of affected paging carriers that would qualify as small business concerns under our definition. However, we estimate that the majority of existing paging providers qualify as small entities under our definition. Consequently, we estimate that there are up to approximately 600 currently licensed small paging carriers that may be affected by the rule changes set out in the *Report and Order*. Further in December 2001, 182 bidders placed high bids for 5,323 geographic area paging licenses in Auction No. 40.[52] Applications remain pending as of the release of this *Report and Order*. Thus, in addition to existing licensees, the rule changes adopted in the *Report and Order* could affect paging licenses won in Auction No. 40.

    22.    **Air-Ground Radiotelephone Service.** The Commission has not adopted a definition of small business specific to the Air-Ground radiotelephone service.[53] Accordingly, we use the SBA definition applicable to radiotelephone companies, *i.e.*, an entity employing no more than 1,500 persons. There are approximately 24 licensees in the Air-Ground radiotelephone service, and the Commission estimates that almost all of them qualify as small entities under the SBA definition.

    23.    **Offshore Radiotelephone Service.** This service operates on several ultra high frequency (UHF) TV broadcast channels that are not used for TV broadcasting in the coastal area of the states bordering the Gulf of Mexico. At present, there are less than ten licensees in this service. The Commission has not adopted a definition of small business specific to the Offshore Radiotelephone Service. Accordingly, we use the SBA definition applicable to radiotelephone companies, *i.e.*, an entity employing no more than 1,500 persons. The Commission assumes, for purposes of this FRFA, that all licensees in this service are small entities, as that term is defined by the SBA.

    24.    **Rural Radiotelephone Service.** The Commission has not adopted a definition of small entity specific to the Rural Radiotelephone Service.[54] A significant subset of the Rural Radiotelephone Service is the Basic Exchange Telephone Radio Systems (BETRS).[55] We therefore use the SBA definition applicable to radiotelephone companies; *i.e.*, an entity employing no more than 1,500 persons. There are approximately 100 licensees in the Rural Radiotelephone Service, and the Commission estimates that almost all of them qualify as small entities under the SBA definition.

    25.    **Cellular Equipment Manufacturers.** Some of the actions adopted in the *Report and Order* will also affect manufacturers of cellular equipment. The Commission does not know how many

---

[50] Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, *Third Report*, 13 FCC Rcd 19746, 19792 (1998).

[51] *See Trends in Telephone Service*, Industry Analysis Division, Common Carrier Bureau, Table 5.3 - Number of Telecommunications Service Providers that are Small Business (August 2001).

[52] *See* "Lower and Upper Paging Bands Auction Closes:  Winning Bidders Announced," *Public Notice*, 16 FCC Rcd 21821 (WTB 2001).

[53] Air-ground radiotelephone service is defined in section 22.99 of the Commission's rules, 47 C.F.R. § 22.99.

[54] Rural Radiotelephone Service is defined in section 22.99 of the Commission's rules, 47 C.F.R. § 22.99.

[55] BETRS is defined in sections 22.757 and 22.729 of the Commission's rules, 47 C.F.R. §§ 22.757, 22.729.

cellular equipment manufacturers are in the current market. The 1997 *Economic Census* provides that there were 1,089 communications-related equipment manufacturing companies as of 1997.[56] This category includes not only cellular equipment manufacturers, but television and AM/FM radio manufacturers as well. Under SBA regulations, a "radio and television broadcasting and wireless communications equipment manufacturing" company, which includes not only U.S. cellular equipment manufacturers but also firms that manufacture radio and television broadcasting and other communications equipment as well as electronic components, must have a total of 750 or fewer employees in order to qualify as a small business concern.[57] Although the exact number is unknown, the number of cellular equipment manufacturers is considerably lower than 1,089.

    26.    **Broadband Personal Communications Service.** The broadband PCS spectrum is divided into six frequency blocks designated A through F, and the Commission has held auctions for each block. The Commission has created a small business size standard for Blocks C and F as an entity that has average gross revenues of less than $40 million in the three previous calendar years.[58] For Block F, an additional small business size standard for "very small business" was added and is defined as an entity that, together with their affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[59] These small business size standards, in the context of broadband PCS auctions, have been approved by the SBA.[60] No small businesses within the SBA-approved small business size standards bid successfully for licenses in Blocks A and B. There were 90 winning bidders that qualified as small entities in the Block C auctions. A total of 93 "small" and "very small" business bidders won approximately 40% of the 1,479 licenses for Blocks D, E, and F.[61] On March 23, 1999, the Commission reauctioned 347 C, D, E, and F Block licenses; there were 48 small business winning bidders. Based on this information, we conclude that the number of small broadband PCS licensees will include the 90 winning C Block bidders and the 93 qualifying bidders in the D, E, and F blocks plus the 48 winning bidders in the re-auction, for a total of 231 small entity PCS providers as defined by the SBA small business standards and the Commission's auction rules. On January 26, 2001, the Commission completed the auction of 422 C and F Broadband PCS licenses in Auction No. 35. Of the 35 winning bidders in this auction, 29 qualified as "small" or "very small" businesses.[62]

    D.    **Description of Projected Reporting, Recordkeeping and Other Compliance Requirements**

---

[56] U.S. Census Bureau, *1997 Economic Census, Manufacturing Subject Series*, at Table 3 – Detailed Statistics by Industry: 1997, NAICS code 334220 (October 2000).

[57] 13 C.F.R. § 121.201, NAICS code 334220.

[58] *See* Amendment of Parts 20 and 24 of the Commission's Rules – Broadband PCS Competitive Bidding and the Commercial Mobile Radio Service Spectrum Cap, WT Docket No. 96-59, *Report and Order*, 11 FCC Rcd 7824, paras. 57-60 (1996); *see also* 47 C.F.R. § 24.720(b).

[59] *See* Amendment of Parts 20 and 24 of the Commission's Rules -- Broadband PCS Competitive Bidding and the Commercial Mobile Radio Service Spectrum Cap, *Report and Order*, 11 FCC Rcd 7824, para. 60 (1996).

[60] *See* Letter to Amy Zoslov, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, Federal Communications Commission, from A. Alvarez, Small Business Administration, dated December 2, 1998.

[61] FCC News, *Broadband PCS, D, E and F Block Auction Closes*, No. 71744 (rel. Jan. 14, 1997).

[62] A number of licenses auctioned in Auction No. 35 are the subject of pending litigation; the associated applications remain in pending status. *See Nextwave Personal Communications, Inc. v. FCC*, 254 F.3d 130 (D.C. Cir. 2001), *cert. granted* 128 S.Ct. 1202 (Mar. 4, 2002) (Nos. 01-653, 01-657); In the Matter of Requests for Refunds of Down Payments Made in Auction No. 35, *Order*, FCC 02-99 (rel. Mar. 27, 2002).

27.     We will require that, (1) three years from the effective date of this order and (2) four years from the effective date of this order, certain CMRS licensees and other entities file reports with the Commission.[63]  In the reports, the carrier must either certify that, within their own markets, there are, at the time of filing, hearing aid-compatible digital devices available to and usable by persons with hearing disabilities for use with that carrier's digital network, or, if no such equipment is available at the time of filing, describe the extent to which, by the end of the fifth year, digital equipment will be available to and usable by persons with hearing disabilities, and describe how the public is being informed of their availability.  If upon review of the filings, we determine that significant problems remain regarding access to mobile telephony by persons with hearing disabilities, we may find that the analog requirement will be removed only for technologies where hearing aid- compatibility solutions are available, or that the sunset period will be extended for all carriers.[64]

E.      **Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered.**

28.     The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[65]

29.     Because several commenters argued that certain entities, such as persons with hearing disabilities and small and regional carriers, may be harmed by the immediate removal of the analog requirement, we instituted a five-year transition period to ease the transition to digital technology.  By establishing this five-year transition period, we take account of the potentially smaller resources available to small entities.

30.     As stated earlier, the *Report and Order* concluded that several of the Commission's technical and anti-trafficking cellular rules are outdated.  Therefore, modifying or eliminating these rules should decrease the costs associated with regulatory compliance for cellular service providers, provide additional flexibility in manufacturing cellular equipment, and also enhance the market demand for some products.  Also, amending the incidental services rules will allow licensees in the Part 22 services greater flexibility in the types of services they offer.  We note that the intent underlying our actions is to lessen the levels of regulation, consistent with our mandate for undertaking biennial reviews.  We have therefore described, *supra*, actions intended to lessen the regulatory burden on carriers and equipment manufacturers, including small entities.

31.     **Report to Congress**: The Commission will send a copy of the *Report and Order*, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act, *see* 5

---

[63] Licenses include Cingular, AT&T Wireless, and Verizon.  We believe that it is appropriate to require these carriers to make reports because such carriers represent a reliable sample of each of the digital technologies in use.  Small and rural carriers will likely utilize the same solutions deployed by the nationwide carriers to provide accessible digital technologies.

[64] For example, it may be that hearing aid compatibility solutions will be developed only for CDMA by the five-year mark, but not for any other digital technology.  In that case, we may determine that the rule will be sunset only for carriers providing CDMA service.

[65] *See* 5 U.S.C. § 603.

**Federal Communications Commission**          **FCC 02-229**

U.S.C. § 801(a)(1)(A). In addition, the Commission will send a copy of the *Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration. A copy of the *Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.  See 5 U.S.C. § 604(b).

Federal Communications Commission                    FCC 02-229

## APPENDIX C

### List of Commenters

#### Comments

Alexander Graham Bell Association for the Deaf and Hard of Hearing (AG Bell)
AT&T Wireless Services, Inc. (AT&T Wireless)
ATX Technologies, Inc. (ATX Technologies)
Bristol Bay Cellular Partnership (Bristol Bay)
CaseNewHolland Inc. (CNH)
Cellular Telecommunications & Internet Assn. (CTIA)
CenturyTel Wireless, Inc. (CenturyTel)
Cingular Wireless, LLC (Cingular)
Council of Organizational Representatives (COR)
Deere & Co. (Deere)
Deltec Telesystems, Inc.
Dixon, Alan
Dobson Communications Corp. (Dobson)
Ericsson, Inc. (Ericsson)
Hiscock, David
Independent Cellular Services Association and MT Communications (ICSA/MT Communications)
Kosterich, Eileen
League For the Hard of Hearing
McElvogue, Ronnald E.
Missouri RSA No. 7 L.P. dba Mid-Missouri Cellular, Northwest Missouri Cellular L.P. dba Northwest
       Missouri Cellular, RSA 1 L.P. dba Cellular 29 Plus (Mid-Missouri Cellular et al.)
National Association of the Deaf (NAD)
OnStar Corp. (OnStar)
Qualcomm, Inc. (Qualcomm)
Qwest Wireless, L.L.C. (Qwest)
Rural Cellular Association (RCA)
Rural Telecommunications Group (RTG)
Secure Alert
Self Help For Hard of Hearing People (SHHH)
Sprint Spectrum L.P., dba Sprint PCS (Sprint)
Telecommunications for the Deaf, Inc. (Telecommunications for the Deaf)
Telecommunications Industry Association (TIA)
U.S. Cellular Corporation (U.S. Cellular)
Verizon Wireless, LLC (Verizon)
Vickery, Ronald H.
Western Wireless, Inc. (Western Wireless)
Wireless Consumers Alliance, Inc. (WCA)

#### Reply Comments

AT&T Wireless
ATX Technologies
CaseNewHolland Inc.
CNH

Federal Communications Commission　　　　　FCC 02-229

Cingular
Council of Organizational Representatives (COR)
Deere
Dobson
EDS Corp. (EDS)
ICSA/MT Communications
Kosterich, Eileen
Leap Wireless International, Inc.
Mercedes-Benz USA, LLC. (MBUSA)
Mid-Missouri Cellular et al.
N.E. Colorado
NAD
RCA
RTG
SHHH
Sprint
Telecommunications For the Deaf
Verizon

### *Ex Partes* or Late Filed Comments

A2Q, Inc.
AARP
ATX Technologies, Inc., et al.
Allen, George (The Hon.)
American Honda Motor Company (Honda)
Audi of America (Audi)
Breaux, John D. (The Hon.)
Brownback, Sam (The Hon.)
Carnahan, Jean (The Hon.)
CTIA
Cingular
Cleland, Max (The Hon.)
Dorgan, Byron L. (The Hon.)
Edwards, John (The Hon.)
Hollings, Ernest F. (The Hon.)
Los Angeles County Service Authority for Freeway Emergencies
Mercedes-Benz USA, LLC
National Association of EMS Physicians (NAEMSP)
National Telecommunications and Information Administration (NTIA)
Nelson, Bill (The Hon.)
National Organization on Disability
OnStar Corporation
Rehabilitation Engineering Research Center on Telecommunications Access (RERC-TA)
RCA
RTG
San Bernardino County – Service Authority for Freeways and Expressways
Smith, Gordon (The Hon.)
Sprint
Toyota Motor North America, Inc. (Toyota)
Transportation Agency for Monterey County

Federal Communications Commission                     FCC 02-229

Wyden, Ron (The Hon.)
Zarick, Michael (late filed)

**Comments re: Request for Waiver of the Vertical Wave Polarization Requirement filed by
Cingular Wireless, LLC**

AirCell, Inc. (AirCell)
Allgon Telecom
Andrew Corp.
AT&T Wireless
CSA Wireless
Cingular
Dobson
Meyers, Lou

## STATEMENT OF COMMISSIONER MICHAEL J. COPPS

## AGREEING IN PART, DISSENTING IN PART

*RE:      Year 2000 Biennial Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting the Cellular Radiotelephone Service and Other Commercial Mobile Radio Services (WT Docket No. 01-108).*

Although there are numerous requirements in this proceeding that I can support eliminating, there are also some from which I must dissent. They are five in number. (1) the elimination of the analog standard and the possible effects on the deaf and hard-of-hearing; (2) the elimination of the requirement that cellular applicants demonstrate their financial ability to operate their system at a time when bankruptcies are threatening consumers; (3) the elimination of cellular anti-trafficking rules; (4) the decision to allow cellular licensees to claim they serve rural areas by merely serving roaming in those areas; and (5) the mischaracterization of our biennial review responsibilities

### *The Order threatens service to Americans with hearing disabilities*

A year ago this Commission said, unambiguously, that "we will not take any action that would undermine service to persons with disabilities" in the Part 22 biennial review proceeding.[1] I must dissent from this Order because I believe it may do just that. At a minimum, this part of the Order is premature. Wireless services have become central to American's lives. They are critical for our jobs and our safety. Indeed, for an increasing number of us, they are becoming our primary phones. Most Americans can now choose to have digital service. Digital service has tremendous advantages, and I am confident that such service will continue to usher in new products, more spectrum efficiency, and higher quality of service. Unfortunately, millions of American with hearing and speech disabilities currently have only analog devices available to them. Wireless companies have not brought hearing-aid and cochlear-implant compatible phones to the market, except in very limited circumstances.

Our goal must be to make all wireless technologies available to Americans with hearing and speech disabilities. Digital service must be compatible with hearing aids and cochlear implants. Accessibility must go hand in glove with advances in technology. The Commission has an opportunity to fulfill this commitment in a pending proceeding on rules governing hearing aid compatible telephones. We should complete an Order in that proceeding as rapidly as possible. I hope that each of my colleagues will make this a strong personal commitment.

Until digital service is a reality for Americans with hearing aids or cochlear implants, however, their only option is the analog standard. If this standard were to disappear prematurely, these citizens would be stranded without any wireless options. That is unacceptable. We must not eliminate the analog standard until hearing-aid-compatible devices are widely available. Yet today the majority finds that the analog standard is no longer "necessary," even though compatible services are not yet available. It guesses that such devices will soon be available, but fails to support this prognostication with any record evidence. Based on this guess, the majority delays final elimination of the rule for five years. But make no mistake, the analog standard has been eliminated *even if hearing-aid-compatible devices are not available* five years from now – *unless* the Commission starts another proceeding and decides to reestablish the rule. My experience at the Commission leads me to believe that such a turn of events is unlikely. My question is: Why is it even necessary to put these citizens through an exercise that is neither

---

[1] *In the matter of Year 2000 Biennial Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting the Cellular Radiotelephone Service and Other Commercial Mobile Radio Services, Notice of Proposed Rulemaking,* 16 FCC Rcd. 11169 (2001).

Federal Communications Commission                    FCC 02-229

necessary not timely? I am further troubled that the Order does not commit to complete the wireless hearing aid compatibility item by a date certain – we owe this to those of our fellow citizens who depend on these services.

Eliminating the analog requirement before compatible devices are available could leave millions of Americans without service in the near future. I am willing to eliminate the rule, but will not until the actual availability of accessible devices. Additionally, I think that setting elimination in process now takes away the best incentive manufacturers have to produce this equipment in volume. It would be better for the industry to know that the rule will not be eliminated until it has done its job.

*The majority misstates the Commission's Biennial Review standard*

The majority also applies an interpretation of the Commission's Biennial Review standard that I find contrary to law. Congress instructed the Commission to review its rules on a biennial basis and "determine whether any . . . regulation [of a provider of telecommunications service] is no longer necessary in the public interest as the result of meaningful economic competition between providers of [that] service."[2] This created a two-step process for the Commission when we review a regulation under this provision. First we must determine if there is "meaningful competition" in the relevant market. Then we must determine whether the existence of "meaningful competition" means that the regulation in question is "no longer necessary in the public interest."

So, here, even once the Commission determines that there is "meaningful competition" it must eliminate a regulation only if it finds that such elimination serves the "public interest." Congress did not limit this public interest inquiry in any way. The 1996 Act certainly does not say that for Biennial Review purposes "public interest" only means "promotes competition." The Act also nowhere even hints that "public interest" only refers to the policies originally referred to in creating the underlying regulation, even though the majority sees this in the "plain meaning" of the statute. "Public interest" here is left unmodified and therefore must be interpreted to mean the traditional Commission public interest standard.

The D.C. Circuit recently reinforced this fact. It stated in *Fox Television Stations v. F.C.C.*, that "nothing in §202(h) signals a departure from [the public interest's] historic scope," and that limiting the inquiry to competition alone is not consistent with the Telecommunication Act.[3] Section 202(h) is directly tied to section 11, stating that "the Commission shall review its rules adopted pursuant to this section and all of its ownership rules biennially as part of its regulatory reform review under section 11." It goes on to use identical language to section 11, stating that the Commission "shall determine whether any of such rules are necessary in the public interest as a result of competition" and that "[t]he Commission shall repeal or modify any regulation it determines to be no longer in the public interest." To argue that the recent D.C. Circuit decision is not relevant to section 11 is suspect.

Congress directs us to facilitate the elimination of unnecessary regulation, but insists that we should do so only where such elimination serves the public interest. The majority, in explaining the section 11 standard, fails to recognize that a competition analysis is only part of its responsibility. Throughout the Order it makes decisions based solely on competitiveness findings, ignoring the duty to protect the larger public interest. This misuse of our section 11 standard is contrary to law. For these reasons I dissent to these parts of the Order.

---

[2] 47 U.S.C. § 161(a)(2).

[3] 208 F.3d 1027, 1042 (D.C. Cir. 2002).

Federal Communications Commission                    FCC 02-229

*The majority eliminates financial safeguards, anti-trafficking rules, and threatens rural wireless service*

    This is a wide-ranging Order, covering many topics other than the analog standard. I agree with a large number of the decisions made today. They remove regulations that have outlived their usefulness or recognize where market or technology changes have made regulations obsolete. Three rules are eliminated, however, that are still very "necessary" in the public interest. I must dissent to the elimination of these protections.

- *The majority eliminates financial safeguards at a time of market turmoil.* Our rules currently require an applicant for a new cellular system, when it applies for a license, to make a demonstration of financial qualification.[4] This means a company must show that it has financial commitments to construct and operate a cellular system for one year. The majority today decides to eliminate this financial safeguard at a time when we can least afford to do so, and at a time, I might add, when financial safeguards seem to be at a premium. The morning papers tell us that banks are looking for more evidence, not less, of financial viability before giving the green light to financial assistance. Perhaps we should take a clue. The fact that this rule applies only to cellular applicants, and only in a narrow set of circumstances, does not mean that it is not important. Rather than looking to cut away the few nets under the high-wire that American telecommunications consumers today walk, we would be better advised to build new precautions.

- *The majority eliminates anti-trafficking rules.* Our rules also currently protect consumers against the dangers of speculation and the trafficking of cellular licenses. There is a danger to American consumers when speculators obtain licenses with the intention of "flipping their license" for a quick profit rather than providing service. The spectrum is a public resource. Congress entrusted the Commission with the duty to manage the spectrum intending that we work to assign it to people who will promote the public interest. Our anti-trafficking rules require cellular licensees to provide service for one year before selling their license. This furthers Congress's goal, and does not seem too much to ask of those privileged to hold a cellular license. Nonetheless, the Commission eliminates this rule today.

- *The majority allows serving only "roamers" to count as rural service.* Our rules currently state that "[a] cellular system is not considered to be providing service to subscribers if . . . the system intentionally serves only roamer stations."[5] By eliminating this rule, the majority now allows a carrier to serve no local residents of a rural area, but only people roaming while driving through. Rural communities are already at a disadvantage when it comes to wireless service. In many areas around the country only the major highways are covered, leaving communities off these highways unserved. By saying that a carrier can claim that an area they promised to serve in its license application is being served by denying all but roamers access to wireless services, we are further undermining rural service.

    For all these reasons, I will approve this Order in part and dissent in part. I do want to thank the Bureau for its hard work in tackling these issues and I am pleased that I am in agreement with some, but not all, of its recommendations.

---

[4] 47 C.F.R. § 22.937.

[5] 47 C.F.R. § 22.946.

Federal Communications Commission                    FCC 02-229

**CONSOLIDATED SEPARATE STATEMENT OF**
**COMMISSIONER KEVIN J. MARTIN,**
**APPROVING IN PART AND CONCURRING IN PART**

*Re:*     *Year 2000 Biennial Regulatory Review – Amendment of Part 22 of the Commission's Rules To Modify or Eliminate Outdated Rules Affecting the Cellular Radiotelephone Service and other Commercial Mobile Radio Services,* WT Docket No. 01-108, Report and Order (FCC 02-229) and Second Report and Order (FCC 02-247)

I support these Orders, which modify or eliminate a number of our Part 22 rules pursuant to the biennial review mandated by section 11 of the Communications Act. I concur, however, with respect to the Orders' discussion of the legal standard for Section 11's biennial review. I also write separately to emphasize my support for ensuring that people with hearing disabilities have sufficient access to wireless services.

Section 11 requires the Commission to review its regulations for providers of telecommunications service every two years and to "determine whether any such regulation is no longer necessary in the public interest as the result of meaningful economic competition between providers of such service." 47 U.S.C. § 161(a). The provision then mandates that "The Commission shall repeal or modify any regulation it determines to be no longer necessary in the public interest." *Id.* § 161(b).

While I agree with much of the Orders' discussion of Section 11's legal standard (*see* First Report and Order ¶ 4; Second Report and Order ¶ 6) – as well as the Orders' application of the standard to the regulations at issue – I am concerned by the Orders' failure to discuss the meaning of the term "necessary" in Section 11. In a similar context, the Commission has argued that the term "necessary" means only "useful" or "appropriate." *See* FCC's Petition for Rehearing or Rehearing *En Banc, Fox Television Stations, Inc. v. FCC,* Nos. 00-1222, *et al.,* 2002 WL 1343461, at 5 (D.C. Cir. Jun 21, 2002) ("Terms such as 'necessary' and 'required' must be read in their statutory context and, so read, can reasonably be interpreted as meaning 'useful' or 'appropriate' rather than 'indispensable' or 'essential.'"). As I have argued elsewhere, I believe the term "necessary" should be read in accordance with its plain meaning, to mean something closer to "essential."[6] But at the very least, I think the Commission should clarify that the term means something more than merely "useful" or "appropriate." Accordingly, I concur in the Orders' discussion of Section 11's legal standard.

I also wish to note my support for ensuring that people with hearing disabilities have sufficient access to wireless services. Currently, hearing disabled people must generally rely on analog wireless service, because most digital phones cause interference to most hearing aids and cochlear implants. For this reason, among others, the First Report and Order leaves in place the requirement that cellular carriers provide analog service for another five years. More importantly, that Order makes clear that – even after the five-year period – the Commission will not eliminate the analog requirement if hearing-aid compatible digital devices are still not available. This latter point was fundamental to my support of the item.

Ultimately, however, the Commission must ensure the availability of digital phones that are compatible with hearing aids and cochlear implants. Fixing the digital compatibility problem, rather than

---

[6] *See* Separate Statement of Commissioner Kevin J. Martin, *Verizon Wireless's Petition for Partial Forbearance from the Commercial Mobile Radio Services Number Portability Obligation,* Memorandum Opinion and Order, WT Docket No. 01-184, CC Docket No. 95-116 (adopted July 16, 2002); Separate statement of Commissioner Kevin J. Martin, *Implementation of the Cable Television Consumer Protection and Competition Act of 1992; Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act; Sunset of Exclusive Contract Prohibition,* Report and Order, CS Docket No. 01-290 (adopted June 13, 2002).

**Federal Communications Commission**     **FCC 02-229**

relegating the hearing disabled community to analog phones, is the real solution.  I thus look forward to tackling that issue and completing our proceeding under the Hearing Aid Compatibility Act of 1988. Completing that proceeding should be, and is, a priority for the Commission.