

67 FR 77175-01                                                                                    Page 1
67 FR 77175-01, 2002 WL 31814254 (F.R.)
**(Cite as: 67 FR 77175)**


RULES and REGULATIONS

FEDERAL COMMUNICATIONS COMMISSION

47 CFR Parts 22 and 24

[WT Docket No. 01-108; FCC 02-229 and FCC 02-247]

Public Mobile Services and Personal Communications Services

Tuesday, December 17, 2002

**\*77175**  AGENCY: Federal Communications Commission.

ACTION: Final rule.

SUMMARY: In this Report and Order and Second Report and Order, the Commission makes significant modifications to its rules that cover the Cellular Radiotelephone and other services as part of its Biennial Review of rules.  The Commission modifies or eliminates various rules that have become outdated due to supervening rules, technological change, or increased competition among providers of Commercial Mobile Radio Services (CMRS).  The actions that the Commission takes in these items amends its rules to modify the requirement that cellular carriers provide analog service compatible with Advanced Mobile Phone Service (AMPS) specifications by establishing a five-year transition period after which the analog standard will not be required, but may still be provided.

DATES: Effective February 18, 2003.  The incorporation by reference of certain publications listed in the regulations is approved by the Director of the Federal Register as of February 18, 2003.

FOR FURTHER INFORMATION CONTACT: Roger Noel or Linda Chang, Wireless Telecommunications Bureau, at (202) 418-0620.

SUPPLEMENTARY INFORMATION: This is a consolidated summary of the Federal Communications Commission's Report and Order (R&O), FCC 02-229, adopted August 8, 2002, and released September 24, 2002, and Second Report and Order (2nd R&O), FCC 02-247, adopted September 10, 2002, and released September 24, 2002.  The full text of the R&O and 2nd R&O is available for public inspection during regular business hours at the FCC Reference Information Center, 445 12th St., SW., Room CY-A257, Washington, DC 20554.  The complete text may be purchased from the Commission's duplicating contractor: Qualex International, 445 12th Street, SW, Room CY-B402, Washington, DC, 20554, telephone 202-863-2893, facsimile 202-863-2898, or via e-mail at qualexint @aol.com.

Synopsis of Report and Order

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

Page 2

## I. Background

1. In June 2001, the Commission issued a Notice of Proposed Rulemaking seeking to identify and address outdated rule sections of part 22. See Year 2000 Biennial Regulatory Review--Amendment of part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting the Cellular Radiotelephone Service and other Commercial Mobile Radio Services, Notice of Proposed Rulemaking, 66 FR 31589 (June 12, 2001) (NPRM). As the Commission observed in the NPRM, technological advances have allowed cellular carriers to increase the capacity of their systems, and to provide advanced services to their customers in the form of enhanced service quality and advanced calling features. Moreover, the mobile telephony industry has become much more competitive with the entry of CMRS providers using technologies other than analog cellular into the market. Many of the Commission's cellular rules, however, do not reflect these developments, and continue to be more applicable to the earlier forms of cellular than the more advanced digital services available today. Accordingly, the Commission concluded in the NPRM that it is appropriate to re-examine its original cellular rules to determine whether certain rules should be eliminated or modified.

## II. Discussion

### A. Section 11 of the Communications Act

2. In 1996, Congress anticipated that the development of competition would lead market forces to reduce the need for regulation and amended the Communications Act of 1934 to permit and encourage competition in various communications markets. See Telecommunications Act of 1996, Pub. *77176 Law No. 104-104, 110 Stat. 56 (1996) ("1996 Act"), introductory statement (the 1996 Act was intended "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."); Joint Managers' Statement, S. Conf. Rep. No. 104-230, 104th Cong., 2d Sess. 113 (1996) at 1 (stating that the 1996 Act would establish a "pro-competitive, deregulatory national policy framework"). Section 11 of the 1996 Act requires the Commission to review biennially all of its regulations "that apply to the operations or activities of any provider of telecommunications service" and to "determine whether any such regulation is no longer necessary in the public interest as a result of meaningful economic competition between providers of such service." See 47 U.S.C. 161. In the past, the Commission has looked to the plain meaning of the text for guidance in exercising its obligation pursuant to section 11. See In the Matter of 2000 Biennial Regulatory Review Spectrum Aggregation Limits for Commercial Mobile Radio Services, WT Docket No. 01-14, Report and Order, 67 FR 1626 (Jan. 14, 2002). The Commission has stated that "the language places an obligation on the Commission to 'determine' if the regulation in question 'is no longer necessary in the public interest as the result of meaningful economic competition.' " Id. at 1617. Further, section 11 explicitly provides that "the Commission shall repeal or modify" any regulation that it determines is no longer necessary in the public interest as a result of meaningful economic competition. 47 U.S.C. 161(b). The Commission notes that section 11 places the burden on the Commission to make the requisite determinations; no particular burden is placed on the opponents or proponents of a given rule. The Commission has previously interpreted the language of section 11 as directing it to examine why a rule originally was "necessary" and whether it continues to be necessary. The Commission has found that in making the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

determination whether a rule remains "necessary" in the public interest once meaningful economic competition exists, the Commission must consider whether the concerns that led to the rule or the rule's original purposes may be achieved without the rule or with a modified rule. Id. at 1628.

B. Analog Cellular Compatibility Standard

3.  In establishing the Cellular Radiotelephone Service in the early 1980s, the Commission found that a single technology--analog--should be mandated to accomplish two goals: (1) To enable subscribers of one cellular system to be able to use their existing terminal equipment (i.e., mobile handset) in a cellular market in a different part of the country (roaming); and (2) to facilitate competition by eliminating the need for cellular consumers to acquire different handset equipment in order to switch between the two competing carriers within the consumers' home market (thus ensuring reasonable consumer costs.).  To facilitate these goals, all carriers were required to provide service exclusively in accordance with the then-existing compatibility standard for analog systems, known as Advanced Mobile Phone Service (AMPS). The detailed technical standards for AMPS were set out in the Office of Engineering and Technology Bulletin No. 53 (OET 53) in April 1981.  The OET 53 specifications established technical operational parameters and descriptions of call processing algorithms and protocols to be used by analog cellular systems. Pursuant to § 22.901, a carrier must provide service to any subscriber within the carrier's CGSA, including both the carrier's subscribers and roaming customers that are using technically compatible equipment.  47 CFR 22.901.  Section 22.901(d) specifically requires that carriers make mobile services available to subscribers whose mobile equipment conforms to the AMPS compatibility standard.  47 CFR 22.901(d).  The Commission's cellular rules, in effect, continue to obligate carriers to provide analog service consistent with the standard identified two decades ago in OET 53.

4.  After reviewing the record, the Commission concludes that in light of the present competitive state of mobile telephony, the nationwide coverage achieved by cellular carriers, and the clear market demand for nationwide, ubiquitous coverage by carriers, the analog requirement has substantially achieved its purpose of ensuring that the public has access to low-cost, compatible equipment and to nationwide roaming.  Not only does the Commission determine that the rule is no longer necessary to achieve its purposes, it concludes that it imposes costs and impedes spectral efficiency.  The development of the mobile telephony industry further leads the Commission to find that these objectives can largely be accomplished by market forces without the need for regulation.  The Commission therefore concludes that the analog requirement should be removed.  However, eliminating the rule immediately without a reasonable transition period would be extremely disruptive to certain consumers, particularly those with hearing disabilities as well as emergency-only consumers, who currently continue to rely on the availability of analog service and lack digital alternatives.  Accordingly, the Commission modifies its rules requiring application of the analog compatibility standard to include a sunset period of five years, during which time the Commission anticipates that problems regarding access will likely be resolved.  In order to enable the Commission to monitor the adequacy of access to mobile telephony by those currently reliant on analog service, certain CMRS carriers will be required to file reports prior to the sunset, describing the extent to which hearing aid-compatible digital devices are available to and usable by consumers with hearing disabilities, and the progress made in informing their customers of the impact of the 5-year sunset date on 911-only phones and analog-only phones, as well as the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

Page 4

availability of digital replacements for donated analog phones.

1. Indefinite Retention of the Analog Requirement is not Warranted

  5.  The Commission finds that it is not necessary to retain the analog requirement in order to ensure competition.  Indeed, the Commission concludes that continuing to require carriers to operate consistent with the AMPS standard may hinder competition by causing spectral inefficiencies and increased costs to those carriers who would prefer to concentrate on digital technology.  Additionally, the robust mobile telephony market leads the Commission to conclude that the analog requirement is no longer necessary to ensure reasonable costs, as well as the continued availability of roaming to the vast majority of consumers.  Removal of the requirement is consistent with its desire to move toward a less regulatory approach, as well as a congressional directive to treat similarly-situated CMRS in a like manner.

  6.  The analog requirement is no longer needed to foster competition.  The Commission sought to ensure that there was competition, albeit limited, within any given market by compelling carriers to operate consistent with AMPS specifications as well as requiring that carriers serve all consumers using AMPS-compatible handsets.  The mobile *77175 telephony industry, however, has changed immensely in the two decades since the establishment of the cellular service.  The market for mobile telephony service now includes the Personal Communications Services (PCS) and the Specialized Mobile Radio (SMR) service in addition to cellular.  The Commission noted in its Seventh CMRS Competition Report that 268 million people, or 94 percent of the total U.S. population, currently reside in areas in which three or more different operators (cellular, broadband PCS, and/or digital SMR providers) offer mobile telephony service in the counties in which they live.  Over 229 million people, or 80 percent of the U.S. population, live in counties with five or more mobile telephony operators offering service, while 151 million people, or 53 percent of the population live in counties with at least six different mobile telephony operators.

  7.  Rather than encouraging competition, the Commission concludes that, in many instances, the analog requirement harms competition by imposing unnecessary operating costs and impeding the spectral efficiency of the two cellular providers in the market.  First, the analog requirement places a financial burden on cellular licensees who would prefer to use their spectrum and other resources on digital technology rather than setting aside a portion to support their analog facilities.  Cellular licensees that deploy digital technologies must also maintain a minimum scale analog network.  These cellular licensees incur operation and maintenance costs for two mobile telephony networks in order to comply with Commission rules.  Also, by maintaining two networks, operation and maintenance costs associated with the digital network may be higher because the carrier is not able to optimize the system as efficiently as it would if there was only one network.  Second, the Commission also agrees with commenters who argue that imposition of the analog requirement impedes spectral efficiency.  Digital technologies are more efficient than analog, use less bandwidth, and give consumers access to advanced services not feasible with analog.  The analog requirement prevents cellular licensees from choosing to efficiently utilize their spectrum by installing an all-digital network and potentially providing additional advanced services.  Further, the analog requirement may result in certain carriers being capacity constrained in certain geographic markets depending on the amount of spectrum dedicated to AMPS, usage by

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                                                          Page 5
67 FR 77175-01, 2002 WL 31814254 (F.R.)
**(Cite as: 67 FR 77175)**

AMPS customers, type of digital technology, and how intensively their digital customers utilize their services.  Thus, to the extent that a cellular carrier incurs costs to operate an analog network that it would not maintain but for the analog requirement, the Commission concludes that the rule imposes unnecessary financial burdens and hinders spectral efficiency.  These factors in turn impede the ability of the cellular carrier to compete vis-[agrave]-vis other mobile telephony providers who are not subject to the requirement.

  8.  Access to reasonably priced equipment is not dependent on the continued imposition of the analog requirement.  It is no longer the case that the analog requirement is needed to ensure reasonably priced equipment, and, as a result, increased competition.  Because early cellular mobile equipment was expensive, the Commission concluded that it was cost-prohibitive for consumers to switch providers in the event the two carriers in the market utilized different technical standards.  The Commission found that consumers would be discouraged from switching cellular providers if they had to purchase additional equipment in order to be served by the second carrier.  The Commission found that mandating a specific technology would enable consumers to choose between carriers without regard to cost of equipment, thereby encouraging competition between the carriers.  Today, however, mobile handsets are much less expensive.  The declining cost of such equipment as well as the frequent carrier subsidy of the cost of the telephones have diminished the handset disincentives for consumers switching between providers (whether cellular or other CMRS).  Consumers are now able to easily choose from a panoply of carriers and technologies.

  9.  Roaming is not dependent on the analog requirement.  The Commission continues to consider the existence of a nationwide, compatible service to be a major goal for the cellular service.  However, given the current competitive state of mobile telephony, the Commission concludes that consumers will continue to have the ability to roam outside of their home markets even in the absence of the analog requirement.  In the years since the cellular service was established, many CMRS providers using digital technology, particularly broadband PCS and SMR services, have developed and established a strong market presence.  When the rules for market-based PCS and SMR services were established, the Commission declined to impose technological compatibility rules, and allowed carriers the flexibility to implement air interface technologies of their own choosing.  In the absence of a Commission-mandated standard for PCS and SMR, carriers have nonetheless established systems providing seamless nationwide service in response to customer demand.  Service providers have been successful in establishing nationwide systems, even though they employ different air interface technologies, by acquiring licenses in as many markets as possible, establishing roaming agreements with other carriers who have implemented the same digital technology, and providing multimode handsets that allow customers to roam using analog cellular service where interoperable digital service is not available.

  10. The Commission does not find persuasive arguments that elimination of the analog requirement will force small and regional carriers to convert to digital earlier than they would otherwise in order to ensure seamless service to their customers and other consumers, or that such a transition will be cost-prohibitive for such service providers or their customers.  The choice to switch from analog to digital technology, as well as the rate at which the transition occurs, are business decisions made by the individual carrier. Indeed, the Commission concludes that market forces are already at work with respect to small and regional carriers.  After reviewing current and future market trends in mobile telephony, the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Commission finds that many small and regional carriers are or will be shifting
their systems towards digital technology. The Commission expects that construction
by PCS licensees in rural areas will continue to increase, thereby providing
digital services to customers in rural areas. With the introduction of digital
services by PCS providers, cellular licensees are likely to find it competitively
necessary to install or expand their digital network, regardless of whether or not
the analog requirement is retained. Moreover, the Commission expects that the
increasing presence of multimode handsets will minimize the necessity for small and
regional carriers to completely switch to a digital system. Accordingly, the
Commission concludes that roaming and interoperability concerns held by small and
regional carriers are not a sufficient basis to require the continued application
of the analog requirement.

   11. The Commission notes that the five-year sunset period it is establishing for
other reasons should mitigate the concerns of small or regional carriers, such as
the disruptions to operations that an immediate elimination of the *77178 analog
requirement might cause. For example, a transition period permits carriers to
evaluate their current and future technology choices as well as those of their
current roaming partners. Carriers will have the opportunity to negotiate new
contracts where needed to ensure the availability of roaming services to their
customers. Also, the elimination of the cellular analog requirement will increase
the demand for the development and commercial implementation of multimode/multiband
handsets, a process that is already occurring. By the end of the transition
period, these handsets should be widely available and customers may choose to
migrate to these new handsets depending on their roaming needs. Further, the
transition period provides additional time for PCS licensees in both Rural Service
Areas (RSAs) and Metropolitan Statistical Areas (MSAs) to further build out their
licensed service areas in order to enhance opportunities for roaming for all
consumers.

   12. The possible impact on telematics providers does not justify retention of the
analog requirement. Telematics providers argue that the elimination of the rule
will significantly impair their ability to provide service because these systems
require analog technology due to its ubiquitous coverage, and that there is
currently no other widely-deployed technology available to adequately support
telematics services. While digital service providers are continuing to expand
their service area footprint, commenters argue that there are still large gaps in
coverage, and note that the various digital standards are not interoperable.
Commenters argue that digital systems cannot yet transmit both voice and data on
the same call, a feature that commenters argue is important for telematics
providers. Commenters assert that the interoperability problem is particularly
difficult for telematics devices because manufacturers must choose a technology
that is embedded in a vehicle that will have a useful life of ten or more years.
Telematics providers contend that, unlike the typical cellular subscriber who can
readily switch to digital handsets if necessary, the development cycle (the length
of time necessary to design, test, and install equipment in vehicles) and hardware
basis of telematics-equipped vehicles prevents users of such services from quickly
and easily migrating to a new technology. Commenters argue that, in evaluating
this issue, the Commission should take into account the useful life of the vehicle,
the vehicle development cycle, as well as investments made by owners of vehicles
with embedded telematics systems.

   13. The Commission concludes that arguments advanced by telematics providers do
not constitute sufficient basis to warrant the indefinite imposition of an outdated

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                          Page 7
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

technical standard.  Each of the factors identified by telematics providers--e.g.
development cycles of vehicles, choice of hardware and technology platforms--are
considerations within the control of the individual provider or the original
equipment manufacturer with whom it partners. However, as in the case of regional
carriers, the Commission finds that the sunset period it is establishing for other
reasons should also mitigate any significant impacts that might affect telematics
providers.  During the transition period, the Commission anticipates that
telematics providers will be able to partner with cellular, PCS, and SMR carriers
in order to secure service on the carriers' digital networks.  Based on the record,
the Commission concludes that within the next five years, the telematics industry
will make great strides towards developing multimode devices that will provide
interoperability and facilitate roaming on digital networks.  Moreover, the
majority of commenters concede that a reasonable transition period would ease any
concerns regarding the elimination of the analog requirement.

  14.  Modification of the rule is supported by section 332 of the Communications
Act. Another factor supporting the modification of the analog requirement to
include a five-year sunset is section 332 of the Act, which directs the Commission
to regulate CMRS providers to technical and operational rules comparable to those
that apply to providers of substantially similar common carrier services.  Section
332 requires that differences between rules governing competing services should be
conformed if the Commission determines that the differences distort competition by
placing unequal regulatory burdens on different types of CMRS providers.  Over the
years, the Commission has shifted towards taking a less regulatory approach in
setting out technical standards for the various wireless services.  Yet in the case
of cellular, while the Commission has afforded carriers the flexibility to deploy
new technologies and to offer digital services similar to that offered by PCS
providers, cellular carriers must nonetheless continue to provide analog service.
The analog standard forces cellular carriers to incur costs and burdens not assumed
by other CMRS licensees despite the similarity of services provided by cellular
carriers as compared with other providers.

2. Sunset of the Analog Requirement

a. 911-Only Phones and Unsubscribed Emergency Phones

  15. A primary reason for the growth of mobile telephony is the safety and security
functions of wireless telephones.  Indeed, some consumers acquire wireless
telephones that can only make 911 calls.  These 911-only consumers can be
categorized as: (1) "Unsubscribed" consumers of recycled phones that were
previously, but are no longer, service-initialized by a wireless carrier, and have
been reissued under some type of donor program, such as phones donated to victims
of domestic violence, and (2) subscribers of newly manufactured 911- only phones
that can only make 911 calls but are incapable of receiving any incoming calls.
Consumers of the latter are often elderly persons who cannot afford basic wireless
service or do not want typical wireless service, but desire immediate access to
emergency services.  The Commission concludes that a transition period is warranted
in order to mitigate possible negative effects to emergency-only consumers that
might otherwise occur with an immediate elimination of the analog requirement.
Also, in some geographic areas in which digital coverage is currently insufficient,
a transition period will allow carriers time to enhance coverage.  The transition
period will allow for the continued expansion of digital networks and further
conversion of analog networks to digital, thereby providing for a more extensive

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

network of digital technologies.  During the transition period, service providers
can conduct customer outreach in order to educate consumers that analog services
may be discontinued on a certain date, thereby providing emergency-only consumers
with time to migrate from analog to digital handsets.

 16. Although there is currently a sizable number of unsubscribed analog and 911-
only consumers, it can be assumed that the total number of such users will decline
in the future, as digital networks expand and carriers migrate current analog
customers to digital services.  The Commission expects that unsubscribed consumers
will have access to digital equipment as digital handsets are being donated as well
as analog handsets.  It is reasonable to assume that the number of digital handsets
will increase over time because the number of digital subscribers is approximately
three times that of analog subscribers, and a **77179**  consumer uses a handset on
average for 1.5 to 2.5 years before acquiring a new one.  Because handsets are
recycled every 18 to 30 months, the Commission concludes that a transition period
should ensure that recipients of donated mobile telephones have access to digital
equipment.

b. Accessibility Issues

 17. The Commission has for some time been cognizant of the concerns held by
persons with hearing disabilities regarding their ability to access wireless
technologies and services.  Although most consumers have a variety of mobile
technologies and services available to them, persons with hearing disabilities
desiring to use wireless devices must currently rely on analog service or the small
number of digital phones that are currently compatible with hearing aids--a
compatibility that is limited to certain types of hearing aids.  Unlike analog
handsets, digital technologies have been shown to cause interference to hearing
aids and cochlear implants.  For the most part, analog wireless equipment does not
pose interference problems for hearing aid wearers because they transmit signals at
a steady rate; no extraneous audible noise is produced because these signals are
not demodulated by the handset and in turn amplified by the hearing aid.  Unlike
analog equipment, however, digital wireless telephones do not transmit
electromagnetic energy at a steady rate, and the fluctuations can cause disruptive
interference to hearing aids or cochlear implants.  Currently, nearly all digital
equipment can cause some interference to many types of hearing aids and cochlear
implants.

 18. The Commission's review of the record leads it to conclude that immediately
removing the requirement that cellular carriers operate consistent with the analog
compatibility standard would indeed be detrimental to persons with hearing
disabilities.  Because persons with hearing disabilities must continue to rely on
analog technology for access to wireless service at this time, the Commission finds
that the record supports implementing a transition period during which time it
anticipates that digital solutions to the hearing aid-compatibility problem will be
developed and made widely available.  In order to ensure that analog service
remains available to persons with hearing disabilities while industry seeks to
develop accessible digital technologies, the Commission provides for a five-year
transition period before the elimination of the analog requirement.  The Commission
concludes that a five-year period provides a reasonable time frame for the
development of solutions to hearing aid-compatibility issues.  The progress made in
developing digital TTY solutions leads it to determine that the industry will also
likely be able to develop digital solutions for telephones within a five-year

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                                                          Page 9
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

period. Moreover, mandating a shorter timeframe may result in persons with hearing disabilities gaining access to digital handsets more quickly than if the Commission sets out a longer period.  Because the Commission is reserving the right to extend the sunset period in the event that solutions to hearing aid-compatibility problems are unsatisfactory, the industry has an incentive to develop digital solutions to the access problem.

19. The Commission notes that it is establishing a transition period to safeguard the ability of persons with hearing disabilities to access mobile telephony services even though carriers are otherwise obligated to ensure that telecommunications service is accessible to persons with disabilities.  Section 255 of the Communications Act requires that "[a] provider of telecommunications service shall ensure that the service is accessible to and usable by individuals with disabilities, if readily achievable." See 47 U.S.C. 255(c).  In the NPRM, the Commission observed that if the analog requirement was eliminated, section 255 would still require that carriers to make digital services compatible with hearing aid devices.  Although a few commenters argue that mobile telephony providers and manufacturers can circumvent the provisions of section 255, the Commission concludes that section 255 requires providers to ensure that their services remain accessible to persons with hearing disabilities.  However, the independent requirements of section 255 notwithstanding, the Commission finds that it is appropriate to also establish a five-year transition period in order to address the particular current problem of hearing aid-compatibility with digital handsets, and ensure access to mobile telephony service for persons with hearing disabilities.

20.  Reporting requirement. In order to monitor the progress made by the wireless and hearing aid industries in developing solutions, and to ensure that wireless services are continuing to be made available to persons with hearing disabilities as well as 911-only consumers, the Commission will require that, no later than the third and fourth anniversary of the effective date of this order, certain CMRS licensees and other entities file reports with the Commission.  The reports will be required from all cellular licensees providing nationwide coverage.  In addition, the reports must inform the Commission whether each carrier intends to discontinue analog service, identify the markets in which it plans to discontinue analog service, and for how long it plans to continue analog service and in which markets. If a carrier intends to discontinue analog service, the carrier must certify and provide information in its report that there are hearing aid-compatible digital devices available to persons with hearing disabilities at the time of filing, or, if no such equipment is available at the time of filing, describe the extent to which, by the end of the fifth year, digital equipment will be available to persons with hearing disabilities in market(s) where the carrier intends to discontinue analog service.  Carriers may also be required to show in their reports that they are in compliance with the provisions of section 255 of the Act, as well as with any other obligations required of them by the Commission.  Such carriers, in their reports, may also be required to describe their plan for informing its subscribers, the public and other interested parties regarding plans to discontinue analog service.  Finally, other interested parties will be able to file reports or comments as appropriate, and the Commission encourages joint efforts.  Such Reports will be made publicly available to all interested parties who may file supplemental information as appropriate to ensure that the Commission has a full record.  The information contained in the reports will be used to determine whether or not the  Commission will initiate a proceeding to extend the sunset date or take appropriate enforcement action under section 255.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

21. Further, the Hearing Aid Compatibility Act of 1988 (HAC Act) requires almost all new telephones to "provide internal means for effective use with hearing aids that are designed to be compatible with telephones which meet established technical standards for hearing aid compatibility," but provides an exemption for certain categories of phones including those used with CMRS and the private mobile radio services (or PMRS). 47 U.S.C. 610(b)(1); see 47 CFR 68.4(a). In November 2001, the Commission initiated a proceeding to examine whether this exemption continues to remain necessary, or whether the statutory criteria for revocation or limitation of the exemption have been satisfied. See In the *77180Matter of Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones, WT Docket No. 01-309, Notice of Proposed Rulemaking, 16 FCC Rcd 20558 (2001) (HAC Proceeding). The action taken here does not preclude the Commission from independently requiring carriers to comply with HAC requirements, even during the 5-year transition period, in the event that the Commission determines in the HAC Proceeding that the statutory criteria for revocation or limitation of the exemption have been satisfied. Finally, the Wireless Telecommunications Bureau, in conjunction with the Consumer & Governmental Affairs Bureau, will work closely with the Food and Drug Administration and the Commission's Office of Engineering and Technology in the development of standards for hearing aid design that alleviate interference.

*C. Electronic Serial Number Rule*

22. In the NPRM, the Commission proposed to remove § 22.919 of its rules, which sets forth electronic serial number (ESN) design requirements for manufacturers of cellular telephones. The purpose of this rule was to address the problem of cellular "cloning" fraud that was prevalent in the mid-1990s. Over the years, however, other measures have developed to combat cloning fraud. For example, Congress enacted the Wireless Telephone Protection Act of 1998 to address fraudulent and unauthorized use of wireless telecommunications services. Further, the cellular industry has developed a more secure access protocol, known as authentication. Other anti-fraud countermeasures developed by the industry include "radio frequency fingerprinting," which identifies a mobile handset by its unique radio transmission characteristics, as well as "call profiling," which enables carriers to monitor for unusual, sudden changes in calling patterns.

23. After reviewing the original purpose of the rule, the anti-fraud techniques that have been developed since the adoption of the rule, as well as the comments in this proceeding, the Commission concludes that the ESN rule is no longer necessary in the public interest and adopts its proposal to eliminate § 22.919. The concerns that led to the adoption of this rule have been addressed and no longer require retention of this rule. The Commission finds that it is unnecessary to continue to mandate detailed hardware design requirements given the success the wireless industry has had in developing other more effective anti-fraud measures.

D. Channelization Requirements

24. Section 22.905 identifies the part of the electromagnetic spectrum that is allocated to the Cellular Radiotelephone Service and divides it into two blocks, labeled A and B. See 47 CFR 22.905. It also sets forth a channelization plan that sub-divides each block into 416 paired 30 kHz channels and designates 21 of these paired channels as control channels. Alternative technologies, including the principal digital technologies many cellular licensees have overlaid on top of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                                              Page 11
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

their analog networks, are exempt from this channelization plan rule.  The
Commission proposed in the NPRM to remove the channelization plan for compatible
AMPS cellular systems from § 22.905 of its rules, and to rephrase the remainder of
that section such that it specifies only the portions of the electromagnetic
spectrum allocated to the Cellular Radiotelephone Service and which frequency
ranges make up the two initial blocks.  The Commission reasoned that the analog
technology to which the channelization plan is applicable is well-established
nationwide, and thus removing the plan would not pose any risk of decreased
cellular technical compatibility.

   25. Given the number of standard analog base stations and handsets in use today
and the efficiencies to be gained by implementing alternative digital (not analog)
technologies, it appears highly unlikely that any carrier would have the incentive
to deploy an alternative analog technology during the five-year sunset adopted in
this proceeding.  Further, carriers will continue to be bound by existing roaming
agreements for at least some portion of the sunset, again making it highly unlikely
that there would be any incentive to deploy an alternative analog technology.  The
Commission notes that the AMPS channelization plan is the current industry standard
for AMPS and will presumably continue to provide guidance to licensees through the
sunset of the analog requirement.

*E. Modulation Requirements and In-band Emissions Limitations*

   26. In the NPRM, the Commission sought comment on its proposal to modify § 22.915
of its rules, which sets out a number of technical specifications for, inter alia,
the performance of audio filter and deviation limiter circuitry in analog cellular
telephones, and adjustment of the modulation levels in analog cellular telephones.
Consistent with its less regulatory approach with PCS and other CMRS, as well as
its proposal to eliminate the analog requirement, the Commission proposed to
eliminate the provision set out in § 22.915 requiring cellular systems to have the
capability to provide service using the modulation types specified in OET 53
(analog compatibility standard).  The Commission also proposed to remove all rules
governing audio filter and deviation limiter performance, modulation levels, and
in-band radio frequency emission limits.

   27. The Commission also proposed changes to § 22.917 of its rules, which
prescribes emission masks limiting both in-band and out-of-band radio frequency
emissions.  As with the proposal to remove the channelization requirements, the
Commission proposed changes to the introductory paragraph of § 22.917, which
requires that analog modulated emissions be transmitted only on the communication
channels.  Further, the Commission sought comment regarding how it should define
the out-of-band emission limit in order to provide an adequate measure of
interference protection to other licensees and service, while also allowing
licensees the flexibility to establish a different limit where appropriate.
Specifically, the Commission asked whether licensees should be permitted to operate
transmitters on frequencies closer to the edge of their authorized spectrum than
full compliance with § 22.917 would normally allow, as long as all potentially
affected parties (i.e. adjacent licensees) agree to such a provision.  The
Commission also noted that its Wireless Communications Service (WCS) rules provide
this flexibility, and it indicated that cellular and broadband PCS licensees would
also benefit from such flexibility. Accordingly, the Commission sought to conform
the language and provisions of the out-of-band emission limit rules specific to the
cellular service and broadband PCS with those applicable to WCS.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                    Page 12
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

28. As the Commission is moving toward a less regulatory approach with respect to
its service rules and is permitting carriers to deploy technologies that best fit
the needs of the market, the Commission adopts its proposal with certain
modifcations.  Further, the Commission concludes that, because it seeks to ensure
regulatory conformity wherever practical, its rules regarding out-of-band emissions
limits for the various services should be similar.

29. However, certain commenters to the proceeding point out that implementation of
the measurement resolution bandwidth specified in the proposed rule would have the
effect of imposing a stricter out-of-band emission *77181 limit than that which
currently applies.  Specifically, the commenters object to the proposed rule's
specification that compliance with the out-of-band emissions limit should be
measured by using instrumentation employing a resolution bandwidth of 1 MHz or more
from the center of the band.  In proposing the rule change, the Commission sought
only to harmonize certain procedures in the WCS, PCS and cellular services, and did
not intend to make the out-of-band emission limits more restrictive.  Accordingly,
the Commission modifies the proposed rule by substituting in language that is more
consistent with recently adopted International Telecommunications Union (ITU)
standards for emissions.  See ITU-R SM.329.

*F. Vertical Wave Polarization Requirement*

30. Section 22.367(a)(4) of the Commission's rules provides that electromagnetic
waves radiated by base, mobile, and auxiliary test transmitters in the Cellular
Radiotelephone Service must be vertically polarized.  47 CFR 22.367(a)(4).  This
rule was originally adopted in order to promote technical compatibility for
cellular systems, as well as to reduce the likelihood of interference from cellular
transmitters to broadcast television (TV) reception on the upper UHF TV channels.
See  In the Matter of Revision of part 22 of the Commission's Rules Governing the
Public Mobile Services, CC Docket No. 92- 115, Report and Order, 9 FCC Rcd 6513
(1994).  The Commission tentatively concluded in the NPRM to relax § 22.367 of its
rules to provide that cellular stations no longer be limited as to the polarization
of the transmitted waves.  The Commission specifically sought comment on what
interference or adverse effects might be caused to mobile, fixed, and broadcast
services operating in the cellular service spectrum or adjacent spectrum.

31. The original purposes of the rule no longer warrant this requirement on
cellular carriers.  The Commission is persuaded that relaxation of this requirement
will have little effect on interoperability or UHF television channels.  Even if a
base station's transmissions are vertically polarized, many hand-held mobile units
may not benefit from vertical polarization because they are either held in a manner
such that their antenna is not vertical, or because the transmission's polarization
will be shifted due to reflections from man-made structures.  Accordingly, a
vertically polarized transmission generally will provide little interoperability
benefit to users of hand-held mobile phones.  Furthermore, cellular base stations
transmit on frequencies above 869 MHz (a minimum separation of 63 MHz from the
closest UHF television frequency), thereby reducing the likelihood of interference
with upper-band UHF television channels.

32. The Commission is not persuaded by arguments that the vertical polarization
requirement should not be removed because it could result in reduced RF coverage
for its end users, and impair telematics' ability to provide geographic location

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

information for emergency services.  The Commission notes that such concerns are
limited to rural areas, where cellular carriers are unlikely to use other than
vertical polarization because they have little incentive to do so.  In addition, it
is anticipated that cellular carriers will make the appropriate technical
adjustments to account for varying polarization of transmit and receive antennas,
and thereby obtain equivalent analog cellular performance at the boundaries of a
rural cell site when using alternative technologies.  The Commission notes that
cellular carriers already have the flexibility to reduce coverage or turn off their
systems for short or long periods without seeking prior approval of the Commission
or notifying customers of their intended action.  Further, telematics carriers may
negotiate with cellular carriers and may enter into voluntary contractual
relationships to accommodate specific coverage needs.  Finally, the Commission
believes that the industry and not regulation should dictate technical
specifications wherever possible.  Given these reasons, the Commission is not
persuaded that it is necessary to retain this rule simply to ensure coverage for
telematics subscribers attempting calls on the fringe of rural cell sites.

*G. Assignment of System Identification Numbers*

33. Section 22.941 of the Commission's rules sets forth the procedure by which the
Commission assigns system identification numbers (SIDs) to systems in the Cellular
Radiotelephone Service.  SIDs are used by cellular systems to identify the home
system of a cellular telephone and by cellular telephones to determine their
roaming status.  47 CFR 22.941.  In the NPRM, the Commission proposed to no longer
consider SIDs as a term of the cellular license and to remove the requirement in §
22.941 of its rules that cellular licensees notify the Commission of the use of
additional SIDs.  The Commission proposed to retain portions of that rule that
provide that a cellular system may transmit another system's SID only if that
system consents to such use.

34. The Commission concludes that it is not necessary in the public interest to
retain the current cellular SID rules as set out in § 22.941 of its rules as there
is no public policy rationale that SIDs must be a term of cellular authorizations.
There are no SID rules for PCS, SMR, or other CMRS, and this administrative
function is carried out successfully within those radio services by the private
sector without Commission involvement.  Further, the Commission removes the SID
rule in its entirety, including the "consent for use" portion of the rule (i.e.
allowing the usage of another system's SID only pursuant to consent).  The
Commission finds no reason to retain a portion of the rule or intervene when the
private sector has shown, as in the case of PCS, for example, that it is capable of
coordinating these types of administrative functions on its own.  For the reasons
stated above, the Commission is eliminating the SID rule in favor of administration
of this function by the private sector.  In eliminating this rule, the Commission
must take certain steps to provide a smooth transition of the SID administration
function to the private sector.  These steps include identifying a party or parties
to administer the function, transitioning the Commission's SID database to the
party(s), and publicizing the change to the cellular industry.  Therefore, the
Commission authorizes and directs the Wireless Telecommunications Bureau to take
all necessary steps to privatize this function.

*H. Determination of Cellular Geographic Service Area*

35. Section 22.911(a) of the Commission's rules sets forth a standardized method

for determining the CGSA of a cellular system.  A system's CGSA is defined as the
geographic area served by the system, within which that system is entitled to
protection and adverse effects are recognized for the purpose of determining
whether a petitioner has standing.  See 47 CFR 22.99.  Cellular licensees must
provide the Commission with certain technical parameters describing each cell site
that makes up the external boundary of its system.  These technical parameters
(latitude, longitude, height above average terrain, and power), or in some cases,
an alternative study, are used to determine the service area boundary (SAB) for
each cell site.  In this vein, the *77182  geographic area within the aggregated
SAB contours of a system (excluding areas outside the market boundary) is its CGSA.
The method for determining the CGSA uses a general mathematical formula to
calculate distances from the cell site along the cardinal radials to the SAB of
each cell in the system.  See 47 CFR 22.911, 22.912.

   36. Section 22.911(b) provides, however, that any cellular licensee may apply for
a modification of its licensed CGSA if it believes that the standard method
produces a CGSA that is substantially different from the actual coverage of its
system.  In adopting this alternative approach for calculating the CGSA, the
Commission stated that alternative showings would only be accepted where the change
to the CGSA is substantial and justified by unique or unusual circumstances, or
where the SAB formula is clearly inapplicable.  When preparing to file an
application requesting such a modification, the licensee must employ alternative
methods (actual measurements, more accurate prediction models or a combination of
the two) to determine the location of the median 32 dBuV/m field strength contour
and the distances along cardinal radials to that contour.  In describing how these
distances to the median 32 dBuV/m contours must be used to determine the CGSA,
paragraphs (b)(1) and (b)(3) of § 22.911 use the term SAB in several places.  In
the Commission's experience, this occasionally leads licensees to believe that they
may employ the alternative methods to determine an SAB, as opposed to the CGSA, and
then to use that "alternate" SAB in connection with various other rules such as the
SAB extension rule or the traffic capture protection rule.  In the NPRM, the
Commission sought to clarify that the SAB of a cell derived using the standard
method and the 32 dBuV/m contour that is used when preparing an alternative CGSA
determination are different and not interchangeable.  Accordingly, the Commission
proposed to reword paragraphs (b)(1) and (b)(3) of § 22.911 to replace the word
"SAB" with "32 dBuV/m contour."

   37. The Commission adopts the rule clarification as proposed.  In setting out the
standard method, the Commission sought to establish a method that would simplify
and remove a measure of uncertainty from the process of calculating and plotting
CGSAs.  The Commission sought to prevent disagreements between parties and the
Commission regarding the accuracy of methods used by parties to predict or measure
actual coverage for a particular location or terrain.  Although there may be certain
situations in which it may not represent actual coverage as closely as other
methods, the standard formula provides a simple and consistent method by which to
calculate cellular system coverage.  The Commission's decision to clarify §
22.911(a) is consistent with its original intent in limiting the scope of alternate
CGSA showings, i.e., to expedite Commission processing of applications, thereby
avoiding delays in the provision of cellular service to the public.  The Commission
does not foreclose, however, the ability of carriers in adjacent markets to agree
to the use of an alternative propagation method, or to enter into contract
agreements, pursuant to § 22.912, to allow SAB extensions calculated using the
standard method into the other carrier's CGSA.  The Commission believes that a
process that affords carriers flexibility and permits parties to enter into

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                                    Page 15
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

contractual agreements will expedite service to subscribers, in comparison to a
more protracted process whereby parties must present and argue the merits of
conflicting engineering studies before the Commission.

*I. Service Commencement and Construction Periods*

  38. Section 22.946, which sets out construction requirements relating to the
deployment of new cellular systems, was previously amended in the Commission's
Universal Licensing System proceeding.  See In the Matter of Biennial Regulatory
Review--Amendment of parts 1, 13, 22, 24, 26, 27, 80, 87, 90, 95, 97, and 101 of
the Commission's Rules to Facilitate the Development and Use of the Universal
Licensing System, WT Docket No. 98-20, Report and Order, 63 FR 6894 (Dec. 14, 1998)
(ULS Report and Order).  In implementing the ULS Report and Order, however, a table
entitled "H-1--Commencement of Service," was inadvertently deleted from § 22.946.
Because certain information in the table was out-dated, the Commission proposed to
correct § 22.946 by re-inserting the table, and to reflect updated information.
The Commission also proposed to delete the final phrase of § 22.946(b), which
prohibits cellular system licensees from "intentionally serv[ing] only roamer
stations."

  39. As consumers now have numerous mobile telephony offerings from which to
choose, the concern regarding lack of competition no longer exists. Accordingly,
the Commission will remove the provision that prohibits service only to roamer
stations.  Further, after the Commission adopted the NPRM, it issued a Report and
Order in WT Docket No. 97-112 regarding cellular service in the Gulf of Mexico.
See In the Matter of Cellular Service and Other Commercial Mobile Radio Services in
the Gulf of Mexico, WT Docket No. 97-112, Amendment of part 22 of the Commission's
Rules to Provide for Filing and Processing of Applications for Unserved Areas in
the Cellular Service and to Modify Other Cellular Rules, CC Docket No. 90-6, Report
and Order, 67 FR 9596 (March 4, 2002).  In that proceeding, the Commission amended
§ 22.946 to reflect construction requirements for licensees in the Gulf of Mexico.
Because it was necessary to amend § 22.946 to add the Gulf of Mexico construction
requirements, the Commission decided to re-insert the inadvertently omitted Table
H-1 at that time.  The Commission notes that § 22.946 was amended to re-insert
Table H-1 after the comment period in this proceeding had run, and that no one
filed comments opposing that correction to this rule section.

*J. Incidental Services Rule*

  40. Section 22.323 of the Commission's rules authorizes carriers to provide other
communications services incidental to the primary public mobile service, provided
certain conditions are met.  In general, § 22.323 requires carriers providing
incidental services to protect mobile subscribers by ensuring that: (1) The costs
and charges of subscribers not wishing to use incidental services are not increased
as a result of the carrier's provision of incidental services to other subscribers;
(2) the quality and availability of primary public mobile service does not
materially deteriorate; and (3) provision of such incidental services is not
inconsistent with the Communications Act of 1934 or the Commission's rules and
policies.  47 CFR 22.323.  In the NPRM, the Commission proposed to eliminate these
conditions, and sought comment on whether it should also remove the remaining
provision (i.e., the statement that incidental services are permitted) as it
applies to some or all part 22 services.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

41. In a related matter, the NPRM also sought comment on FreePage Corporation's (FreePage) request that § 22.323 be amended to include the "Limited Program Distribution Service" (LPDS) service proposed by FreePage as an "incidental service." In February 2000, the Wireless Telecommunications Bureau sought comment on a petition for rulemaking filed by FreePage requesting that the Commission amend § 22.323 to permit paging licensees to use their assigned channels to transmit audio programming of interest to a *77183 narrow or specialized audience.  Possible services cited by FreePage included, without limitation, children's programming, foreign language programming, and reading services for persons who have sight disabilities.

42. In the NPRM, the Commission invited comments on whether spectrum assigned to CMRS licensees could be used for the LPDS service proposed by FreePage.  In particular, the Commission sought comments addressing whether the service proposed by FreePage is in fact a broadcast service, and, therefore, whether it would need to change existing spectrum allocation and service rules to permit LPDS service in spectrum assigned to CMRS licensees.  More generally, the Commission also requested comments on what effects, if any, the implementation of FreePage's LPDS proposal would have on other authorized service offerings or services proposed in pending Commission rulemaking proceedings.  Finally, the Commission solicited comments from members of the disability community regarding how they might benefit from a revision of the Commission's rules that would permit use of the spectrum for programming to narrow or specialized audiences.

43. The Commission agrees with commenters that the imposing of conditions on the provision of incidental services by part 22 licensees is no longer necessary.  Section 22.323(a) imposes the condition that the costs and charges to subscribers not wishing to receive incidental services may not be increased as a result of the provision of incidental services to other subscribers.  Because of the competitive wireless environment, however, CMRS licensees are not subject to federal rate regulation and are not permitted to file tariffs with the Commission.  Under these circumstances, the Commission concludes that this rate restriction is unnecessary, as any dissatisfied subscriber will have the option of switching to a competing carrier.  The Commission further concludes that there is no reason to retain the remainder of the rule in the absence of those conditions.  The Commission recognizes that some commenters advocated that it retain this portion of the rule on the grounds that having an express provision for incidental services codified in the rules is helpful in demonstrating to state commissions that certain services must be treated as CMRS exempt from state and local regulation of rates and entry.

44. With respect to FreePage's request to include a provision in § 22.323 that LPDS is an incidental service within the meaning of the rule, the Commission denies the request but grants alternative relief as follows.  First, the Commission finds that it is unnecessary to determine whether FreePage's LPDS service constitutes an incidental service because FreePage may provide any form of fixed or mobile service under a part 22 authorization, provided only that its service does not constitute broadcasting.  Second, to the extent FreePage's intended service offering constitutes broadcast service, the Commission finds that it is in the public interest to provide FreePage with the flexibility to provide its LPDS service pursuant to the terms of a developmental authorization.  The Commission therefore directs Commission staff to waive the allocation if necessary in order to process the developmental license.  Accordingly, FreePage may file an application for developmental authority with the Commission, which will be processed by the Wireless Telecommunications Bureau pursuant to the regulations set forth in §

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                          Page 17
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

22.401 of the Commission's rules.  The Commission believes that a developmental
license will afford FreePage the opportunity to assess consumer demand for its LPDS
service offering.

*K. Cellular Anti-Trafficking Rules*

  45. In the NPRM, the Commission noted that §§ 22.937, 22.943, and 22.945 were
originally adopted to prevent speculation and trafficking in cellular licenses that
were awarded by random selection.  Because the Commission is now required to
resolve mutually exclusive applications for initial cellular licenses through
competitive bidding, it proposed to eliminate or substantially modify rule §§
22.937, 22.943, and 22.945 as they are now unnecessary and no longer serve the
public interest.

  46. In adopting § 22.937, the Commission stated that it was requiring applicants
to show financial qualification because of the large capital investment required to
finance the complex and sophisticated technology associated with cellular
operations.  The Commission noted that cellular service was viewed as a relatively
high-cost business venture because the service was still at an early stage of
development.  The Commission concludes that § 22.937 is no longer necessary as a
general matter because the cellular radiotelephone service has matured and there
are two authorized cellular carriers in all MSAs and virtually all RSAs.  The
Commission's cellular rules have been amended to permit interested parties to file
applications for any areas not serviced by cellular carriers after the expiration
of the applicable build-out period, and such applications are now subject to
competitive bidding.  Although it proposed to retain § 22.937 in the context of
comparative renewal proceedings, the Commission finds that the rule is not
necessary.  The Commission has the authority to seek financial qualification
information in a comparative renewal proceeding if it so chooses.  The Commission
therefore eliminates § 22.937 in its entirety.

  47. The Commission similarly concludes that § 22.943 should be removed as
unnecessary.  The Commission's anti-trafficking rules were developed to deter
speculation on cellular licenses.  In setting out the anti-trafficking rules, the
Commission sought to balance the public interest in liberal transferability of
licenses with a means to deter insincere applicants from speculating on unbuilt
facilities.  Accordingly, the Commission proposed to eliminate § 22.943 to the
extent that it prohibits trafficking in cellular licenses and precludes unserved
area licensees from assigning or transferring an authorization until they have
provided service to subscribers for at least one year.  The Commission noted that
the cellular service-specific anti-trafficking rule set out in § 22.943 may be
unnecessary and duplicative as there are similar provisions in part 1 of its rules
that are applicable to all wireless services.

  48. While § 22.943 was useful in deterring speculation during the time period in
which it used lotteries to select licensees, the Commission now uses competitive
bidding to resolve mutual exclusivity.  Mutually exclusive applications for
licenses in other CMRS are also required to be resolved through the use of
competitive bidding.  Yet in those cases, the Commission does not impose service-
specific anti-trafficking rules, or mandate specific holding periods prior to
assignment or transfer of licenses acquired through competitive bidding.
Accordingly, the Commission eliminates the portions of § 22.943 that prohibit
trafficking in cellular licenses, and that require carriers who acquired unserved

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

area licenses to provide service to subscribers for at least one year before such
licenses may be assigned or transferred.  The Commission further finds that the
cellular service-specific anti-trafficking rule set out in § 22.943 is unnecessary,
given the presence of the anti-trafficking provisions of § 1.948(i), which is
applicable to all services. See 47 CFR 1.948(i).

49. The Commission's conclusion to remove service-specific anti-trafficking
provisions of § 22.943 extends to § 22.943(c), which states that it will not **\*77184**
accept applications for consent to assign or transfer a cellular authorization
acquired by a current licensee for the first time as a result of a comparative
renewal proceeding until the system has provided service to subscribers for at
least three years.  See 47 CFR 22.943(c).  The Commission noted in the NPRM that it
would leave intact portions of § 22.937 relating cellular renewal proceedings, but
requested comment on whether to retain § 22.943(c).  Although § 22.943(c) also
relates to cellular renewals, it is nonetheless an anti-trafficking provision and
should be removed as duplicative of rule § 1.948(i).

50. Similarly, because § 22.945 was adopted for the sole purpose of preventing
lottery system abuses, the Commission's obligation to resolve mutual exclusivity
through competitive bidding also makes this rule unnecessary.  An applicant filing
more than one application for a specific unserved area under the current rules
would have no advantage over other applicants seeking authorization to serve the
same geographic area.

*L. Other Rule Changes Recommended by Commenters*

51. In the NPRM, the Commission not only sought comment on its specific proposals,
but also invited comment on whether it should modify any additional provisions of
its part 22 rules as a result of competitive or technological developments.

1. Overhaul of the Unserved Area Licensing Rules

52. Section 22.941 sets forth the "unserved area" licensing process for the
cellular service.  Certain carriers recommend that the Commission replace the
unserved area licensing process.  47 CFR 22.941.  In general, the commenters point
out that the current site-by-site approach requires pre-approval each time a
licensee wishes to expand its system.  Proposals by two of the commenters favor a
one-time process that licenses the remaining unserved areas, so that pre-approval
of future expansions is no longer necessary.  One recommendation proposes that the
Commission abandon the per-application approach of the unserved area rules and
instead: (1) Automatically incorporate areas of 50 square miles or less into the
CGSAs of the first-authorized incumbent adjoining the unserved area; and (2) open a
filing window for all unserved areas exceeding 50 square miles, resulting in either
the incorporation of the unserved area into the incumbent carrier's CGSA, or an
auction among mutually exclusive applicants.  Another proposal recommends
eliminating filings for unserved areas of less than 50 square miles that are
completely surrounded by an incumbent's CGSA (i.e., the incumbent is the only one
eligible under the rules to file an application), while another recommends that
incumbents should be able to cover unserved areas of less than 50 square miles on a
secondary basis without having to obtain prior Commission approval.

53. The Commission declines to adopt such changes.  Suggestions made by commenters
constitute a fundamental change to its cellular service licensing model, and, as

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                              Page 19
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

such, are beyond the scope of this proceeding.  The Commission also notes that
under its current process, the Commission receives approximately 40 unserved area
applications each month, disposing of each usually within 45-60 days.  Given that
so few unserved area applications are filed with the Commission today and are
processed quickly, it questions whether the burdens on all licensees of a major
overhaul at this point warrants any corresponding benefits.  In considering the
wisdom of making significant changes within the cellular unserved licensing
context, the Commission would need to identify an alternative approach that is
administratively efficient, less complicated than the current approach, represents
an improvement over the status quo in terms of speed of licensing and convenience
for licensees, and continues to provide small as well as large carriers with
reasonable opportunities to serve currently unserved areas.  Given that the current
system results in little administrative delay, the Commission does not find that
commenters have done so.  Moreover, commenters have failed to adequately address
construction, interference protection, and market structure issues that would need
to be addressed under a new processing regime.  The Commission believes that a more
complete record must be developed before any Commission action is warranted.

2. CGSA Expansion Notifications

  54. One commenter seeks to remove the requirement that licensees notify the
Commission of each CGSA expansion for markets within the initial five-year
construction period.  Currently, § 22.165(e) requires licensees to notify the
Commission within 15 days of expanding their CGSAs, even during the initial five-
year construction period.  Cellular licensees are free to construct facilities
anywhere within their markets without the possibility of competing applications
during the initial construction period.  The proposal would have the Commission
require the licensee to file a system information update at the end of the five-
year period, i.e., identify the areas that are served and unserved in preparation
for the unserved area Phase I process.

  55. The Commission agrees that generally it and other licensees have no interest
in knowing the precise location of an initial licensee's CGSA until the end of the
initial five-year period.  At that point, the CGSA must be a matter of record
available to potential Phase I unserved area applicants as well as the Commission's
staff in order to process the unserved area applications.  Presently, there are
only eleven cellular markets that are still within the initial five-year
construction period.  In addition, the Commission will soon issue initial licenses
in three of the remaining RSAs.  Even though very few licensees will be in a
position to take advantage of this change, the Commission will revise the rule
substantially as requested.  Therefore, the Commission will revise § 22.165(e) to
require licensees in their initial five-year build-out period to notify the
Commission of cell sites making up their CGSAs once yearly on the anniversary of
license grant, rather than requiring licensees to file notifications within 15 days
of initiating service at each site.  The Commission concludes that revising this
requirement to provide for an annual reporting obligation will minimize unnecessary
regulatory burdens for initial cellular licensees while providing a reasonably up-
to-date source of data for other cellular licensees and Commission staff.

3. Contract Extension Clarification

  56. Section 22.912 of the Commission's rules provides that any SAB extensions into
an adjacent carrier's CGSA requires the consent of the adjacent carrier.  One

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

commeter requested the Commission to clarify that, in the case where an adjacent
carrier has already consented to analog SAB extensions into its CGSA, a separate
agreement is not required in order to extend the SAB of a digital signal into the
CGSA so long as it does not exceed boundary established by the initial analog
agreement.  The Commission clarifies that its rules do not limit the scope of
private, contractual agreements between cellular licensees in this case.  To the
extent that a carrier enters into an agreement that provides for extensions of both
analog and digital signals into an adjacent carrier's CGSA, the Commission's rules
**77185**  do not require separate notification to the Commission of such extensions;
a single notification of the scope of that extension will be adequate notice.

III.  Administrative Matters

*A. Paperwork Reduction Act Analysis*

 57. The actions taken in this Report and Order have been analyzed with respect to
the Paperwork Reduction Act of 1995, Public Law No. 104-13, and found to impose no
new or modified recordkeeping requirements or burdens on the public.

*B. Final Regulatory Flexibility Analysis*

 58. As required by the Regulatory Flexibility Act (RFA), an Initial Regulatory
Flexibility Analysis (IRFA) was incorporated in the NPRM.  The Commission sought
written public comment on the proposals in the NPRM, including comment on the IRFA.
The comments received are discussed below.  The Final Regulatory Flexibility
Analysis (FRFA) conforms to the RFA.

Need for, and Objectives of, the Order

 59. In the Telecommunications Act of 1996, Congress added sections 11 and 202(h)
to the Communications Act of 1934, as amended, requiring the Commission to (1)
review biennially its regulations that pertain to the operations or activities of
telecommunications service providers, and (2) determine whether those regulations
are no longer necessary in the public interest as a result of meaningful economic
competition.  47 U.S.C. 11(b).  Following such review, the Commission is required
to modify or repeal any such regulations that are no longer in the public interest.
Accordingly, as part of the Commission's year 2000 Biennial Review of regulations,
the Report and Order amends part 22 of the Commission's rules by modifying or
eliminating various rules that have become outdated due to technological change,
increased competition in the Commercial Mobile Radio Services (CMRS) market, or
supervening rules.

 60. In particular, the Report and Order removes the cellular analog requirement
after a five-year transition period and requires reports by certain CMRS licensees
and other entities showing the level of access to mobile telephony had by persons
with hearing disabilities or those using emergency-only phones.  The Report and
Order also removes the manufacturing requirements governing Electronic Serial
Numbers (ESNs) in cellular telephones, as well as modifying several other technical
rules.  In the same vein, the Commission found some of the cellular anti-
trafficking rules to be outdated because they were adopted during a period when the
Commission resolved mutually exclusive applications for initial cellular services
through lottery, rather than the current system of resolving such mutually

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                                              Page 21
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

exclusive applications through competitive bidding.  The Commission also
reevaluated certain other part 22 rules that apply both to cellular and to other
CMRS, specifically § 22.323, which imposes conditions on the provision of
"incidental" services by Public Mobile Services providers.

Summary of Significant Issues Raised by Public Comments in Response to the IRFA

  61. Although the Commission received numerous comments in response to the NPRM, it
received no comments in response to the IRFA.  However, as described below, the
Commission nonetheless considered potential significant economic impacts of the
rules on small entities.

  62. Analog Compatibility Requirement.  Although the comments suggest that
elimination of the analog requirement would not affect the majority of wireless
consumers that are already using digital service, some commenters contend that
there are particular classes of consumers and service providers that would be
harmed by elimination of the rule.  These commenters focus particularly on the
possibility that, if the rule were eliminated, cellular carriers in major markets
would be likely to drop analog service in those markets to provide more capacity
for their digital systems.  Commenters argue that, at the very least, the
requirement should be eliminated only after a transition period.  The
unavailability of analog service in these markets, commenters contend, would have
an adverse impact on the following groups:

  63.  Small and regional carriers. Small and regional carriers argue that, if the
analog requirement is eliminated, they will be forced to transition from solely
analog services to digital in order to ensure that their customers will have
service outside of their home market, as well as to continue to provide roaming
service to customers of the large nationwide carriers.  They argue that eliminating
the analog requirement will force them to bear the financial burden of immediately
converting to digital, regardless of consumer demand within their particular
markets.  Further, these commenters assert that a decision to adopt any particular
digital technology will be dictated by a small/regional carrier's larger roaming
partner.  Moreover, commenters argue that, in certain areas, a small or regional
licensee may be positioned between major markets whose licensees have chosen
incompatible digital technologies, forcing it to choose between roaming partners
and multiple digital standards in the absence of analog technology.  These
commenters argue that, in the absence of interoperable digital technology, the
analog requirement should not be eliminated.

  64.  Analog-only consumers. It is estimated that there are approximately 26
million analog-only subscribers.  These include consumers who use analog-only
handsets because their carriers do not provide digital service (mainly rural
cellular carriers) as well as subscribers who have purchased 911-only mobile
phones.  Remaining analog-only users are non-subscribers, such as certain elderly
or victims of domestic violence, who have received recycled analog equipment for
use for emergency purposes.  Presently, a customer using analog-only equipment can
roam on other cellular networks in the event the consumer is outside of his/her
home market.  Commenters argue that these cellular customers would lose the ability
to roam with their current analog-only handset if the analog standard is eliminated
and both carriers within a given area shut down their analog networks.

  65.  Telematics. Telematics services providers have, for the most part, relied on

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

analog technology to ensure interoperable communications nationwide. Telematics
advocates assert that analog service is vital, due to the ambulant nationwide
nature of telematics technology.  It is argued that digital systems cannot yet
transmit both voice and data on the same call, a feature that commenters argue is
important for telematics providers.  These commenters assert that the
interoperability problem is particularly difficult for telematics devices because
manufacturers must choose a technology that is embedded in a vehicle that will have
a useful life of ten or more years. Moreover, these providers assert that, unlike
the typical cellular subscriber who can readily switch to digital handsets if
necessary, the development cycle (the length of time necessary to design equipment,
test, and install in compatible vehicles) and hardware basis of telematics-equipped
vehicles prevents users of such services from quickly and easily migrating to a new
technology.  These providers argue that telematics devices are imbedded into
vehicles in such a **77186** way as to make it cost prohibitive to retrofit legacy
vehicles with analog-based equipment.  Given the development cycles and life spans
of such vehicles (often longer than ten years), commenters argue that the immediate
elimination of the analog rule would be a setback for telematics providers and
their customers.  Instead, certain telematics providers argue that if the analog
requirement must be eliminated, the industry must be given a reasonable transition
period, and suggest that such a transition period would be ten years.

  66.  Persons with hearing disabilities. Persons with hearing disabilities desiring
to use wireless devices must currently rely on analog service or the small number
of digital phones that are currently compatible with only certain hearing aids.
Unlike analog handsets, digital technologies have been shown to cause interference
to hearing aids and cochlear implants.  Accessibility advocates and those with
hearing disabilities note that market forces (e.g. need for spectrum efficiency,
enhanced services such as wireless data) make a shift to digital technology
inevitable.  These commenters argue that at this point, however, due to the lack of
hearing aid-compatible digital equipment, persons with hearing disabilities must
rely on analog equipment to access mobile telephony, thereby settling for inferior
sound quality, fewer service options, and higher prices.  Commenters argue that,
because persons with hearing disabilities account for only a small percentage of
mobile telephony users, there are not sufficient economic incentives for carriers
to expend resources to ensure that these individuals have access to wireless
service. Accessibility advocacy groups maintain that the analog requirement should
not be eliminated (if at all) until new digital services are accessible and readily
available to persons with hearing disabilities.

  67. Electronic Serial Number.  Numerous commenters support the proposal to remove
§ 22.919.  Commenters agree that the industry is capable of developing anti-fraud
measures on its own and that the rule prevents carriers from deploying advanced
technologies such as smart cards.  One commenter, however, supports elimination of
the detailed design requirements in the rule, but would keep the requirement that
cellular telephones have a unique ESN. Further, two other commenters argue that
removing the ESN rule would be disruptive to other aspects of cellular service.
Alternatively, another commenter supports the Commission's proposal, but does so
because it believes that it should be legal to clone cellular telephones (in
particular, as a small business activity) for customers who are already legitimate
cellular subscribers, as opposed to those who are not subscribers.

  68. Channelization Requirements.  A majority of the commenters addressing this
issue support the Commission's proposal.  One commenter, however, opposes the
elimination of the channelization plan rule prior to the elimination of the analog

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                                 Page 23
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

service requirement, stating that some cellular carriers might start providing
analog service using a different and incompatible analog channel plan, which would
leave some subscribers without roamer service. Another commenter also opposes
removal of the channelization plan because it believes that the rule provides a
legal basis for "frequency protection" from adjacent systems using digital
technologies.

  69. Modulation Requirements and In-band Emissions Limitations.  The Commission
received a number of comments supporting various aspects of its proposal to a
number of technical specifications for, inter alia, the performance of audio filter
and deviation limiter circuitry in analog cellular telephones, and adjustment of
the modulation levels in analog cellular telephones. One commenter states that § 
22.915 should be eliminated because the rule's requirements are specific to the
AMPS analog compatibility standard, and, as such, are contrary to the goal of
allowing carriers to implement the technologies of their choice, and stifles the
development of technologically advanced systems. Certain commenters, however,
object to the specific language the Commission proposed for the out-of-band
emission limit measurement rule in § 22.917. These parties point out that
implementation of the measurement resolution bandwidth specified in the proposed
rule would have the effect of imposing a stricter out-of-band emission limit than
that which currently applies. A few commenters submitted alternative language
which more accurately reflect the Commission's intended goal of harmonizing certain
procedures in the wireless communications services (WCS), personal communications
services (PCS) and cellular services.

  70. Wave Polarization Requirement. A majority of the commenters addressing this
issue generally support relaxation of the rule requiring electromagnetic waves
radiated by transmitters to be vertically polarized because of the technical
flexibility it will provide cellular carriers. One commenter notes that
flexibility in polarization is beneficial in order to reduce multipath fading and
to improve signal quality, while another points out that eliminating the vertical
polarization requirement will permit carriers to reduce the antenna space needed on
towers, thereby benefiting carriers as well as the public by fostering more
aesthetically pleasing antenna sites, reducing the number of antennas required at a
particular site (thereby reducing the need for local zoning clearance in many
cases), permitting collocation of multiple carriers' facilities on the same tower,
and reducing site deployment costs.

  71. One commenter, however, objects to relaxing the rule on the basis that non-
vertical antenna polarization could result in reduced RF coverage for its end users
and impair telematics' ability to provide geographic location information for
emergency services. Specifically, the commenter notes that it utilizes analog
cellular technology to provide location-based telematics service offerings, such as
automatic crash notification, through systems embedded in vehicles of certain
automobile manufacturers. Likewise, another commenter objects to relaxing the
requirement because of the "isolation" it provides to cellular systems from co-
channel and adjacent-channel transmitters.

  72. Assignment of System Identification Numbers. Commenters generally support the
proposal to eliminate the procedures and rules set forth in § 22.941 by which the
Commission administers cellular system identification numbers (SIDs). The
commenters agree that there is no regulatory purpose in retaining SIDs as a term of
cellular licenses. As commenters point out, there are no SID rules for PCS, SMR,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

or other CMRS, and this administrative function is carried out successfully within
those radio services by the private sector without Commission involvement.

    73. Determination of Cellular Geographic Service Area.  Several cellular carriers
oppose the Commission's intent to clarify the language in § 22.911(b) regarding the
term "SAB" (service area boundary) in situations in which a carrier employs
alternative methods to calculate the CGSA of its system.  One commenter advocates
that the Commission in fact allow alternative propagation methods to be used for
evaluating signal extensions into adjacent systems, in lieu of the formula in §
22.911(a), and another commenter argues that when a carrier has determined its CGSA
by use of an alternative method, it is "illogical *77187  and inconsistent" to
require that cell SABs be used for all other purposes.

    74. Incidental Services Rule.  Commenters generally agree that the Commission
should modify § 22.323 of its rules that permits carriers to provide other
communications services incidental to the primary public mobile service.
Commenters, on the other hand, believe that the provision in § 22.323 that states
that incidental services are permitted should be retained.  Several of the carriers
addressing this issue point out that an express provision for incidental services
is helpful in demonstrating to state commissions that certain services must be
treated as CMRS exempt from state and local regulation of rates and entry.

Description and Estimate of the Number of Small Entities to which the Rules Will
Apply

    75. The RFA directs agencies to provide a description of, and where feasible, an
estimate of the number of small entities that may be affected by the proposed
rules, if adopted.  5 U.S.C. 603(b)(3).  The RFA generally defines the term "small
entity" as having the same meaning as the terms "small business," "small
organization," and "small governmental jurisdiction." 5 U.S.C. 601(6).  In
addition, the term "small business" has the same meaning as the term "small
business concern" under the Small Business Act.  5 U.S.C. 601(3).  A "small
business concern" is one which: (1) Is independently owned and operated; (2) is not
dominant in its field of operation; and (3) satisfies any additional criteria
established by the Small Business Administration (SBA).  15 U.S.C. 632.

    76. This Report and Order results in rule changes that could affect small
businesses that currently are or may become Cellular Radiotelephone Service
providers that are regulated under subpart H of part 22 of the Commission's rules.
In addition, changes to § 22.323 of the Commission's rules could affect service
providers that are regulated under any provisions of part 22 of the Commission's
rules.  These include, in addition to Cellular Radiotelephone Service providers,
providers of Paging and Radiotelephone (Common Carrier Paging), Air-Ground
Radiotelephone, Offshore Radiotelephone, and Rural Radiotelephone services.  In
addition, pursuant to § 90.493(b) of the Commission's rules, paging licensees on
exclusive channels in the 929-930 MHz bands are subject to the licensing,
construction, and operation rules set forth in part 22.  See 47 CFR 90.493(b).  As
this rulemaking proceeding may apply to multiple services, the Commission analyzes
the number of small entities affected on a service-by-service basis.  In addition
to service providers, some of the proposed rule changes may also affect
manufacturers of cellular telecommunications equipment.  The Commission will
include a separate discussion regarding the number of small cellular equipment
manufacturing entities that are potentially affected by the proposed rule changes.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                                  Page 25
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

77. Cellular Radiotelephone Service.  The SBA has developed a small business size
standard for small businesses in the category "Cellular and Other Wireless
Telecommunications." 13 CFR 121.201, North American Industry Classification System
(NAICS) code 513322.  Under that SBA category, a business is small if it has 1,500
or fewer employees.  According to the Bureau of the Census, only twelve firms from
a total of 1,238 cellular and other wireless telecommunications firms operating
during 1997 had 1,000 or more employees. Therefore, even if all twelve of these
firms were cellular telephone companies, nearly all cellular carriers were small
businesses under the SBA's definition. In addition, the Commission notes that there
are 1,807 cellular licenses; however, a cellular licensee may own several licenses.
According to the most recent Trends in Telephone Service data, 806 carriers
reported that they were engaged in the provision of either cellular service, PCS,
or SMR telephony services, which are placed together in that data.  See Trends in
Telephone Service, Industry Analysis Division, Common Carrier Bureau, Table 5.3--
Number of Telecommunications Service Providers that are Small Businesses (August
2001).  The Commission has estimated that 323 of these are small under the SBA
small business size standard.  Accordingly, based on this data, the Commission
estimates that not more than 323 cellular service providers will be affected by
these revised rules.

78. Paging.  The Commission has adopted, and the SBA has approved, a two-tier
definition of small businesses in the context of auctioning licenses in the paging
services.  Under this definition, a small business is defined as either (1) an
entity that, together with its affiliates and controlling principals, has average
gross revenues for the three preceding years of not more than $3 million, or (2) an
entity that, together with affiliates and controlling principals, has average gross
revenues for the three preceding calendar years of not more than $15 million.  See
Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993,
Third Report, FCC 98-91(rel.  June 11, 1998).  The Commission has estimated that as
of January 1998, there were more than 600 paging companies in the United States.
In the August 2001 Trends in Telephone Service data, 427 carriers reported that
they were engaged in the provision of paging and messaging service; 407 of these
firms identified themselves as having 1,500 or fewer employees.  The Commission
does not have data specifying the number of these carriers that are not
independently owned and operated or meet the small business thresholds set forth
above, or the number of these carriers that are regulated under part 22 of the
Commission's rules, and thus is unable at this time to estimate with precision the
number of affected paging carriers that would qualify as small business concerns
under its definition.  However, the Commission estimates that the majority of
existing paging providers qualify as small entities under its definition.
Consequently, the Commission estimates that there are up to approximately 600
currently licensed small paging carriers that may be affected by the rule changes
set out in the Report and Order. Further in December 2001, 182 bidders placed high
bids for 5,323 geographic area paging licenses in Auction No. 40.  Applications
remain pending as of the release of this Report and Order. Thus, in addition to
existing licensees, the rule changes adopted in the Report and Order could affect
paging licenses won in Auction No. 40.

79. Air-Ground Radiotelephone Service.  The Commission has not adopted a
definition of small business specific to the Air-Ground radiotelephone service.
Accordingly, the Commission uses the SBA definition applicable to radiotelephone
companies, i.e., an entity employing no more than 1,500 persons.  There are
approximately 24 licensees in the Air-Ground radiotelephone service, and the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06519   Document 22-6   Filed 01/09/2008   Page 26 of 39

Commission estimates that almost all of them qualify as small entities under the SBA definition.

80. Offshore Radiotelephone Service.  This service operates on several ultra high frequency (UHF) TV broadcast channels that are not used for TV broadcasting in the coastal area of the states bordering the Gulf of Mexico. At present, there are less than ten licensees in this service.  The Commission has not adopted a definition of small business specific to the Offshore Radiotelephone Service.  Accordingly, the Commission uses the SBA definition applicable to radiotelephone companies, i.e., an entity employing no more than 1,500 **77188** persons.  The Commission assumes that all licensees in this service are small entities, as that term is defined by the SBA.

81. Rural Radiotelephone Service.  The Commission has not adopted a definition of small entity specific to the Rural Radiotelephone Service.  A significant subset of the Rural Radiotelephone Service is the Basic Exchange Telephone Radio Systems (BETRS).  The Commission therefore uses the SBA definition applicable to radiotelephone companies; i.e., an entity employing no more than 1,500 persons. There are approximately 100 licensees in the Rural Radiotelephone Service, and the Commission estimates that almost all of them qualify as small entities under the SBA definition.

82. Cellular Equipment Manufacturers.  Some of the actions adopted in the Report and Order will also affect manufacturers of cellular equipment.  The Commission does not know how many cellular equipment manufacturers are in the current market. The 1997 Economic Census provides that there were 1,089 communications-related equipment manufacturing companies as of 1997.  This category includes not only cellular equipment manufacturers, but television and AM/FM radio manufacturers as well.  Under SBA regulations, a "radio and television broadcasting and wireless communications equipment manufacturing" company, which includes not only U.S. cellular equipment manufacturers but also firms that manufacture radio and television broadcasting and other communications equipment as well as electronic components, must have a total of 750 or fewer employees in order to qualify as a small business concern.  13 CFR 121.201, NAICS code 334220.  Although the exact number is unknown, the number of cellular equipment manufacturers is considerably lower than 1,089. U.S. Census Bureau, 1997 Economic Census, Manufacturing Subject Series, at Table 3--Detailed Statistics by Industry: 1997, NAICS code 334220 (October 2000).

83. Broadband Personal Communications Service.  The broadband PCS spectrum is divided into six frequency blocks designated A through F, and the Commission has held auctions for each block.  The Commission has created a small business size standard for Blocks C and F as an entity that has average gross revenues of less than $40 million in the three previous calendar years.  For Block F, an additional small business size standard for "very small business" was added and is defined as an entity that, together with their affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years. These small business size standards, in the context of broadband PCS auctions, have been approved by the SBA.  No small businesses within the SBA-approved small business size standards bid successfully for licenses in Blocks A and B. There were 90 winning bidders that qualified as small entities in the Block C auctions.  A total of 93 "small" and "very small" business bidders won approximately 40% of the 1,479 licenses for Blocks D, E, and F. On March 23, 1999, the Commission reauctioned 347 C, D, E, and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                          Page 27
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

F Block licenses; there were 48 small business winning bidders. Based on this
information, the Commission concludes that the number of small broadband PCS
licensees will include the 90 winning C Block bidders and the 93 qualifying bidders
in the D, E, and F blocks plus the 48 winning bidders in the re-auction, for a
total of 231 small entity PCS providers as defined by the SBA small business
standards and the Commission's auction rules. On January 26, 2001, the Commission
completed the auction of 422 C and F Broadband PCS licenses in Auction No. 35. Of
the 35 winning bidders in this auction, 29 qualified as "small" or "very small"
businesses.

Description of Projected Reporting, Recordkeeping and Other Compliance Requirements

  84. The Commission will require that, (1) three years from the effective date of
this order and (2) four years from the effective date of this order, certain CMRS
licensees and other entities file reports with the Commission. In the reports, the
carrier must either certify that, within their own markets, there are, at the time
of filing, hearing aid-compatible digital devices available to and usable by
persons with hearing disabilities for use with that carrier's digital network, or,
if no such equipment is available at the time of filing, describe the extent to
which, by the end of the fifth year, digital equipment will be available to and
usable by persons with hearing disabilities, and describe how the public is being
informed of their availability. If upon review of the filings, the Commission
determines that significant problems remain regarding access to mobile telephony by
persons with hearing disabilities, the Commission may find that the analog
requirement will be removed only for technologies where hearing aid-compatibility
solutions are available, or that the sunset period will be extended for all
carriers. Steps Taken to Minimize Significant Economic Impact on Small Entities,
and Significant Alternatives Considered.

  85. The RFA requires an agency to describe any significant alternatives that it
has considered in reaching its proposed approach, which may include the following
four alternatives (among others): (1) the establishment of differing compliance or
reporting requirements or timetables that take into account the resources available
to small entities; (2) the clarification, consolidation, or simplification of
compliance or reporting requirements under the rule for small entities; (3) the use
of performance, rather than design, standards; and (4) an exemption from coverage
of the rule, or any part thereof, for small entities. See 5 U.S.C. 603.

  86. Because several commenters argued that certain entities, such as persons with
hearing disabilities and small and regional carriers, may be harmed by the
immediate removal of the analog requirement, the Commission instituted a five-year
transition period to ease the transition to digital technology. By establishing
this five-year transition period, the Commission takes account of the potentially
smaller resources available to small entities.

  87. The Report and Order concluded that several of the Commission's technical and
anti-trafficking cellular rules are outdated. Therefore, modifying or eliminating
these rules should decrease the costs associated with regulatory compliance for
cellular service providers, provide additional flexibility in manufacturing
cellular equipment, and also enhance the market demand for some products. Also,
amending the incidental services rules will allow licensees in the part 22 services
greater flexibility in the types of services they offer. The Commission notes that
the intent underlying its actions is to lessen the levels of regulation, consistent

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                          Page 28
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

with its mandate for undertaking biennial reviews.  The Commission has therefore
described, supra, actions intended to lessen the regulatory burden on carriers and
equipment manufacturers, including small entities.

  88.  Report to Congress: The Commission will send a copy of the Report and Order,
including the associated FRFA, in a report to be sent to Congress pursuant to the
Congressional Review Act, see 5 U.S.C. 801(a)(1)(A).  In addition, the Commission
will send a copy of the Report and Order, including the associated FRFA, to the
Chief Counsel for Advocacy of the Small Business Administration.  A copy of the
Report *77189  and Order and associated FRFA (or summaries thereof) will also be
published in the Federal Register.  See 5 U.S.C. 604(b).

IV.  Ordering Clauses

  89.  Pursuant to the authority of sections 4(i), 7, 303(c), 303(f), 303(g), 303(r),
and 332 of the Communications Act of 1934, as amended, 47 U.S.C. 154(i), 303(c),
303(f), 303(g), 303(r), and 332, the rule changes specified below are adopted.

  90.  The rule changes set forth below will become effective February 18, 2003.

  91.  Certain commercial mobile radio service carriers and other entities must
submit reports regarding access to mobile telephony services by emergency-only
consumers and persons with hearing disabilities at one and two years prior to the
sunset of the rules requiring cellular carriers to provide analog service
compatible with Advanced Mobile Phone Service (AMPS) specifications.

  92.  The Wireless Telecommunications Bureau is authorized to carry out such actions
necessary to transfer the administration of cellular system identification numbers
as identified herein.

Synopsis of the Second Report and Order

I.  Background

  93.  In the NPRM, the Commission proposed to modify various general cellular
service requirements set out in § 22.901 of the Commission's rules.  First, the
Commission proposed deleting current § 22.901(d), which addresses alternative
cellular technologies.  Because the rule is drafted as though the principal
cellular technology is analog technology, the Commission therefore proposed
deleting current § 22.901(d) and adding the following language to the introductory
paragraph of the rule: "In providing cellular services, each cellular system may
incorporate any technology that meets all applicable technical requirements in this
part."

  94.  The Commission also proposed deleting certain §§ 22.901(a) and  22.901(b) of
its rules.  Section 22.901(a) requires that cellular licensees provide subscribers
with information regarding the service area of the cellular provider.  The
Commission sought comment on whether there is any material difference between the
service-area-related information provided by cellular providers in comparison with
other providers of CMRS services.  The NPRM also requested comment on whether, in
light of the current level of competition in the provision of CMRS services, such a
requirement is still necessary to ensure that consumers have access to service-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

area-related information.  Section 22.901(b) requires the cellular licensee to
notify the Commission in the event that a subscriber's request for service is
denied due to lack of cellular system capacity.  See 47 CFR 22.901(b).  The
Commission proposed removing this requirement, noting that the rule does not
provide any mechanism for ameliorating any instance of a lack of system capacity.
The Commission also explained that, given the current level of competition,
consumers who are denied service by a particular provider due to lack of capacity
will be very likely to have other service options.

  95. Further, the Commission proposed deleting the first sentence of the
introductory paragraph, which provides that "Cellular system licensees must provide
cellular mobile radiotelephone service upon request to all cellular subscribers in
good standing . . . ." 47 CFR 22.901.  The Commission also proposed removing the
specific reference in the introductory paragraph that provides that a cellular
system may terminate service when a subscriber "operates a cellular telephone in an
airborne aircraft."

II. Discussion

  96. First, the Commission concludes that the competitive state of the mobile
telephony market renders unnecessary both § 22.901(d) to the extent it
characterizes certain technologies as "primary" or "alternative" as well as the
first sentence in the introductory paragraph of § 22.901 to the extent it requires
licensees to "provide cellular mobile radiotelephone service upon request to all
cellular subscribers in good standing." The Commission deletes the existing text of
§ 22.201(d) (which implies that analog is the principal technology in use).  The
Commission adds a technologically-neutral statement to § 22.901: "In providing
cellular services, each cellular system may incorporate any technology that meets
all applicable technical requirements of this part." Further, the Commission finds
that the statement in the introductory paragraph about provision of service to
"cellular subscribers in good standing" is unnecessary because, even in the absence
of this rule, cellular service providers, like all common carriers, are required to
comply with sections 201 and 202 of Title II of the Act.  Those sections require
cellular carriers to provide service upon reasonable request, to have charges,
practices, classifications, and regulations that are just and reasonable, and to
avoid unjust or unreasonable discrimination in their charges, practices,
classifications, regulations, facilities, or services.  Further, the Commission
notes that there are no other comparable rule requirements placed on other CMRS
licensees.

  97. Second, the Commission finds that it is no longer necessary to require
cellular carriers to provide subscribers with information regarding the service
area of the provider and therefore delete § 22.901(a).  While the Commission agrees
that consumers should have access to information about carriers' service areas
prior to purchasing wireless services, as well as while using the services, it
finds that cellular carriers, as well as PCS and digital SMR carriers are already
making this information available at retail outlets, as well as via the internet.
The Commission notes that PCS and digital SMR providers are doing so without any
comparable regulatory requirement, presumably because consumers demand this
information.  Notably, the Commission believes the rule is no longer necessary
because, even in the absence of the rule, cellular carriers will continue to make
this information available while marketing their services in today's competitive
marketplace.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

98. Third, the Commission finds that the current level of competition renders
unnecessary the provision in § 22.901(b) that carriers must notify the Commission
in the event that a subscriber's request for service is denied due to lack of
capacity.  As a threshold matter, the Commission is unaware of any cellular
licensee having filed such a notification with the Commission. The Commission notes
that carriers must provide sufficient capacity for analog service in instances
where it is required.  In fact, revised § 22.901(b)(2) states in part that
"[c]ellular licensees must allot sufficient system resources such that the quality
of AMPS provided, in terms of geographic coverage and traffic capacity, is fully
adequate to satisfy the concurrent need for AMPS availability." The Commission
believes that this rule provision, combined with the choices of wireless services
available to consumers today, will ensure that consumers of analog services will
continue to receive adequate service even in the absence of the notification
requirement.

99. Finally, the Commission concludes that it is unnecessary to retain the
provision in the introductory paragraph to § 22.901 stating that a carrier may
terminate service to a customer who operates a cellular telephone while on board an
airborne aircraft.  The Commission finds that there is no basis to retain this
provision *77190 because its rules already explicitly prohibit operation of
cellular telephones on board airborne aircraft, and a cellular licensee would be
within its obligations under sections 201 and 202 of the Act in terminating the
service of customers who violate the Commission's rules. Further, such a rule could
be misinterpreted to limit a cellular or other CMRS licensee's ability to terminate
service to customers in the case of other types of rule violations.  Therefore, the
Commission finds that an express condition regarding airborne operation is
unnecessary and potentially confusing to licensees.

III.  Administrative Matters

A. Paperwork Reduction Act Analysis

100.  The actions taken in the Second Report and Order have been analyzed with
respect to the Paperwork Reduction Act of 1995, Public Law No. 104-13, and found to
impose no new or modified recordkeeping requirements or burdens on the public.

B. Final Regulatory Flexibility Analysis

101.  As required by the Regulatory Flexibility Act (RFA), an Initial Regulatory
Flexibility Analysis (IRFA) was incorporated in the NPRM.  The Commission sought
written public comment on the proposals in the NPRM, including comment on the IRFA.
The comments received are discussed below.  The Final Regulatory Flexibility
Analysis (FRFA) conforms to the RFA.

Need for, and Objectives of, the Order

102.  As part of the Commission's year 2000 Biennial Review of regulations, the
Second Report and Order amends part 22 of the Commission's rules by modifying or
eliminating various rules that have become outdated due to technological change,
increased competition in the Commercial Mobile Radio Services (CMRS) market, or
supervening rules.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

Page 31

Summary of Significant Issues Raised by Public Comments in Response to the IRFA

103.  A number of commenters argue that certain portions of § 22.901 should be removed as outdated, duplicative, and unnecessary.  Other commenters, however, argued that the Commission should retain the requirement in § 22.901(a) requiring cellular licensees to provide service area a information to potential customers. They argue that consumers require access to this information in order to make sound choices when purchasing wireless services. Likewise, other commenters urge the Commission to retain the requirement in § 22.901(b) requiring cellular licensees to notify the Commission in the event a consumer's request for service is denied due to lack of capacity.  They argue that eliminating the rule may lead to cellular carriers not providing sufficient capacity for analog services going forward.

Description and Estimate of the Number of Small Entities To Which the Rules Will Apply

104.  Cellular Radiotelephone Service.  The SBA has developed a small business size standard for small businesses in the category "Cellular and Other Wireless Telecommunications." 13 CFR 121.201, North American Industry Classification System (NAICS) code 513322.  Under that SBA category, a business is small if it has 1,500 or fewer employees.  According to the Bureau of the Census, only twelve firms from a total of 1,238 cellular and other wireless telecommunications firms operating during 1997 had 1,000 or more employees. Therefore, even if all twelve of these firms were cellular telephone companies, nearly all cellular carriers were small businesses under the SBA's definition. In addition, the Commission notes that there are 1,807 cellular licenses; however, a cellular licensee may own several licenses. According to the most recent Trends in Telephone Service data, 806 carriers reported that they were engaged in the provision of either cellular service, PCS, or SMR telephony services, which are placed together in that data.  See Trends in Telephone Service, Industry Analysis Division, Common Carrier Bureau, Table 5.3-- Number of Telecommunications Service Providers that are Small Businesses (August 2001).  The Commission has estimated that 323 of these are small under the SBA small business size standard.  Accordingly, based on this data, the Commission estimates that not more than 323 cellular service providers will be affected by these revised rules.

Description of Projected Reporting, Recordkeeping and Other Compliance Requirements

105.  None.

Steps Taken To Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

106.  The Second Report and Order concluded that certain provisions of § 22.901 are unnecessary in light of meaningful economic competition or technological advances.  Therefore, modifying or eliminating these provisions should decrease the costs associated with regulatory compliance for cellular service providers, provide additional flexibility in manufacturing cellular equipment, and also enhance the market demand for some products.

Federal Rules That May Duplicate, Overlap or Conflict With the Proposed Rules

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107.  None.

108.  Report to Congress: The Commission will send a copy of the Second Report and Order, including the associated FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act, see 5 U.S.C. 801(a)(1)(A).  In addition, the Commission will send a copy of the Second Report and Order, including the associated FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.  A copy of the Second Report and Order and FRFA (or summaries thereof) will also be published in the Federal Register.  See 5 U.S.C. 604(b).

List of Subjects

*47 CFR part 22*

 Communications common carriers, Communications equipment , Incorporation by reference, Reporting and recordkeeping requirements.

*47 CFR part 24*

 Communications common carriers.

Federal Communications Commission.

Marlene H. Dortch,

Secretary.

Rule Changes

 For the reasons discussed in the Preamble, the Federal Communications Commission amends 47 CFR part 22 as follows:

PART 22--PUBLIC MOBILE SERVICES

 1.  The authority citation for part 22 continues to read as follows:

 Authority: 47 U.S.C. 154, 222, 303, 309 and 332.

47 CFR § 22.165

 2.  Section 22.165 is amended by revising paragraph (e) to read, as follows:

47 CFR § 22.165

§ 22.165 Additional transmitters for existing systems.

* * * * *
 (e) Cellular radiotelephone service. During the five-year build-out period, the service area boundaries of the additional transmitters, as calculated by the method

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

set forth in § 22.911(a), must remain within the market, except that the service area boundaries may extend beyond the market boundary into the area that is part of the CGSA or is already encompassed by the service area boundaries of previously authorized **77191** facilities. After the five-year build-out period, the service area boundaries of the additional transmitters, as calculated by the method set forth in § 22.911(a), must remain within the CGSA. Licensees must notify the Commission (FCC Form 601) of any transmitters added under this section that cause a change in the CGSA boundary. The notification must include full size and reduced maps, and supporting engineering, as described in § 22.953(a)(1) through (3). If the addition of transmitters involves a contract service area boundary (SAB) extension (see § 22.912), the notification must include a statement as to whether the five-year build-out period for the system on the relevant channel block in the market into which the SAB extends has elapsed and whether the SAB extends into any unserved area in the market. The notification must be made electronically via the ULS, or delivered to the filing place (see § 1.913 of this chapter) once yearly during the five-year build-out on the anniversary of the license grant date.

* * * * *

47 CFR § 22.323

§ 22.323 [Removed]

47 CFR § 22.323

3. Section 22.323 is removed.

47 CFR § 22.367

4. Section 22.367 is amended by removing and reserving paragraph (a)(4) and by revising paragraph (d), to read as follows:

47 CFR § 22.367

§ 22.367 Wave polarization.

* * * * *
 (a) * * *

 (4) [Reserved]

* * * * *
 (d) Any polarization. Base, mobile and auxiliary test transmitters in the Cellular Radiotelephone Service are not limited as to wave polarization. Public Mobile Service stations transmitting on channels higher than 960 MHz are not limited as to wave polarization.

47 CFR § 22.377

§ 22.377 [Amended]

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                           Page 34
67 FR 77175-01, 2002 WL 31814254 (F.R.)
**(Cite as: 67 FR 77175)**

47 CFR § 22.377

5.  Section 22.377 is amended by removing paragraph (c).

47 CFR § 22.901

6.  Section 22.901 is revised to read as follows:

47 CFR § 22.901

§ 22.901 Cellular service requirements and limitations.

  The licensee of each cellular system is responsible for ensuring that its cellular system operates in compliance with this section.

  (a) Each cellular system must provide either mobile service, fixed service, or a combination of mobile and fixed service, subject to the requirements, limitations and exceptions in this section.  Mobile service provided may be of any type, including two way radiotelephone, dispatch, one way or two way paging, and personal communications services (as defined in part 24 of this chapter).  Fixed service is considered to be primary service, as is mobile service.  When both mobile and fixed service are provided, they are considered to be co primary services.  In providing cellular services, each cellular system may incorporate any technology that meets all applicable technical requirements in this part.

  (b) Until February 18, 2008, each cellular system that provides two-way cellular mobile radiotelephone service must--

  (1) Maintain the capability to provide compatible analog service ("AMPS") to cellular telephones designed in conformance with the specifications contained in sections 1 and 2 of the standard document ANSI TIA/EIA-553-A-1999 Mobile Station-- Base Station Compatibility Standard (approved October 14, 1999); or, the corresponding portions, applicable to mobile stations, of whichever of the predecessor standard documents was in effect at the time of the manufacture of the telephone.  This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.  Copies of the standard may be purchased from Global Engineering Documents, 15 Inverness Way East, Englewood, CO 80112-5704 (or via the internet at http:// global.ihs.com).  Copies are available for inspection at the Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554, or the Office of the Federal Register, 800 North Capitol Street, NW., Suite 700, Washington, DC.

  (2) Provide AMPS, upon request, to subscribers and roamers using such cellular telephones while such subscribers are located in any portion of the cellular system's CGSA where facilities have been constructed and service to subscribers has commenced.  See also § 20.12 of this chapter.  Cellular licensees must allot sufficient system resources such that the quality of AMPS provided, in terms of geographic coverage and traffic capacity, is fully adequate to satisfy the concurrent need for AMPS availability.

47 CFR § 22.905

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01                                                              Page 35
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

7.   Section 22.905 is revised to read as follows:

### 47 CFR § 22.905

§ 22.905 Channels for cellular service.

 The following frequency bands are allocated for assignment to service providers in
the Cellular Radiotelephone Service.

 (a) Channel Block A: 869--880 MHz paired with 824--835 MHz, and 890--891.5 MHz
paired with 845--846.5 MHz.

 (b) Channel Block B: 880--890 MHz paired with 835--845 MHz, and 891.5--894 MHz
paired with 846.5--849 MHz.

### 47 CFR § 22.911

8.   Section 22.911 is amended by revising the first sentence in paragraphs  (b)(1)
and (b)(3), to read as follows:

### 47 CFR § 22.911

§ 22.911 Cellular geographic service area.

* * * * *
 (b) * * *

 (1) The alternative CGSA determination must define the CGSA in terms of distances
from the cell sites to the 32 dBuV/m contour along the eight cardinal radials, with
points in other azimuthal directions determined by the method given in paragraph
(a)(6) of this section.  * * *

* * * * *
 (3) The provision for alternative CGSA determinations was made in recognition that
the formula in paragraph (a)(1) of this section is a general model that provides a
reasonable approximation of coverage in most land areas, but may under-predict or
over-predict coverage in specific areas with unusual terrain roughness or features,
and may be inapplicable for certain purposes, e.g., cells with a coverage radius of
less than 8 kilometers (5 miles).  * * *

* * * * *

### 47 CFR § 22.915

§ 22.915 [Removed]

### 47 CFR § 22.915

9.   Section 22.915 is removed.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

<u>47 CFR § 22.917</u>

10. <u>Section 22.917</u> is revised to read as follows:

<u>47 CFR § 22.917</u>

<u>§ 22.917</u> Emission limitations for cellular equipment.

 The rules in this section govern the spectral characteristics of emissions in the Cellular Radiotelephone Service.

 (a) Out of band emissions. The power of any emission outside of the authorized operating frequency ranges must be attenuated below the transmitting power (P) by a factor of at least 43 + 10 log(P) dB.

 (b) Measurement procedure. Compliance with these rules is based on the use of measurement instrumentation employing a resolution bandwidth of 100 kHz or greater. In the 1 MHz bands immediately outside and adjacent to the frequency block a resolution bandwidth of at least one percent of the emission bandwidth of the fundamental emission of the transmitter may be employed. A narrower resolution bandwidth is permitted in all cases to improve measurement accuracy provided the measured power is integrated over the full required measurement bandwidth (i.e. 100 kHz or 1 percent of emission *77192 bandwidth, as specified). The emission bandwidth is defined as the width of the signal between two points, one below the carrier center frequency and one above the carrier center frequency, outside of which all emissions are attenuated at least 26 dB below the transmitter power.

 (c) Alternative out of band emission limit. Licensees in this service may establish an alternative out of band emission limit to be used at specified band edge(s) in specified geographical areas, in lieu of that set forth in this section, pursuant to a private contractual arrangement of all affected licensees and applicants. In this event, each party to such contract shall maintain a copy of the contract in their station files and disclose it to prospective assignees or transferees and, upon request, to the FCC.

 (d) Interference caused by out of band emissions. If any emission from a transmitter operating in this service results in interference to users of another radio service, the FCC may require a greater attenuation of that emission than specified in this section.

<u>47 CFR § 22.919</u>

<u>§ 22.919</u> [Removed]

<u>47 CFR § 22.919</u>

11. <u>Section 22.919</u> is removed.

<u>47 CFR § 22.921</u>

12. <u>Section 22.921</u> is revised to read as follows:

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

### 47 CFR § 22.921

§ 22.921 911 call processing procedures; 911-only calling mode.

 Mobile telephones manufactured after February 13, 2000 that are capable of
operating in the analog mode described in the standard document ANSI TIA/EIA-553-A-
1999 Mobile Station--Base Station Compatibility Standard (approved October 14,
1999--available for purchase from Global Engineering Documents, 15 Inverness East,
Englewood, CO 80112), must incorporate a special procedure for processing 911
calls.  Such procedure must recognize when a 911 call is made and, at such time,
must override any programming in the mobile unit that determines the handling of a
non-911 call and permit the call to be transmitted through the analog systems of
other carriers.  This special procedure must incorporate one or more of the 911
call system selection processes endorsed or approved by the FCC.

### 47 CFR § 22.933

§ 22.933 [Removed]

### 47 CFR § 22.933

 13. Section 22.933 is removed.

### 47 CFR § 22.937

§ 22.937 [Removed]

### 47 CFR § 22.937

 14. Section 22.937 is removed.

### 47 CFR § 22.941

§ 22.941 [Removed]

### 47 CFR § 22.941

 15. Section 22.941 is removed.

### 47 CFR § 22.943

 16. Section 22.943 is revised to read as follows:

### 47 CFR § 22.943

§ 22.943 Limitations on transfer of control and assignment for authorizations
issued as a result of a comparative renewal proceeding.

 Except as otherwise provided in this section, the FCC does not accept applications

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

Page 38

for consent to transfer of control or for assignment of the authorization of a
cellular system that has been acquired by the current licensee for the first time
as a result of a comparative renewal proceeding until the system has provided
service to subscribers for at least three years.

  (a) The FCC may accept and grant applications for consent to transfer of control
or for assignment of the authorization of a cellular system that is to be
transferred as a part of a bona fide sale of an on-going business to which the
cellular operation is incidental.

  (b) The FCC may accept and grant applications for consent to transfer of control
or for assignment of the authorization of a cellular system that is to be
transferred as a result of the death of the licensee.

  (c) The FCC may accept and grant applications for consent to transfer of control
or for assignment of authorization if the transfer or assignment is pro forma and
does not involve a change in ownership.

### 47 CFR § 22.945

§ 22.945 [Removed]

### 47 CFR § 22.945

  17. Section 22.945 is removed.

### 47 CFR § 22.946

  18. Section 22.946 is amended by revising paragraph (b) and (c) to read as
follows:

### 47 CFR § 22.946

§ 22.946 Service commencement and construction systems.

* * * * *
  (b) To satisfy this requirement, a cellular system must be interconnected with the
public switched telephone network (PSTN) and must be providing service to mobile
stations operated by its subscribers and roamers.  A cellular system is considered
to be providing service only if mobile stations can originate telephone calls to
and receive telephone calls from wireline telephones through the PSTN.

  (c) Construction period for specific facilities. The construction period
applicable to specific new or modified cellular facilities for which a separate
authorization is granted is one year, beginning on the date the authorization is
granted.

PART 24--PERSONAL COMMUNICATIONS SERVICES

  19. The authority citation for part 24 continues to read as follows:

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

67 FR 77175-01
67 FR 77175-01, 2002 WL 31814254 (F.R.)
(Cite as: 67 FR 77175)

Authority: 47 U.S.C. 154, 301, 302, 303, 309 and 332.

47 CFR § 24.238

20. Section 24.238 is revised to read as follows:

47 CFR § 24.238

§ 24.238 Emission limitations for Broadband PCS equipment.

The rules in this section govern the spectral characteristics of emissions in the Broadband Personal Communications Service.

(a) Out of band emissions. The power of any emission outside of the authorized operating frequency ranges must be attenuated below the transmitting power (P) by a factor of at least 43 + 10 log(P) dB.

(b) Measurement procedure. Compliance with these rules is based on the use of measurement instrumentation employing a resolution bandwidth of 1 MHz or greater. However, in the 1 MHz bands immediately outside and adjacent to the frequency block a resolution bandwidth of at least one percent of the emission bandwidth of the fundamental emission of the transmitter may be employed.  A narrower resolution bandwidth is permitted in all cases to improve measurement accuracy provided the measured power is integrated over the full required measurement bandwidth (i.e. 1 MHz or 1 percent of emission bandwidth, as specified).  The emission bandwidth is defined as the width of the signal between two points, one below the carrier center frequency and one above the carrier center frequency, outside of which all emissions are attenuated at least 26 dB below the transmitter power.

(c) Alternative out of band emission limit. Licensees in this service may establish an alternative out of band emission limit to be used at specified band edge(s) in specified geographical areas, in lieu of that set forth in this section, pursuant to a private contractual arrangement of all affected licensees and applicants.  In this event, each party to such contract shall maintain a copy of the contract in their station files and disclose it to prospective assignees or transferees and, upon request, to the FCC.

(d) Interference caused by out of band emissions. If any emission from a transmitter operating in this service results in interference to users of another radio service, the FCC may require a greater attenuation of that emission than specified in this section.

[FR Doc. 02-31382 Filed 12-16-02; 8:45 am]

BILLING CODE 6712-01-P

67 FR 77175-01, 2002 WL 31814254 (F.R.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.